ORIGINAL

FILED
AUG 2 5 2005
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTH STAR ALASKA HOUSING CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

05-930C

**COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

Plaintiff North Star Alaska Housing Corporation alleges:

**JURISDICTION**

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491, *et seq.* and 41 U.S.C. § 601, *et seq.*

**THE PARTIES**

2. The plaintiff is North Star Alaska Housing Corporation ("North Star"), an Alaska corporation with its principal offices at 937 Harvard Avenue East, Seattle, Washington 98102.

3. The defendant is the United States of America, acting through officials representing the Secretary of the Army and the Chief of the Army Corps of Engineers (the "Government").

**NATURE OF THE ACTION**

4. This is an action for breach of contract arising out of the lease agreement ("Lease," attached hereto as Exhibit A) between North Star and the Government for the 400-unit Army housing complex on Fort Wainwright, Alaska known as Birchwood Homes or Birchwood Property which was entered into by virtue of the authority of 10 U.S.C. § 2828, as amended by

Section 801 of Public Law 98-115 ("Section 801"). Section 801 introduced privatization into the military housing market, and represents an effort by Congress to ensure that soldiers and their families receive quality, safe, affordable, and convenient housing options that had been lacking when military housing was exclusively Government-run.

5. As set forth below, the Government has breached its Lease with North Star and has acted in bad faith in administering the Lease.

6. Further, pursuant to 28 U.S.C. § 2201-02, North Star seeks a declaration as to the Government's contractual obligations pursuant to the Lease.

7. Prerequisite jurisdictional matters with respect to the filing of this Complaint and with respect to the claims asserted in this Complaint have been met.

8. For six (6) of the fourteen (14) requests for a Contracting Officer's Decision ("COD") which form the basis of this complaint, the contracting officer declined to issue a COD because he contended that the requests implicated the same allegations which are already pending before the Court of Federal Claims.

**BACKGROUND**

9. In February 1985, the United States Army Corps of Engineers (hereafter "COE") issued Request for Proposals (hereinafter "RFP") No. DAC85-85-R-0019 for Design and Construction of 400 units of Section 801 Build-to-Lease On-Base Family Housing for Fort Wainwright, Alaska.

10. North Star submitted proposals in a timely manner for the July 5, 1985 deadline for receipt of initial proposals and for the December 16, 1985 deadline for receipt of best and final offers. The contract was awarded to North Star on December 31, 1985. The contract documents include the following:

(a) Contract No. DACA85-1-86-11, the Outlease of the Government property on Fort Wainwright to North Star for a term of thirty-two (32) years, beginning on June 27, 1986 and ending on June 26, 2018, entered into under the authority of 10 U.S.C. § 2667;

(b) Contract No. DACA85-9-86-27, the Agreement to Lease the same Government property from North Star with residential buildings and other improvements back to the Government, which was effective on June 17, 1986, under the authority of 10 U.S.C. § 2828, as amended by Section 801 of P.L. 98-115;

(c) Contract No. DACA85-87-74, the Interim Lease for the residential units for the period of phased occupancy as the units became ready for habitation until the COE accepted all of the units entered into between COE and North Star on January 24, 1987 and terminating upon execution of the Lease;

(d) Contract No. DACA085-5-88-17, the Lease between COE and North Star for the land and improvements for a term of nineteen (19) years and six (6) months executed on November 6, 1987; and

(e) A Memorandum of Understanding (hereafter "MOU") that sets forth the conditions agreed to by North Star and the COE for acceptance of units during the phased occupancy period, which was effective December 22, 1986.

11. Pursuant to the Lease, the COE is renting all 400 units for nineteen years and six months. The COE pays "shelter rent" for the use of the housing. This is an amount determined

by North Star and submitted as a part of its price proposal to provide for return on and of the capital investment required for construction. In addition, the COE is contracting with North Star for a variety of maintenance and operational services. Payment for these services is called "maintenance rent." The COE is also obligated to pay the rates and charges for utilities used by the Government during the full term of the Lease.

12. Under the Lease, Section C.1.(t), the "normal maximum amounts to be charged in the event of damage to property and equipment installed within a living unit over and above normal wear and tear" are derived from a List of Repair Costs, which is established by North Star with Government approval based on the latest published edition of applicable Engineered Performance Standards Manuals.

## FACTUAL ALLEGATIONS

### I. The Government Continues to Apply a Double Standard to North Star With Respect To Matching of Adjacent Surfaces to the Detriment of North Star's Asset and Which Diminishes the Value of the Birchwood Property

13. Under the Lease, the Government must reimburse North Star for the cost of correcting all occupant-caused damage. Under the Lease, the Government must notify North Star of all occupant-caused damage and associated reimbursement amounts via a work authorization.

14. Section E of the Lease states that "all replacements shall match existing dimensions, material, ... finish, color and design." Section E.2.(b)(6) requires that "[a]ny complete or partial replacement of carpeting shall be in kind." On November 20, 2002, the contracting officer issued a decision that "any carpet being installed must be compatible in kind and color with adjacent installed carpet." On January 31, 2003, the contracting officer issued a decision that "all countertop surfaces in a room ... must match to meet lease requirements."

15. The Government failed to issue a work authorization to North Star for the replacement of occupant-damaged downstairs carpet in Unit 623.

16. The Government instead contracted with a third party Government contractor, CSSI, to replace the downstairs carpet in Unit 623.

17. Although all of the carpet in Unit 623 was a textured loop type carpet, CSSI replaced the downstairs carpet in Unit 623 with a cut pile plush type carpet that did not match the adjacent carpet in kind.

18. On August 31, 2004, North Star requested a contracting officer decision ("COD") on whether the carpet replaced by the Government in Unit 623 was compatible with the adjacent carpet.

19. On October 29, 2004, the contracting officer issued a final decision that the carpet replaced by the Government in Unit 623 was compatible with the adjacent carpet. This decision conflicts with prior CODs on matching and further evidences the double standard the Government applies to North Star.

20. Unit 1256 sustained obvious occupant damage to the upstairs hall bathroom and downstairs vinyl that the Government failed to work authorize.

21. On July 2, 2004, North Star requested that the contracting officer's representative ("COR") inspect the upstairs hall bathroom vinyl and downstairs vinyl in Unit 1256 and determine whether the replacement of the vinyl was necessitated by occupant damage, and thus the financial responsibility of the Government. The COR did not respond.

22. North Star replaced the vinyl in Unit 1256 at its own expense.

23. On August 25, 2004, North Star requested a COD respecting financial responsibility for replacement of the upstairs hall bathroom vinyl and downstairs vinyl in Unit

1256. The amount in dispute was easily determinable by the contracting officer in accordance with the List of Repair Costs.

24. On October 22, 2004, the contracting officer issued a final decision that North Star was responsible for the cost to replace the upstairs hall bathroom vinyl and downstairs vinyl in Unit 1256. Upon information and belief, the contracting officer did not inspect the unit.

25. The Government directed North Star to replace the bathroom vinyl in Unit 916 due to a crack caused by normal wear and tear. The crack, however, was repairable. The Government did not issue a work authorization to North Star for replacement of the adjacent dining room and kitchen vinyl which was damaged by the occupant.

26. Under the Lease, and pursuant to the COD dated November 20, 2002 on flooring matching and January 31, 2003 on countertop matching, replacements must be compatible in kind and color with adjacent areas.

27. The vinyl in the bathroom, dining room, and kitchen of Unit 916 is one large continuous piece of flooring. There is no seam at the bathroom doorway. Accordingly, in order to carry out the Government's directive to replace the bathroom vinyl, North Star had to (and did) replace the dining room and kitchen vinyl in Unit 916.

28. Upon information and belief, the Government directed North Star to replace only the portion of vinyl in the bathroom at North Star's expense to improperly place the cost of replacing the adjacent portions of occupant-damaged vinyl on North Star.

29. On September 1, 2004, North Star requested that the COR make a determination as to financial responsibility for replacement of the occupant damaged dining room and kitchen vinyl in Unit 916.

30. On September 7, 2004, the COR determined that the dining room and kitchen vinyl did not require replacement.

31. On September 9, 2004, North Star requested a COD that the Government was responsible for the cost to replace the adjacent dining room and kitchen vinyl in Unit 916.

32. On November 5, 2004, the contracting officer issued a final decision that the occupant-damaged vinyl in the dining room and kitchen did not require replacement, but that the fair wear and tear vinyl in the bathroom did. The contracting officer also decided that irrespective of the November 20, 2002 and January 31, 2003 CODs, Section E of the Lease, and the fact that the bathroom, kitchen, and dining vinyl was one contiguous piece, the adjacent portions of dining room and kitchen vinyl did not need to be replaced. The contracting officer stated that the amount in dispute was $704.54.

## II. The Government Diminishes the Value of the Birchwood Property by Refusing to Authorize Necessary and Required Maintenance and Repair

33. The Government failed to issue a work authorization to North star for correction of the following occupant damage in Unit 821: a damaged refrigerator door bar; a broken refrigerator door panel; broken refrigerator end caps; damage from a dog chewing and scratching doors and door jams; damaged window blinds and grids; oil in the driveway; water damaged bath cabinet vanity and door; a broken jam stop on a bedroom door; and a missing wheel on the dishwasher rack. The Government's failure to issue a work authorization for these items impairs North Star's ability to maintain the unit in accordance with the standards for maintenance set forth in Section E of the Lease.

34. Because the refrigerator in Unit 821 sustained significant occupant-caused damage it could not remain in the unit for the next tenant. Accordingly, North Star replaced the refrigerator at its cost.

35. On July 13, 2004, North Star requested that the COR make a determination that the Government was required to issue a work authorization for the cost to correct the occupant damaged items in Unit 821 and required to reimburse North Star for the cost of replacing the refrigerator in the amount of $570.90. The COR did not respond.

36. On August 26, 2004, North Star requested a COD on the Government's responsibility to issue a work authorization for the occupant damaged items in Unit 821, and to reimburse North Star via work authorization for the cost to replace the refrigerator.

37. On October 24, 2004, the contracting officer issued a final decision that the Government was responsible for the cost to replace the missing wheel in the dishwasher rack and the interior door panel of the refrigerator, as well as the cost to seal the driveway in Unit 821. The contracting officer decided that although North Star had replaced the refrigerator, the Government was only responsible for the cost to replace the refrigerator's interior door panel. His decision was silent as to the refrigerator end caps.

38. The contracting officer also decided that the doors, door jams, window blinds, and bathroom cabinet and drawers in Unit 821 were acceptable in their present condition, or were repaired or work authorized by the Government.

39. North Star's position is that because replacement of the refrigerator in Unit 821 was necessitated by occupant caused damage, and accomplished by North Star at North Star's expense, the Government should pay the entire cost of replacement.

40. The window blinds in Unit 861 were damaged by the occupant. The Government failed to issue a work authorization for their repair or replacement.

41. North Star did not repair or replace the window blinds in Unit 861. Upon information and belief, the occupant attempted to repair the damaged blinds. The attempted

repair did not satisfy the Standards for Maintenance set forth in Section E of the Lease, and the blinds did not operate properly.

42. On August 12, 2004, North Star requested that the COR make a determination that the blinds in Unit 861 required repair or replacement at the Government's expense. The COR did not respond.

43. On August 26, 2004, North Star requested a COD with respect to the occupant-damaged blinds in Unit 861.

44. On October 25, 2004, the contracting officer issued a final decision that the occupant-caused damage to the window blinds in Unit 861 was satisfactorily repaired by the occupant even though the blinds did not operate properly after the repair.

45. The carpet in Unit 963 was damaged by pet urine. On November 23, 2004, the Government identified that all of the carpet in Unit 963 needed to be replaced due to pet urine damage. Rather than issue a work authorization to North Star for accomplishment of the work, the Government undertook the carpet replacement itself.

46. In order to remediate urine damage, the entirety of a room must be sealed even where the urine damage is only to a portion of the room, as has been the past practice of North Star and the Government.

47. Upon information and belief, the Government replaced the carpet and pad in Unit 963, but did not seal all the flooring.

48. On February 24, 2005, North Star requested a COD that the Government must perform a complete sealing of urine damaged rooms in Unit 963.

49. On April 13, 2005, the contracting officer issued a final decision agreeing with North Star that the parties' prior course of dealing reflected that the common practice was to treat

the complete floor of any room that was damaged by pet urine, before replacing the carpet. However, the contracting officer also decided that the floors in Unit 963 were properly sealed before the carpet was replaced.

50. The occupant of Unit 913 replaced the Moen master bathroom faucet with a Delta brand faucet. North Star does not use Delta brand faucets, or stock an inventory of parts for Delta brand faucets. North Star uses and stocks an inventory of parts for Moen brand faucets.

51. By permitting the occupant to install a brand of faucet that North Star does not stock, the Government impaired North Star's ability to perform necessary repairs. North Star does not stock repair parts for faucets that it does not use, and cannot repair a faucet without the proper repair parts.

52. On September 9, 2004, North Star requested a COD that the occupant or Government may not replace parts in Birchwood homes with models, brands, and kinds other than those which North Star uses and stocks repair parts for.

53. On November 5, 2004, the contracting officer issued a final decision that although Section E of the Lease provides that "[a]ll replacements shall match existing dimensions, material, quality of work, finish, color and design," the occupant was permitted to replace the master bathroom faucet in Unit 913 with a brand that North Star does not stock. The contracting officer also decided that North Star's ability to repair the faucet was not impaired despite that North Star does not have any of the replacement parts for the new faucet. The contracting officer stated that the amount in dispute was $89.71.

## III. The Government Diminishes the Birchwood Property by Permitting Companies Other than North Star to Accomplish Maintenance and Repairs That North Star is Entitled to Perform

54. Under Section C.1 of the Lease, North Star is "responsible for the management, maintenance, repair, replacement, work reception, supervision, ... and all operations required to support the housing site."

55. Under Section E of the Lease, North Star must "maintain[] all real property assets provided for in [the Lease] including dwelling units, garages, carports and other buildings to a standard that prevents deterioration beyond that which results from normal wear and tear, and corrects deficiencies in a timely manner to assure full life expectancy of the facilities and equipment." Section E of the Lease details the Standards for Maintenance to which North Star's units must be kept.

56. The Government has hired companies other than North Star to perform maintenance and repairs in Birchwood housing units that under the Lease North Star is entitled to perform. Upon information and belief, these contractors do not consistently adhere to the Standards for Maintenance contained in the Lease.

57. On July 30, 2004, North Star requested a COD that the Lease does not permit the Government to hire contractors other than North Star to perform repair work and maintenance on Birchwood housing units.

58. On September 27, 2004, the contracting officer issued a final decision that the Government has the authority to accomplish repairs to occupant-caused damage by any means it chooses.

**IV. The Government Continues to Wrongfully Reduce North Star's Rent Which Also Diminishes the Value of the Birchwood Property**

59. On June 30, 2004, the Government stated that $252.52 would be deducted from North Star's rent for alleged excess downtime for May 2004. North Star's records do not support the Government's calculation of 2.5 excess downtime days for May 2004.

60. On August 25, 2004, North Star requested a COD that the Government acted improperly when it deducted $252.52 from North Star's rent based on the Government's calculation of May 2004 downtime, and that the Government's method of calculating the downtime amount was improper.

61. By letter dated October 22, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the claim respecting Rent Payment Withheld by the Government – May 2004 Rent Abatement implicated the same allegations that are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

62. On July 28, 2004, the Government stated that $717.71 would be deducted from North Star's rent for alleged excess downtime for June 2004. North Star's records do not support the Government's calculation of 7 excess downtime days for June 2004.

63. On August 25, 2004, North Star requested a COD that the Government acted improperly when it deducted $717.71 from North Star's rent based on the Government's calculation of June 2004 downtime, and that the Government's method of calculating the downtime was improper.

64. By letter dated October 22, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on

the claim respecting Rent Payment Withheld by the Government – June 2004 Rent Abatement implicated the same allegations that are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

65. On October 22, 2004, the Government stated that $1,896.80 would be deducted from North Star's rent for alleged excess downtime for September 2004. North Star's records do not support the Government's calculation of 18.5 excess downtime days for September 2004.

66. On November 22, 2004, North Star requested a COD that the Government acted improperly when it deducted $1,896.80 from North Star's rent based on the Government's calculation of September 2004 downtime, and that the Government's method of calculating the downtime amount was improper.

67. By letter dated January 18, 2005, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the claim respecting Rent Payment Withheld by the Government – September 2004 Rent Abatement implicated the same allegations that are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

68. On December 2, 2004, the Government stated that $101.01 would be deducted from North Star's rent for alleged excess downtime for October 2004. North Star's records do not support the Government's calculation of 1 excess downtime day for September 2004.

69. On December 6, 2004, North Star requested a COD that the Government acted improperly when it deducted $101.01 from North Star's rent based on the Government's

calculation of October 2004 downtime, and that the Government's method of calculating the downtime amount was improper.

70. By letter dated January 18, 2005, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the claim respecting Rent Payment Withheld by the Government – October 2004 Rent Abatement implicated the same allegations that are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

71. On May 9, 2005, the Government stated that $207.84 would be deducted from North Star's rent for alleged excess downtime for March 2005. North Star's records do not support the Government's calculation of 2 excess downtime days for March 2005.

72. On May 20, 2005, North Star requested a COD that the Government acted improperly when it deducted $207.84 from North Star's rent based on the Government's calculation of March 2005 downtime, and that the Government's method of calculating the downtime amount was improper.

73. By letter dated June 14, 2005, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the claim respecting Rent Payment Withheld by the Government - March 2005 Rent Abatement implicated the same allegations that are already pending before the Court of Federal Claims. North Star deems the decision of the contracting officer not to issue a decision to be a denial of North Star's claim for purposes of seeking judicial relief.

74. The contracting officer has deducted rent from North Star since February 2002 which has diminished the value of the Birchwood Property.

## V. The Government Continues to Deal with North Star in Bad Faith

75. North Star and the Government agree that North Star is entitled to additional downtime to perform repairs on damaged units.

76. North Star has continuously requested additional downtime to perform repairs on damaged units which the Government has failed and refused to do.

77. By letter dated October 22, 2004, the contracting officer declined to issue a final decision because he contended that North Star's Request for a Contracting Officer's Decision on the claim respecting extra time and whether the Government's administration of the Lease in this respect constitutes an act of bad faith implicated the same allegations that are already pending before the Court of Federal Claims.

78. Further, North Star has repeatedly advised the Government that its records do not support the Government's monthly downtime calculations.

## COUNT I

## BREACH OF CONTRACT

79. Paragraphs 1 through 78 above are incorporated by reference as if fully set forth herein.

80. The Government has continued to breach its Lease with North Star.

81. As a direct and proximate result of the Government's breaches, North Star has suffered damages in an amount to be determined at trial, including the diminution in value of the Birchwood Property.

## COUNT II

## BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

82. Paragraphs 1 though 81 above are incorporated by reference as if fully set forth herein.

83. The Lease and other contract documents carry with them the obligation of the parties to conduct their affairs in good faith and to deal fairly with each other.

84. The Government's conduct under the Lease, set forth above, is in direct violation of its duty of good faith and fair dealing.

85. As a direct and proximate result of the Government's conduct, North Star has suffered damages in an amount to be determined at trial, including the diminution in value of the Birchwood Property.

**COUNT III**

**DECLARATORY JUDGMENT**

86. Paragraphs 1 though 85 above are incorporated by reference as if fully set forth herein.

87. There is a substantial controversy between the parties having adverse legal interests and/or sufficient immediacy to warrant issuance of a declaratory judgment.

88. Based upon the actions and inactions of the Government, North Star requests that this court find and declare that North Star's interpretations of the Contract, set forth above, are correct.

**PRAYER FOR RELIEF**

**WHEREFORE**, plaintiff respectfully demands judgment against defendant as follows:

(A) Damages in an amount to be determined at trial, including the diminution in value of the Birchwood Property;

(B) A Declaration that plaintiff's interpretations of the Lease relative to this complaint are correct;

(C) Appropriate interest, attorneys' fees, and costs; and

(D) Such other and further relief as the court deems just and proper.

Dated: August 25, 2005

Respectfully Submitted,

PAUL W. KILLIAN

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave. N.W.
Washington, D.C. 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Plaintiff's Complaint for Damages and Declaratory Relief was served first-class U.S. mail, postage pre-paid, and via hand delivery, this 25 th day of August, 2005, on:

Timothy P. McIlmail, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530

Attorney for Defendant

Paul W. Killian

LEASE NO. DACA85-5-88-17
BETWEEN
THE UNITED STATES OF AMERICA
AND
NORTH STAR ALASKA HOUSING CORPORATION

THIS LEASE is made and entered into as of the 6th day of November, 1987, by and between NORTH STAR ALASKA HOUSING CORPORATION (hereinafter referred to as "Developer") and the United States of America represented by the U.S. ARMY ENGINEER DISTRICT, ALASKA (hereinafter referred to as "Government") by virtue of the authority contained in Title 10, United States Code 2828, as amended by Section 801 of Public Law 98-115.

ARTICLE I

THE PREMISES

In consideration of the mutual benefits accruing to the parties hereto, and of the covenants, agreements, and obligations set out hereafter, the Developer does hereby lease to the Government all of the following land situated on the Fort Wainwright Military Reservation, Fairbanks Recording District, Fourth Judicial District, State of Alaska, as more particularly described in Exhibit "A", attached hereto, together with the improvements constructed and provided thereon, said land and improvements (hereinafter referred to as the "Premises"). The Premises shall be used for housing and other purposes associated therewith.

ARTICLE II

THE TERM

The term of this Lease shall be for nineteen (19) years and six (6) months commencing on November 6, 1987, and terminating on May 5, 2007.

ARTICLE III

ASSIGNMENT AND SUBLETTING

The Government shall have the right to sublet all or any part of the Premises. This Lease, or any part thereof, shall not be conveyed, transferred, assigned, or sold at foreclosure without the prior written approval of the Government, which approval shall not be unreasonably or arbitrarily withheld, so long as such assignee or Purchaser has both experience/expertise in the development, management, and operation of residential housing (or if it does not have such experience/expertise, it retains a management agent which does) and a net worth as determined acceptable by the Government and consists of reputable individuals who have no conflicts of interest vis-a-vis the Federal Government. The assumption of the Developer's rights and obligations hereunder by a Mortgagee, as described in Article XIV hereof, shall not be considered an assignment of this Lease.

ARTICLE IV

RENT

Subject to the provisions of Article VIII, the Government shall pay to the Developer an annual rental, as set forth in Exhibit "B" of this lease, for each housing unit leased, payable monthly in arrears. The Rental shall consist of a shelter rent and a maintenance rent, both of which shall be separately identified in Exhibit "B".

That portion of the annual rental attributable to maintenance shall be increased or decreased at the commencement of each year of the lease after the first year of the lease and ending with the twentieth year of the lease by the increase or decrease in the Housing, Shelter, Maintenance, and Repair Index for the preceding 12 months of the "Economic Indicators" prepared for the Joint Economic Committee of Congress by the Council of Economic Advisors, as published by the Government Printing Office, so as to reflect any increases or decreases in costs incurred by the Developer in maintaining the Premises in accordance with the provisions of this Lease.

It is expressly understood and agreed to by the Developer that the obligations of the Government to make any payments under this agreement and Lease is subject to the availability of appropriations for that purpose.

ARTICLE V

RIGHT OF FIRST REFUSAL

At any time during the term of this Lease and upon expiration or earlier termination, should Developer receive from a third party within six (6) months of said expiration a bona fide offer to purchase the Premises, or any portion thereof, at a specified price, whether such price be first fixed by Developer or the third party, and Developer shall decide to sell the same for such amount, Developer shall promptly give to the Government notice of the terms of such offer and of Developer's willingness to sell for the price offered, and Government shall have the right of first refusal to purchase said Premises at such a price, such option to be exercised within ninety (90) days after the Government receives notice from the Developer. In the event the Government shall not give the Developer notice within said ninety (90) day period of its election to purchase for the amount specified in said offer, the Developer may thereafter sell said improvements to the party making the offer. If for any reason said improvements are not sold to such party, notice of any subsequent bona fide offers, acceptable to the Developer, shall be given to the Government upon the same terms and conditions for acceptance or rejection as hereinabove provided. It is the express and specific intent of the parties hereto that this provision and the right of the Government to exercise its purchase option does not apply to any mortgage, encumbrance, deed of trust, or any other transfer made exclusively or solely for the purpose of securing a loan or other indebtedness. However, in event of a default on a mortgage,

encumbrance, deed of trust, or other such indebtedness, the creditor or any assignee thereof who shall succeed to the interest of the Developer shall be subject to the provisions of this Lease and the Government's right of first refusal.

## ARTICLE VI

## UTILITIES, RATES, CHARGES, TAXES AND ASSESSMENTS

The Government shall pay all rates and charges which may become payable for water, sewer, gas, electric current, oil or other forms of power, fuel, or utility used or utilized by the Government on the leased Premises during the full term of this Lease. Determination of such charges shall be substantiated by metering or submetering. Developer shall be responsible to pay all taxes, general or special, all public rates, dues, and special assessments of every kind which shall become due and payable or which are to be assessed against or levied upon said Premises during the term of this Lease. The Developer will allow the Government to deduct and retain out of any rent of said Premises all such sum and sums of money as the Government shall pay on account of such rates, taxes, and assessments, whether the same shall or shall not have accrued, and become payable for or in respect of the same period out of which the same shall be deducted provided the Government shall give written notice of its intent to so act to the Developer at least thirty (30) days prior to any such payment.

The Developer shall furnish the Government copies of all notices and tax bills which may affect the evaluation of the Premises for general real estate tax purposes or which may affect the levy or assessment of general real estate taxes thereon. Such notices and tax bills shall be delivered or mailed within three (3) days from the receipt thereof by the Developer to the Government's designated representative. The Developer shall cause payment of said general real estate taxes to be made under protest when requested to do so by the Government. The Government may contest the amount or validity of any valuation for general real estate tax purposes or of any levy or assessment of any general real estate taxes by appropriate legal proceedings, either in the name of the Government or the name of the Developer or in the names of both. The Developer, upon reasonable notice and request by the Government, shall join in any such proceedings, but the Developer shall not be subject to any liability for the payment of penalties, costs, or expenses in connection with any proceedings brought by the Government. The Developer shall cooperate with the Government in any such contest or proceeding and execute any documents or pleadings required for such purpose, provided the Developer shall reasonably be satisfied that the facts and data set forth in such documents or pleadings are accurate.

In addition, if the total general real estate taxes levied during a lease year exceed the total general real estate taxes levied during the second lease year, the increase for that year shall be increased by 80% of the excess and reimbursed by the Government. The amount of increase shall be prorated for each housing unit. General real estate taxes are taxes which are assigned on

an *ad valorem* basis, against all taxable real property in the taxing authority's jurisdiction without regard to benefit to the property, for the purpose of funding general governmental services. The term "general real estate taxes" shall exclude any fine, interest, or penalty for nonpayment but shall include any discount offered for prompt payment whether or not the Developer has taken advantage thereof. This increase shall occur only after submission by the Developer of copies of the tax bills, receipts (or other documentary evidence of payment), and a correctly calculated invoice.

## ARTICLE VII

## ALTERATIONS

The Government shall have the right, during the existence of this Lease, to make alterations, attach fixtures, and erect additions, structures, or signs in or upon the Premises. However, no such changes shall be made to any improvement without the written consent of the Developer. Such consent shall not be unreasonably withheld. Structural additions shall become the property of the Developer, and the Government has no obligation to remove or restore them to their original condition. Any nonstructural alterations and improvements which are made shall remain the property of the Government and may be removed or disposed of by the Government or abandoned in place prior to the expiration or upon termination of this Lease or renewal thereof.

## ARTICLE VIII

## MAINTENANCE, REPLACEMENTS, REHABILITATION, REDECORATION, AND REPAIRS

The Developer, at its sole cost and expense, shall operate and perform all maintenance, repairs, replacements, rehabilitation, and redecoration of the Premises in accordance with the requirements, procedures, and criteria set forth in Exhibit "C" of this Lease (Maintenance, Repair and Operational Services Standards Annex). Should Developer fail to provide the necessary maintenance, repairs, replacements, rehabilitation, and redecoration as set forth in Exhibit "C", the Government, at its own option, may avail itself of the remedies or other means of redress specified in Exhibit "C", including performing such services or making such repairs, replacements, rehabilitation maintenance and/or redecoration at its own cost, and deducting the full amount thereof out of any rent that may then or thereafter become due with respect to the Premises or any portion thereof, in accordance with the provisions contained in Exhibit "C".

In addition to rents stipulated in Article IV of this Lease, the Government, at its option, may pay the Developer an incentive fee not to exceed 5 percent (5%) of the maintenance rental for all housing units, for the period of time for which Developer's performance of the obligations and responsibilities contained herein are evaluated and found by the Government to substantially exceed the established standards. The amount of the incentive fee shall be

determined by an Incentive Fee Board based upon the performance of the Developer in operating the Premises in accordance with its obligation. Exhibit "C" contains the provisions to establish the makeup of the Board and the procedures for determining such bonuses.

## ARTICLE IX

## LOSS, DAMAGE, AND INSURANCE

The Developer shall, in any event and without prejudice to any other rights of the Government bear responsibility for loss or damage by fire, lightning, storm, tempest, explosion, impact, aircraft, riot, civil commotion, bursting or overflowing of water tanks, apparatus or pipes, flood; labor disturbances, earthquake, malicious damage (other than Government-caused) or any other casualty or act of God, and shall maintain at the expense of the Developer and at all times during the term of this Lease, insurance coverage against the risks enumerated above with a reputable insurance company and shall ensure that the Government is named as a coinsured on any such policy. In no circumstances will the Developer be entitled to assign to any third party rights of action which the Developer may have against the Government. Developer's liability shall be limited to the leased property.

## ARTICLE X

## DAMAGE OR DESTRUCTION BY FIRE OR OTHER CAUSES

If any of the housing units or improvements are destroyed by fire or other casualty, except in case of the negligence on the part of the occupant, the Government may, at its sole option, terminate this Lease immediately in respect to the destroyed housing unit or units, and if so terminated, no rent shall accrue to the Developer after the date of such destruction. In case of only partial destruction or damage to a housing unit such as to render it untenantable in the judgment of the Government, the Government may, at its sole option, suspend this Lease for that housing unit by giving written notice to the Developer, and if so suspended, no rent shall accrue to the Developer after the date of such partial destruction or damage until the unit is restored and accepted for occupancy by the Government in accordance with Exhibit "C".

## ARTICLE XI

## NOTICES

All notices, payments, and other correspondence required or arising from the terms of this Lease from the Government to the Developer shall be served on or mailed to the Developer at the following address:

North Star Alaska Housing Corporation
937 Harvard Avenue, East
Seattle, Washington 98102

The Government should be notified, in writing, of any changes in the Developer's address. All notices, payment, or other correspondence required or arising from the terms of this Lease from the Developer to the Government shall be served on or mailed to the office of the Government's designated representative. The Government's designated representative shall be:

District Engineer
U.S. Army Engineer District, Alaska
P.O. Box 898
Anchorage, Alaska 99506-0898

## ARTICLE XII

### COVENANT OF TITLE

The Developer covenants that it has lawful authority and title to make this Lease for the term aforesaid, that it will put the Government into complete and exclusive possession of the Premises free from all orders and notices of violations of any public and quasi-public authority, and that, if the Government shall pay the rental and perform all the covenants and provisions of this Lease, the Government shall, during the term hereby demised, freely, peaceably, and quietly occupy and enjoy the full possession of the Premises hereby demised and the tenements, hereditaments, and appurtenances thereto without molestation or hindrance, lawful or unlawful, of any person whomsoever; and if at any time during the term of this Lease the authority or title of the Developer shall fail or be discovered not to enable it to grant the term hereby demised, the Government shall have the option to annul and void this Lease, and thereafter no rent shall become due or payable to the Developer, their successors or assigns.

## ARTICLE XIII

### OFFICIALS NOT TO BENEFIT

No member of or delegate to the Congress of the United States of America, or resident commissioner of the United States of America, shall be admitted to any share or part of this Lease, or to any benefit that may arise therefrom; but this provision shall not be construed to extend to this Lease if made with a corporation for its general benefit.

## ARTICLE XIV

### MORTGAGE OF PREMISES

A. Except as provided herein, the Developer shall not: (i) engage in any financing or other transaction creating any mortgage upon the Premises, (ii) place or suffer to be placed upon the Premises any lien or other encumbrance; or (iii) suffer any levy or attachment to be made on the Developer's interest in the Premises, other than such levy or attachment as may result from a foreclosure of a mortgage. Any such mortgage, encumbrance, or lien shall be deemed to be a violation of this covenant on the date of its execution or filing of record regardless of whether or when it is foreclosed or otherwise enforced.

B. During the term of this Lease, the Developer may encumber its interest in the Premise by way of one or more loans, secured by a mortgage. The proposed holder of any such mortgage (hereinafter referred to as "Mortgagee") must be approved by the Government prior to the execution of such loan, which shall not be unreasonably withheld. Any loan may be further secured by a conditional assignment of this Lease by the Developer to the Mortgagee. The Government agrees to execute an Estoppel/Certificate and any other similar documentation as may reasonably be required by the Mortgagee so as to give its consent to the said conditional assignment of this Lease and to certify as to the status of this Lease and to the performance of the Developer hereunder as of the date of such certification. Notwithstanding any foreclosure, the Developer shall remain liable for the performance of all the terms, covenants, and conditions of this Lease, which by the terms hereof are to be carried out and performed by the Developer.

C. Promptly after assigning or encumbering the Premises, the Developer shall furnish the Government a written notice setting forth the name and address of such Mortgagee. Further, the Developer shall notify the Government promptly of any lien or encumbrance which has been created or attached to the Premises or to the Developer's interest in the Premises whether by act of the Developer or otherwise, of which the Developer itself has notice.

D. If a Mortgagee or purchaser at foreclosure of the mortgage shall acquire the Developer's interest in the Premises by virtue of default by the Developer under the mortgage or otherwise, this Lease shall continue in full force and effect so long as the Mortgagee or purchaser at foreclosure is not in default hereunder. The Mortgagee or purchaser at foreclosure may not appoint an agent or nominee to operate the Premises on its behalf without obtaining the prior written approval of the Government's designated representative; such approval shall not be withheld so long as such proposed agent/nominee has experience/expertise in the development, management and operation of residential housing as determined acceptable by the Government. For the period of time during which the Mortgagee or any purchaser at foreclosure of a mortgage holds the Developer's interest in the Premises, the Mortgagee or such purchaser shall become liable and fully bound by the provisions of this Lease.

## ARTICLE XV

## RIGHTS AND DUTIES OF MORTGAGEES

A. With respect to the Mortgagees, the Government agrees that the following shall apply:

1. If requested by a Mortgagee, which shall have duly registered in writing with the Government its name and address, any notice with respect to a default or a termination of this Lease from the Government to the Developer shall be simultaneously delivered to such Mortgagee at its registered address, and in the event of any such registration, no notice of default or termination

of this Lease given by the Government to the Developer shall be deemed legally effective until and unless like notice shall have been given by the Government to such Mortgagee.

2. Such Mortgagee entitled to such notice shall have any and all rights of the Developer with respect to the curing of any default hereunder by the Developer.

3. The Government will not accept any cancellation by the Developer or enter into any material modification of this Lease without the prior written consent thereto of each Mortgagee who shall become entitled to notice as provided in Article XIV; provided however, that the foregoing shall not apply to any right the Government may have to terminate this Lease pursuant to the terms hereof. It is also agreed that the Developer shall provide any such Mortgagee with notice of any proposed modification.

B. If the Government shall elect to terminate this Lease by reason of any default described herein, each Mortgagee shall have become entitled to notice as provided in this paragraph shall not only have any/all rights of the Developer with respect to curing of any default, but shall also have the right to postpone and extend the specified date for the termination of this Lease (hereinafter called the "Mortgagee's Right to Postpone") in any notice of termination by the Government to the Developer (hereinafter called "Termination Notice") subject to the following conditions:

1. Such Mortgagee shall (i) give the Government written notice of the exercise of the Mortgagee's Right to Postpone prior to the date of termination specified by the Government in the Termination Notice; and (ii) simultaneously pay to the Government all amounts required to cure all defaults then existing (as of the date of the exercise of Mortgagee's Right to Postpone) which may be cured by the payment of a sum of money.

2. Such Mortgagee shall (i) pay all sums for rent and other sums and charges due hereunder during the period from the date of the exercise of Mortgagee's Right to Postpone and thereafter during the period of postponement; (ii) promptly initiate and diligently pursue all reasonable and necessary steps to acquire the Developer's interest in this Lease and the improvements; and (iii) promptly undertake to cure, diligently prosecute and, as soon as reasonably possible, complete the curing of any other default of the Developer which is susceptible of being cured by such Mortgagee.

3. The Mortgagee's Right to Postpone shall extend the date for the termination of this Lease specified in the Termination Notice for a period of not more than six (6) months. If at the end of said six (6) months period such Mortgagee shall be actively and in good faith engaged in steps to acquire the Developer's interest in this Lease and the Improvements, the time for such Mortgagee to comply with the provisions of this Article shall be extended, for such reasonable period as may be necessary under the circumstances, provided that such Mortgagee uses its best efforts and continues to diligently pursue all reasonable and necessary steps to acquire the Developer's interest in the Premises.

4. If, before the date specified for the termination of this Lease as extended by such Mortgagee's exercise of Mortgagee's Right to Postpone, (i) the Developer shall be duly removed from possession; (ii) the assumption required by Article III of performance and observance of the convenants and conditions herein contained on the Developer's part to be performed shall be delivered to the Government by the Mortgagee, or its nominee; and (iii) the Mortgagee shall have complied with all obligations on the Government's part to be performed hereunder and no further default shall have occurred hereunder which shall not have been cured within the periods of time after notice above provided for, then and in such event, all defaults under this Lease shall be deemed to have been cured, and the Government's Termination Notice shall be deemed to have been withdrawn.

C. Nothing herein contained shall be deemed to impose any obligation on the part of the Government to deliver physical possession of the demised Premises to such holder of a mortgage.

D. If more than one Mortgagee shall seek to exercise any of the rights provided for in this Article, the holder of the mortgage having priority of lien over the other Mortgagees shall be entitled, as against the others, to exercise such rights. Should a dispute arise among Mortgagees regarding the priority of lien, the Mortgagees must prove, to the satisfaction of the Government, that they have settled this dispute.

E. The Mortgagee may not appoint an agent or nominee to manage the Premises on its behalf without first obtaining the written approval of the Government. Such approval shall not be withheld so long as such agent/nominee has experience/expertise in the management and operation of residential developments similar to the Premises, as determined by the Government.

ARTICLE XVI

DISPUTES

A. That, except as otherwise provided in this lease, any dispute concerning a question of fact arising under this lease which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Developer. The decision of the said officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the Developer mails or otherwise furnishes to the said officer a written appeal addressed to the Secretary of the Army. The decision of the Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding under this condition, the Developer shall be afforded an opportunity to be heard and to offer evidence in support

of its appeal. Pending final decision of a dispute hereunder, the Developer shall proceed diligently with the performance of the contract and in accordance with the said officer's decision.

B. This Article does not preclude consideration of questions of law in connection with decisions provided for in paragraph A above; nothing in this Article shall be construed as making final the decision of any administrative official, representative, or board on a question of law.

## ARTICLE XVII

## GRATUITIES

A. The right of the Developer to proceed may be terminated by written notice if, after notice of hearing, the agency head or a designee determines that the Developer, its agent, or another representative -

1. Offered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government; and

2. Intended, by the gratuity, to obtain a contract or favorable treatment under a contract.

B. The facts supporting this determination may be reviewed by any court having lawful jurisdiction.

C. If this contract is terminated under paragraph A. above, the Government is entitled:

1. To pursue the same remedies as in a breach of the contract; and

2. In addition to any other damages provided by law, to exemplary damages of not less than three (3) nor more than ten (10) times the cost incurred by the Developer in giving gratuities to the person concerned, as determined by the agency head or a designee. (This subparagraph C.2. is applicable only if this contract uses money appropriated to the Department of Defense.)

D. The rights and remedies of the Government provided in this clause shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract.

## ARTICLE XVIII

## COVENANT AGAINST CONTINGENT FEES

A. The Developer warrants that no person or selling agency has been employed or retained to solicit or secure this Lease Agreement upon an agreement or understanding, for a commission, percentage, brokerage, or contingent fee, excepting bona fide employees or bona fide established commercial or selling agencies maintained by the Developer for the purpose of securing business.

For breach or violation of this warranty, the Government shall have the right to cancel this Lease Agreement without liability, or in its discretion, to deduct from the rental or consideration, or otherwise recover, the full amount of such commission, percentage, brokerage or contingent fee.

B. "Bona fide agency," as used in this clause, means an established commercial or selling agency, maintained by a contractor for the purpose of securing business, that neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds itself out as being able to obtain any Government contract or contracts through improper influence.

1. "Bona fide employee," as used in this clause, means a person employed by a contractor and subject to the contractor's supervision and control as to time, place, and manner of performance, who neither exerts nor proposes to exert improper influence to solicit or obtain Government contracts nor holds out as being able to obtain any Government contract or contracts through improper influence.

2. "Contingent fee," as used in this clause, means any commission, percentage, brokerage, or other fee that is contingent upon the success that a person or concern has in securing a Government contract.

3. "Improper influence," as used in this clause, means any influence that induces or tends to induce a Government employee or officer to give consideration or to act regarding a Government contract on any basis other than the merits of the matter.

## ARTICLE XIX

## EXAMINATION OF RECORDS

A. This clause applies if this agreement exceeds $10,000 and was entered into by negotiation.

B. The Comptroller General of the United States or a duly authorized representative from the General Accounting Office shall, until 3 years after final payment under this contract or for any shorter period specified in Federal Acquisition Regulation (FAR) Subpart 4.7, Developer Records Retention, have access to and the right to examine any of the Developer's directly pertinent books, documents, papers, or other records involving transactions related to this contract.

C. The Developer agrees to include in first-tier subcontracts under this contract a clause to the effect that the Comptroller General or a duly authorized representative from the General Accounting Office shall, until 3 years after final payment under the subcontract, or for any shorter period specified in FAR Subpart 4.7, have access to and the right to examine any of the subcontractor's directly pertinent books, documents, papers, or other records involving transactions related to the subcontract. "Subcontract," as

used in this clause, excludes (1) purchase orders not exceeding $10,000 and (2) subcontracts or purchase orders for public utility services at rates established to apply uniformly to the public, plus any applicable reasonable connection charge.

D. The periods of access and examination in paragraphs B and C. above for records relating to (1) appeals under the Disputes clause, (2) litigation or settlement of claims arising from the performance of this contract, or (3) costs and expenses of this contract to which the Comptroller General or a duly authorized representative from the General Accounting Office has taken exception shall continue until such appeals, litigation, claims, or exceptions are disposed of.

## ARTICLE XX

## ASSIGNMENT OF CLAIMS

A. The Developer, under the Assignment of Claims Act, as amended, 31 U.S.C. 203, 41 U.S.C. 15 (hereafter referred to as "the Act"), may assign its rights to be paid amounts due or to become due as a result of the performance of this contract to a bank, trust company, or other financing institution, including any Federal lending agency. The assignee under such an assignment may thereafter further assign or reassign its right under the original assignment to any type of financing institution described in the preceding sentence.

B. Any assignment or reassignment authorized under the Act and this clause shall cover all unpaid amounts payable under this contract, and shall not be made to more than one party, except that an assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in the financing of this contract.

C. The Developer shall not furnish or disclose to any assignee under this contract any classified document (including this agreement) or information related to work under this contract until the Contracting Officer authorizes such action in writing.

## ARTICLE XXI

## EQUAL OPPORTUNITY CLAUSE

The following clause is applicable unless this lease is exempt under the rules, regulations, and relevant orders of the Secretary of Labor (41 CFR, ch. 60).

A. If, during any 12-month period (including the 12 months preceding the award of this contract), the Developer has been or is awarded nonexempt Federal contracts and/or subcontracts that have an aggregate value in excess of $10,000, the Developer shall comply with subparagraphs B. 1 through 11 below. Upon request, the Developer shall provide information necessary to determine the applicability of this clause.

B. During performance of this contract, the Developer agrees as follows:

1. The Developer shall not discriminate against any employee or applicant for employment because of race, color, religion, sex, or national origin.

2. The Developer shall take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex, or national origin. This shall include, but not be limited to (i) employment; (ii) upgrading; (iii) demotion; (iv) transfer; (v) recruitment or recruitment advertising; (vi) layoff or termination; (vii) rates of pay or other forms of compensation; and (viii) selection for training, including apprenticeship.

3. The Developer shall post in conspicuous places, available to employees and applicants for employment the notices to be provided by the Contracting Officer that explain this clause.

4. The Developer shall, in all solicitations or advertisement for employees placed by or on behalf of the Developer, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex, or national origin.

5. The Developer shall send, to each labor union or representative of workers with which it has a collective bargaining agreement or other contract or understanding, the notice to be provided by the Contracting Officer advising the labor union or workers' representative of the Developer's commitments under this clause, and post copies of the notice in conspicuous places available to employees and applicants for employment.

6. The Developer shall comply with Executive Order 11246, as amended, and the rules, regulations, and orders of the Secretary of Labor.

7. The Developer shall furnish to the contracting agency all information required by Executive Order 11246, as amended, and by the rules, regulations, and orders of the Secretary of Labor. Standard Form 100 (EEO-1), or any successor form, is the prescribed form to be filed within thirty (30) days following the award, unless filed within twelve (12) months preceding the date of award.

8. The Developer shall permit access to its books, records, and accounts by the contracting agency or the Office of Federal Contract Compliance Programs (OFCCP) for the purposes of investigation to ascertain the Developer's compliance with the applicable rules, regulations, and orders.

9. If the OFCCP determines that the Developer is not in compliance with this clause or any rule, regulation, or order of the Secretary of Labor, this contract may be canceled, terminated, or suspended in whole or in part and the Developer may be declared ineligible for further Government contracts, under the procedures authorized in Executive Order 11246, as amended. In addition, sanctions may be imposed and remedies invoked against the Developer as

provided in Executive Order 11246, as amended, the rules, regulations, and orders of the Secretary of Labor, or as otherwise provided by law.

10. The Developer shall include the terms and conditions of subparagraph B. 1. through 11. of this clause in every subcontract or purchase order that is not exempted by the rules, regulations, or orders of the Secretary of Labor issued under Executive Order 11246, as amended, so that these terms and conditions will be binding upon each subcontractor or vendor.

11. The Developer shall take such action with respect to any subcontractor or purchase order as the contracting agency may direct as a means of enforcing these terms and conditions, including sanctions for noncompliance; provided that if the Developer becomes involved in, or is threatened with, litigation with a subcontractor or vendor as a result of any direction, the Developer may request the United States to enter into the litigation to protect the interests of the United States.

C. Notwithstanding any other clause in this contract, disputes relative to this clause will be governed by the procedures in 41 CFR 60-1.1.

## ARTICLE XXII

## FACILITIES NONDISCRIMINATION

A. As used in this section, the term "facility" means stores, shops, restaurants, cafeterias, restrooms, and any other facility of a public nature in the building in which the space covered by this Lease is located.

B. The Developer agrees that he will not discriminate, by segregation or otherwise, against any person or persons because of race, color, religion, sex, or national origin in furnishing, or by refusing to furnish, to such person or persons the use of any facility, including any and all services, privileges, accommodations, and activities provided thereby. Nothing herein shall require the furnishing to the general public of the use of any facility customarily furnished by the Developer solely to occupants, their employees, customers, patients, clients, guests and invitees.

C. It is agreed that upon the Developer's noncompliance, the Government may take appropriate action to enforce compliance, may terminate this Lease, or may pursue such other remedies as may be provided by law. In the event of termination, the Developer shall be liable for all excess costs of the Government in acquiring substitute space, including but not limited to the cost of moving to such space. Substitute space shall be obtained in as close proximity to the Developer's building as is feasible and moving costs will be limited to the actual expenses thereof as incurred.

D. It is further agreed that from and after the date hereof the Developer will, at such time as any agreement is to be entered into or a concession is to be permitted to operate, include or require the inclusion of the foregoing provisions of this section in every such agreement or concession pursuant to which any person other than the Developer operates or has the right to operate

any facility. Nothing herein contained, however, shall be deemed to require the Developer to include or require the inclusion of the foregoing provisions of this section in any existing agreement or concession arrangement or one in which the leasing party other than the Developer has the unilateral right to renew or extend the agreement or arrangement, until the expiration of the existing agreement or arrangement and unilateral right to renew or extend. The Developer also agrees that it will take any and all lawful actions as expeditiously as possible, with respect to any such agreement as the leasing agency may direct, as a means of enforcing the intent of this section, including, but not limited to, termination of the agreement or concession and institution of court action.

## ARTICLE XXIII

## MISCELLANEOUS PROVISIONS

A. If this Lease or any term or provision thereof or the application thereof to any person or circumstances shall, to any extent be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

B. All of the covenants, conditions, and obligations contained in this Lease shall be binding upon and inure to the benefit of the respective successors and assigns of the Developer to the same extent as if each successor and assign were in each case named as a party to this Lease. Any person, corporation, or other legal entity acquiring any or all of the rights, title, and interest of the Developer in and to leasehold estate in the Premises shall thereby become liable under and be fully bound by all of the provisions of this Lease.

C. The parties herein agree that nothing herein nor any prior agreements between the Developer and the Government shall be deemed or construed by the parties hereto or by any third party as creating or authorizing the creation of any partnership or joint venture between the Government and the Developer, it being understood and agreed that no provision of this Lease, nor any act of the Government or the Developer hereafter, shall be deemed to create any relationship between the Government and the Developer other than the relationship of tenant and landlord.

D. The specified remedies to which the Government may resort under the terms of this Lease are cumulative and are not intended to be exclusive of any other remedies or means of redress to which the Government may be lawfully entitled in case of any breach or threatened breach by the Developer of any provisions of this Lease. The failure of the Government to insist in any one or more cases upon the strict performance of any of the covenants of this Lease on the

part of the Developer to be performed or to exercise any option herein contained shall not be construed as a waiver or relinquishment for the future of such covenant or option. Payment by the Government of the rental with knowledge of the breach by the Developer of any covenant shall not be deemed a waiver of such breach and no waiver by the Government of any provisions of this Lease shall be deemed to have been made unless expressed in writing signed by a duly authorized agent of the Government.

E. The Developer shall comply with all laws, codes, and ordinances applicable to the developership and operation of the Premises, and at its own expense, obtain all necessary permits and related items.

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names as of the date first above written.

NORTH STAR ALASKA HOUSING CORPORATION

Witness

Vice-president

The UNITED STATES OF AMERICA

Witness

Payment will be made by Disbursing Officer, 6th Infantry Division (Light), ATTN: AFVR-DE-H, Fort Richardson, AK 99505-5500.
Appropriation Data:

CORPORATE CERTIFICATE

I, Teri A. Fischer, certify that I am the Secretary of NORTH STAR ALASKA HOUSING CORPORATION, Lessor ("Developer") in the above and foregoing lease; that R.W. Fischer, who executed the same on behalf of said corporation, was then its Vice President; that the above and foregoing lease was duly signed for and on behalf of said corporation by authority of its governing body and within the scope of its corporate powers.

DATED this 30th day of September, 1987.

Teri A Fischer

(Corporate Seal)

EXHIBIT A
LEASE NO. DACA85-5-88-17

FT. WAINWRIGHT, ALASKA
LEGAL DESCRIPTION

A parcel of land located within Section 12, Township 1 South, Range 1 West, Fairbanks Meridian, Fairbanks Recording District, Fourth Judicial District, State of Alaska; as shown on attached Exhibit "A", said parcel being more particularly described as follows:

Beginning at a point that is common to Section 1, 12, 11 and 2, T.1S., R.1W., F.M.; thence easterly along the section line between Section 1 and Section 12, said line being common with the north boundary of Block 5, Northeast portion of Hamilton Acres Plat, as recorded in the Fairbanks Recording District, a distance of 1320.86 feet to the W. 1/16, Section 1, Section 12, T.1 S., R.1 W., F.M.; thence southerly along the west boundary of Fort Wainwright, said line being common to the east boundary of the Northeast Portion of Hamilton Acres Plat, as recorded in the Fairbanks Recording District, a distance of 1454.38 feet, to the existing centerline of the Alaska Railroad; thence southerly along the west boundary of Fort Wainwright, a distance of 29.45 feet, to a point that is 25.00 feet perpendicular to the existing centerline of the Alaska Railroad, said point being the True Point of Beginning; thence S 58 degrees 06′ 26" E along a line, said line being 25.00 foot southerly and parallel to the existing centerline of the Alaska Railroad, a distance of 1335.43 feet to the beginning of a curve concave to the northeast having a radius of 991.14 feet; thence northeasterly along said curve through a central angle of 41 degrees 50′ 51" and an arc distance of 723.91 feet to the point of tangent; said curve being 25.00 feet southerly and parallel to the existing centerline of the Alaska Railroad; thence N 80 degrees 02′ 43" E along a line, said line being 25.00 feet southerly and parallel to the existing centerline of the Alaska Railroad, a distance of 654.33 feet, to a point that is 25.00 feet perpendicular to the existing centerline of the Alaska Railroad and is 50.00 feet perpendicular to the existing centerline of Fegree Road; thence S 13 degrees 44′ 03" W along a line, said line being 50.00 feet westerly and parallel to the existing centerline of Fegree Road, a distance of 1059.55 feet to the beginning of a curve concave to the southeast having a radius of 1820.04 feet; thence southwesterly along said curve through a central angle of 12 degrees 49′ 05" and arc distance of 407.18 feet to a point; said curve being 50.00 feet westerly and parallel to the existing centerline of Fegree Road, said point also being 110.00 feet southerly and parallel to the approach-departure zone of Runway 6L; thence N 82 degrees 27′ 57" W along a line, said line being 110.00 feet southerly and parallel to the approach-departure zone of Runway 6L, a distance of 2188.44 feet, to a point on the west boundary of Fort Wainwright and Southeast Portion of Hamilton Acres Plat and 110.00 feet southerly to the approach-departure zone of Runway 6L; thence N 00 degrees 00′ 44" W along a line, said line being common to the west boundary of Fort Wainwright and the east boundary of the Southeast Portion and the Middle East Portion of Hamilton Acres Plat, a distance of 1872.46 feet, to the True Point of Beginning. Said parcel containing 76.021 acres more or less.

W.O. 2470
JAN. 1986

# EXHIBIT 'A'

SCALE: 1" = 800'




| | | |
|---|---|---|
| ① | S 58° 06' 26" E | 1355.45' |
| ② | L = 723.91' Δ = 41° 50' 51" | R = 991.14' |
| ③ | N 80° 02' 43" E | 654.33' |
| ④ | S 13° 44' 03" W | 1059.55' |
| ⑤ | L = 407.18' Δ = 12° 49' 05" | R = 1820.04' |
| ⑥ | N 82° 27' 57" W | 2188.44' |
| ⑦ | N 00° 00' 44" W | 1872.46' |

LEASE NO. DACA85-5-88-17

EXHIBIT B

ANNUAL RENT

The total annual rental for housing units shall be as follows:

| | Shelter Rent | Maintenance Rent |
|---|---|---|
| 5 Bedroom Units: | | |
| Shelter x Quantity<br>$18,430 x 28 | $516,040 | |
| Maintenance x Quantity<br>$2,600 x 28 | | $72,800 |
| 4 Bedroom Units: | | |
| Shelter x Quantity<br>$17,550 x 68 | $1,193,400 | |
| Maintenance x Quantity<br>$2,450 x 68 | | $166,600 |
| 3 Bedroom Units: | | |
| Shelter x Quantity<br>$16,670 x 304 | $5,067,680 | |
| Maintenance x Quantity<br>$2,350 x 304 | | $714,400 |

Total Rental (400 Units):

| | Shelter | Maintenance | Total |
|---|---|---|---|
| Annually | $6,777,120.00 | $953,800.00 | $7,730,920.00 |
| Monthly | $564,760.00 | $79,483.33* | $644,243.33 |

*Monthly payment requires adjustment for repeating decimal.

EXHIBIT C

<u>MAINTENANCE, REPAIR AND OPERATIONAL SERVICES</u>
<u>STANDARDS ANNEX</u>

INDEX

A. GENERAL

B. DEFINITIONS

C. RESPONSIBILITIES

1. DEVELOPER RESPONSIBILITIES

2. GOVERNMENT RESPONSIBILITIES

3. OCCUPANT RESPONSIBILITIES

D. MAINTENANCE MANAGEMENT

E. STANDARDS FOR MAINTENANCE OF STRUCTURES

F. STANDARDS FOR MAINTENANCE OF OTHER REAL PROPERTY

G. STANDARDS FOR PROVISION OF OPERATIONAL SERVICES

H. PAYMENTS AND DEDUCTIONS

EXHIBITS

1. CURRENT BAQ/VHA RATES

2. SAMPLE LIST OF REPAIR COSTS

3. NOTIFICATION OF SCHEDULED CHANGE OF OCCUPANCY

4. WORK AUTHORIZATION

5. NOTIFICATION OF WORK COMPLETION

6. ENERGY CONSUMPTION ANALYSIS

A. GENERAL: The work to be accomplished by the Developer within the scope and intent of this annex includes the maintenance and repair of all family housing units and other real property within the housing site as well as both built-in and movable equipment provided by the Developer therein. Included in the operational services to be provided are entomological, janitorial, refuse and snow removal, and street cleaning services. The scope of work also includes various management tasks to be provided by the Developer. This annex describes the work to be accomplished, delineates some of the procedures, and establishes the acceptable standards for performing this work.

B. DEFINITIONS:

1. Abandonment: Unoccupied unit which was unofficially vacated by a occupant with no intent to return.

2. Acceptance Inspection: The inspection of a vacant unit between changes of occupancy or subsequent to completion of renovation work to ensure that all work has been completed satisfactorily and that the unit is in a presentable condition for viewing and acceptance by a prospective occupant.

3. Assignment: The formal provision of quarters to eligible personnel Government.

4. Basic Allowance for Quarters (BAQ)/Variable Housing Allowance (VHA): The housing allowances program(s) prescribed by Public Law, as amended, and any successor housing allowances program, provided to the military member to offset the cost of housing. The current BAQ and VHA rates and methods for calculating the current average daily rates are provided in Exhibit 1.

5. Beneficial Occupancy Date: The date upon which all units constructed under this agreement are completed, are accepted by the Government, and are available for occupancy.

6. Catastrophe: A sudden event or situation resulting in severe damage, loss or destruction.

7. Change of Occupancy: The termination of assignment by the Government of a occupant to a unit or the assignment of a occupant by the Government to a unit and the associated downtime occurring between these two events.

8. Common Areas: Areas which are not assigned to any one unit or occupant for care and maintenance. Examples of common areas are common hallways, stairs, and utility areas of multi-dwelling units, grounds not assigned to a occupant, central trash collection points, or administrative space.

9. Developer: The party who is conveying real property to the United States Government by lease.

10. Downtime: The period of time during which a unit is vacant and has been officially turned over to the Developer for accomplishment of required work. For purposes of this lease agreement, downtime is measured in working days, vice calendar days.

11. Emergency/Service Call: A request for unscheduled repairs in order to correct a condition which threatens the safety or sanitation of occupants or their property, or is otherwise deemed to cause enough of a threat of further deterioration that corrective action cannot be further postponed.

12. Facility History Jacket: An official file for each dwelling unit and/or facility identified by address for the purpose of containing documents of work in progress or completed.

13. Field Activity: The military installation to which responsibility for fulfilling all Government functions and contractual obligations is assigned.

14. Government: The party that holds real property under this lease; in this instance, the United States Government through the Department of the Army.

15. Housing Project Manager: The individual(s), designated by the Government, who is/are charged with the responsibility for the day-to-day administration of the housing site and fulfillment of the Government's responsibilities under the terms of this lease agreement.

16. Housing Site: A locally defined, readily identifiable grouping of dwelling units and associated structures within an approximate area.

17. Items of Work: The following is a list of items of work which will be the basis for assessing administrative fees in accordance with H.1(a)(1)a. of this annex:

E/S Calls (each)
Exterior Walls
Roofing
Gutters, downspouts and splash blocks
Overhangs
Windows, doors, screens and shutters
Miscellaneous roof structures
Interior walls
Concrete floors
Subflooring
Hardwood flooring
Floor covering
Ceramic tile
Carpeting
Stairways
Ceilings
Venetian blinds and shades
Drapery rods
Interior trim
Built-in cabinetry
House accessories
Keys and locks
Electrical systems
Plumbing systems
HVAC systems
Filter replacement

Roads, streets, curbing
Sidewalks
Driveways
Parking areas
Grass mowing and trimming
Hedges and shrubs
Weed and brush control
Trees
Grasses and ground cover
Irrigation
Leaf collection
Plant disease and insect control
Care of flower beds
Policing of grounds
Drainage systems
Miscellaneous structures
Master TV antenna
Playground/tot lot equipment
Refuse collection
Pest control
Sweeping/dust mopping
Vacuuming rugs
Cleaning carpets/rugs
Damp mopping
Buffing
Waxing

Preventive maintenance
Appliance maintenance/repair/ replacement (each item)
Interior/exterior painting (each unit)
Utility systems (each system)
Cleaning glass
Cleaning venetian blinds
Cleaning light fixture covers
Spot-washing walls
Cleaning vents
Stripping and rewaxing
Dusting
Cleaning/servicing restrooms and showers
Cleaning drinking fountains
Repair damaged/inoperable items
Moveable equipment (each item)
Installed equipment (each item)
Cleaning door exteriors

18. Maintenance: The recurring periodic or scheduled work required to preserve real property facilties, systems, moveable equipment, and accessories in such condition that they may be effectively utilized for their designated purpose.

19. Moveable Equipment: Durable appliance items such as ranges and refrigerators.

20. Occupant: The military member, Department of Defense (DOD) civilian or any other person assigned by the service to a specific unit for occupancy.

21. Operational Services: Municipal-type services designed to enhance the environment and habitability of the housing site, provide protection for life and property, and ensure equitable treatment for occupants.

22. Other Real Property (ORP): Areas and structures, excluding the dwelling unit, assigned and constructed within the housing site. Includes utility distribution systems, roads, grounds, drainage system and miscellaneous structures.

23. Pest Control: The prevention, destruction, repelling, or mitigating of an unwanted organism (animal, plant, bacteria, fungus, virus, etc.).

24. Pre-Termination Inspection: The inspection of a unit prior to the termination of a occupant's assignment to that unit during which time the occupant's responsibilities and maintenance deficiencies are identified.

25. Preventive Maintenance: The correction of incipient failures in the built-in or movable equipment of a unit, and other components of the unit before they develop into major defects or cause breakdowns. Preventive maintenance includes the periodic service of such equipment, per manufacturer recommendations, to ensure efficient operation.

26. Repair: The restoration of real property facilities, systems, moveable equipment, and accessories to such condition that they may be effectively utilized for their designated purpose.

27. Restoration: Reconstruction of a structure to its original form or condition.

28. Site Manager: Primary point of contact authorized to act for the Developer in all matters regarding work required at the housing site.

29. Structure: Any building, dwelling unit, or improvement thereto constructed within the terms of the lease and located at the housing site.

30. Termination: The formal cessation of assignment by the Government of a occupant to a unit.

31. Termination Inspection: The inspection of a unit after a unit is vacated prior to the formal termination of assignment of a occupant to that unit.

32. Uninhabitable: Condition in which a unit is determined by the Government not to be safe, decent, or sanitary. Examples of such conditions include, but are not limited to, prolonged disruption of utility service, inability to use range or refrigerator, heating system failure, loss of protection of tenants or belongings from outside elements, and threats to the health of the tenants or to the security of the tenants or their property.

33. Work Authorization: An official document issued by the Government for the accomplishment of work by the Developer and which is used to verify entitlement for reimbursement.

34. Work Order: A chit or other medium which is used by the Developer to document all maintenance, repair, or renovation work accomplished by the Developer in accordance with the terms of this lease agreement.

35. Work Reception Desk: A location within the Developer's administrative space for the purpose of receiving emergency/service calls.

C. RESPONSIBILITIES:

1. Developer Responsibilities: The Developer is responsible for the management, maintenance, repair, replacement, work reception, supervision, procurement, supply, transportation, equipment, tools, accounting, administrative services, and all operations required to support the housing site. This includes, but is not limited to, housing units, utility systems, common areas, grounds, trees, shrubbery, sidewalks, parking areas, driveways, roads, access roads, recreational facilities, and all other components and systems of the total housing site insofar as such responsibilities are not normally undertaken by local governmental authorities.

(a) Onsite Administrative Space for Developer Use: The Developer shall provide and maintain onsite administrative space required for performance of this annex. If there is more than one housing site, this space shall be located in the site that is the most centrally located in terms of time and distance in relation to the other sites. All files relating to the housing site which are required eleswhere in this annex shall be located within this space. The Developer shall be responsible for the cost of all utilities provided for this space.

(b) Onsite Facilities for Government Use: The Developer will provide a minimum of 400 square feet of office space and operational facilities for the sole use of the Government. The length of any wall shall not be less than 16 feet. This space shall be located either at the entrance to the housing site or at a central location within the housing site. If there is more than one housing site, this space shall be located in the site that is the most

centrally located in terms of time and distance in relation to the other sites. This space shall be served by an outside entrance with locks, and shall be provided with heating, ventilation and air conditioning, telephone hook-ups, lighting, and electricity. Adjacent parking area shall also be provided which is sufficient to accommodate a minimum of four vehicles and which is dedicated solely for use of the Government. In addition to the office space, separate men's and women's restrooms will be accessible from inside the office space.

(c) Personnel Requirements:

(1) The Developer shall designate a site manager, who is delegated full authority to act for the Developer in all matters pertaining to work required by this annex. The site manager shall be located onsite or at the centrally located site Monday through Friday from 0800 to 1630 hours. The site manager or his designee shall be able to be reached by telephone or electronic "beeper" at all other times.

(2) The Developer shall furnish sufficient personnel to perform all work specified within this annex. All personnel employed by the Developer shall be experienced in their respective trade or profession.

(3) This annex requires the Developer's employees to conduct themselves in a proper and efficient manner at all times and especially maintain a courteous and businesslike relationship with occupants. The Developer expressly agrees to remove, from the site, any employee who fails to do so. All of the Developer's employees working under this annex shall be identified by a distinctive name plate, emblem, or patch attached in a prominent place to the shirt.

(d) Working Hours: All routine work in occupied quarters will be performed during the normal workweek, Monday through Friday (0730 to 1630 hours). Emergency or urgent work, as requested by the Government or a occupant, will be performed when and as required. Operation of utility plants and systems will be accomplished on a 24-hour basis, seven days a week, including all holidays.

(e) Telephones: The Developer is responsible for providing telephones necessary to perform in accordance with this annex. As a minimum, separate telephones shall be located in the Developer's administrative space, one for the purpose of conducting routine business and one dedicated solely to the receipt of emergency/service (E/S) calls. These telephones shall be manned during the normal workweek. The Developer shall also make provisions for receiving E/S calls after normal working hours to ensure prompt receipt and response to E/S calls 24 hours per day. The same telephone number must be useable 24 hours per day, 365 days per year. The Developer shall furnish all appropriate telephone numbers to the Government at the time of beneficial occupancy.

(f) Work Reception Desk: The Developer shall maintain a work reception desk, within the Developer's administrative space, to be attended continuously during normal work hours to receive all E/S calls.

(g) Keys and Locks: The Developer shall provide to the Government at the time of beneficial occupancy three sets of keys appropriately identified for all exterior locks located in the housing site, excluding those providing access to the Developer's administrative space. In addition, the Developer shall maintain master keys for all locks and will provide a set of master keys to the Government. In the event a lock is changed on an occupied unit, the Developer shall provide two keys to the occupant of that unit and one key to the Government. All new locks shall fit existing master key systems and keyed to fit the existing key it replaces. In the event a master key in the possession of the Developer is lost or duplicated, all locks and keys for that system shall be replaced or retumbled by the Developer at no cost to the Government.

(h) Facility History Files: A facility history file for each housing unit and/or facility identified by address shall be maintained by the Developer. Each file shall contain a copy of all Government-issued work authorizations, preventive maintenance inspection reports and all E/S calls, routine maintenance or repair, and renovation work orders in progress or completed. The Government shall require access to these files and they shall be available for periodic review by the Government. All documents shall be filed within 10 days of the completed transaction.

(i) Moveable Equipment Inventories: The Developer shall maintain a current accurate inventory of all moveable equipment. The inventory shall include type, make, location by address, and serial numbers. An initial inventory shall be provided to the Government at the time of beneficial occupancy.

(j) Quality of Work: The quality and workmanship of maintenance, repair, replacement, and operational services shall be first class in every respect and will be subject to the approval of the Government.

(k) Permits: The Developer shall, without additional expense to the Government, obtain all appointments, licenses, and permits required for the prosecution of the work and for complying with all applicable Federal, State, and local law.

(l) Safety: The Developer shall take all safety precautions, during the performance of work required by this annex, which are necessary in protecting the occupants and their property. The Developer shall immediately correct any fire or safety hazards arising from structural, electrical, or mechanical defects. The Developer shall also abide by all applicable safety regulations.

(m) Security and Fire Protection: The Government shall be responsible for the provision of security and fire protection services for the housing site.

(n) Pre-Performance Conference: Prior to the beneficial occupancy date, the Developer shall meet with the Government, at a time specified, to discuss and develop mutual understandings relative to this annex.

(o) Performance of Work:

(1) Work in Occupied Quarters: The Developer will schedule his work so as to cause a minimum of interference to occupants. The Developer's employees will cleanup the work area daily and after completion of the job. The Developer shall instruct his employees to report to him any occupant-caused fire or safety hazards, unsafe or unsanitary conditions, and items in need of maintenance or repair. Fire hazards and safety hazards discovered in occupied quarters will also be immediately reported to the occupant. The Developer shall, in turn, notify the Government in writing of any occupant-caused fire or safety hazard or unsafe or unsanitary condition, and items in need of maintenance or repair. Fire hazards and safety hazards discovered in occupied quarters will also be immediately reported to the occupant. The Developer shall, in turn, notify the Government in writing of any occupant-caused fire or safety hazard or unsafe or unsanitary condition which requires the Government's action.

(2) Occupant Not Home: The Developer may respond to an E/S call, either routinely or by appointment, only to find upon arrival at the quarters that the occupant is not at home or has not made arrangements to allow the Developer entry to the unit. The Developer will not enter these quarters and must reschedule the work. The Developer will only contact the Government for assistance in scheduling work with an occupant when there are extraordinary circumstances which cannot be reconciled by the Developer.

(p) Cleanup: Prior to acceptance of a unit by the Government, either for initial occupancy or after completion of maintenance or repair work, the Developer shall clean the entire unit. The Developer shall insure units meet the same standard of cleanliness the Government requires of terminating occupants. Work will consist of, but shall not be limited to, removal of all stains, fingerprints, and paint spots, cleaning of all dust and dirt, washing of windows, cleaning of all appliances, cleaning of all ceramic tile, and washing of floors.

(q) Care of Property Other Than Developer's: In the performance of maintenance, repair, replacement, and rehabilitation services, the Developer will take the utmost care in protecting appliances, furniture, and other property belonging to occupants or to the Government. During any work in quarters containing appliances, furniture, or other personal property, the Developer will use drop cloths or provide other means adequate to protect the property. In the event that damage occurs to appliances, furniture, or other personal property belonging to occupants or to the Government, the Developer shall be responsible for repairing, restoring, or replacing the damaged property.

(r) Operational Services: The Developer is responsible to provide, or arrange for the provision of, operational services for the housing site, as described elsewhere in this annex. The services are to include entomological, janitorial, refuse collection, street cleaning, and snow removal services.

(s) Damages Caused by Occupants: Damages to a housing unit or to other improvements within the project which are beyond normal wear and tear and are caused by the Government or an occupant, his dependents, or invited guests, which are not corrected by the Government or occupant, shall be repaired by the Developer. The cost of such repairs shall be billed to the Government. Under no circumstances shall the Developer negotiate or settle reimbursement of costs for such repairs directly with the occupant, his dependents, or invited guests. Repair of damages which occur to the units or other improvements that cannot be attributed to the Government, his agents, officers, occupants, their dependents, or invited guests, shall be accomplished by the Developer at no cost to the Government.

(t) List of Repair Costs: The Developer shall, with the approval of the Government, establish a list of cleaning and repair costs for dwelling unit components which will establish the normal maximum amounts to be charged in the event of damage to property and equipment installed within a living unit over and above normal wear and tear. The list of repair costs will be based upon the latest published edition of applicable Engineered Performance Standards (EPS) Manuals (Army TB 420-series, Navy NAVFAC P-700 Series, Air Force AFM 85-series) which will be utilized to estimate manhour requirements. These manuals will be provided to the Developer upon request. The manhour requirements will be multiplied by the Department of Labor Service Contract Act Wage Determination rate plus materials at wholesale cost plus reasonable overhead and profit. This list will be provided at the time of the pre-performance conference. Such a list will be subject to change annually or from time to time by mutual agreement of the Developer and the Government. Examples of items which might be included on this list are cleaning of stove, refrigerator, and entire dwelling unit, replacement of interior door, patching/repairing hole in interior door, patching/repairing hole in dry wall (2" in diameter or less), et cetera. A sample format for this list is provided in Exhibit 2.

(u) Abandonments: The Developer when notified by the Government of apparent abandonment of a unit, shall in addition to normal change of occupancy work, clean the unit to the same standard as required where quarters are normally vacated. The cost of cleaning alone shall be billed to the Government based upon the approved list of repair costs stipulated in clause C.1.(t).

(v) Schedule and Notification of Repairs: The Developer shall provide to the Government, for approval, a schedule of repairs and renovations in units which will result in the major inconvenience or relocation of occupants. The first schedule will be provided 1 year from the beneficial occupancy date, and subsequent schedules will be submitted annually thereafter. Additionally, the Developer shall provide no less than 120 days advance written notification to the Government. This advance notification will include the date when repairs are expected to start, work to be accomplished and the reason for the work, expected completion date, and an identification of the units to be affected. Subsequent to notification, the Developer and Government shall mutually agree upon a plan for relocating occupants prior to commencement of work. The costs of occupant moves will be borne by the Developer. In no case will units remain vacant in excess of 2 weeks for scheduled repairs without the approval of the Government.

(w) Major Unforeseen, Unscheduled Work: The Developer shall be responsible for all costs, including those for relocating occupants, associated with major unforeseen unscheduled work resulting from fires, acts of God, or structural, electrical, or mechanical defects. The Developer shall also be responsible for all occupant relocation costs associated with structural, electrical, or mechanical breakdowns which render the unit or units uninhabitable for periods in excess of 24 hours. The relocation of occupants shall be accomplished through coordination between the Developer and the Government.

(x) Damage Due to Fire and Acts of God: The Developer is responsible for obtaining insurance to protect leased facilities and equipment located within the housing site from fire or acts of God. The Developer is responsible for correcting damages resulting from fire or acts of God. The Developer liability will be limited to leased property. Government or occupant owned property will not be a Developer responsibility. The Developer shall secure areas affected by fire or acts of God subsequent to such events and prior to reassignment to prevent unauthorized entry by persons other than representatives/agents of the Developer or Government.

(y) Insurance: At all times during the term of this lease agreement, the Developer, his contractors and subcontractors shall provide and keep in force, at their own costs and expense, the following insurance: (i) Workmen's Compensation Insurance covering all persons employed in connection with any work and with respect to whom death or bodily claims could be asserted against the Government or the Developer; and (ii) comprehensive general public liability insurance expressly covering the hazards arising from any work, for the mutual benefit of the Developer and Government, with limits of not less than $1,000,000. in the event of bodily injury and death to any number of persons in any one accident, and with limits of not less than $500,000 for property damage. Certified copies of such insurance policies shall be delivered to the Government's representative with evidence of payment of such policies. Further, each such policy shall provide that the insurer shall furnish written notice to the Government's representative, 30 days in advance of the effective date of any reduction or in cancellation of such policies.

(z) Invoicing Instructions: The Developer shall submit invoices in accordance with clause H.3.

2. Government's Responsibilities:

(a) Acceptance inspections of all dwelling units will be conducted prior to beneficial occupancy and after completion of repair or rehabilitation work on the unit. The Government shall conduct these inspections jointly with the Developer. The Government will schedule these inspections to occur on the same date that work is completed if notification of work completion is received before 12:00 noon, or before 12:00 noon of the next workday, if such notification is received after 12:00 noon, at a time that is mutually agreeable. The Government has the right to refuse to accept the unit if the work has not been completed or performed satisfactorily or is otherwise not in accordance with the provisions of this annex. The Government shall, immediately upon conclusion of the acceptance inspection, notify the Developer in writing of acceptance or refusal. If the unit is refused, the Government shall also notify the Developer, in writing, of all discrepancies requiring correction.

(b) Designation of Housing Project Manager and/or Staff: The Government shall designate, by name and position title, the housing project manager and staff who will be responsible for the day-to-day administration of the Government's responsibilities with respect to this lease separate from lease administrative functions. The Goverment will notify the Developer of the name and telephone number of the housing project manager prior to beneficial occupancy. The housing manager shall serve as the primary point of contact for matters involving the day-to-day coordination and administration of the Government's responsibilities.

(c) Housing Project Administration: The Government is responsible for the day-to-day administration at the housing site to include the following:

(1) Establish and disseminate to occupants rules and regulations governing occupancy of the units.

(2) Accept applications for, and assign occupants to, the units.

(3) Ensure occupant compliance with all rules and regulations.

(4) Handle all matters involving occupancy of the units, including the mediation of all complaints or disputes between occupants.

(5) Mediate all disputes or complaints between the Developer and occupants.

(6) Determine criteria and procedures for, and implement eviction of, occupants.

(7) Schedule and coordinate all change of occupancy inspections (check-in, pretermination and termination).

(8) Advise Developer of proposed occupancy changes and date of pretermination and termination.

(9) Notify Developer of any apparent abandonment of a unit and dispose of personal effects contained therein.

(10) Notify Developer via work authorization of occupant-caused damages or conditions requiring correction or cleaning and reimbursing Developer for accomplishment of same.

(11) Approve annual schedule of repairs, list of repair costs for occupant damages and printed occupant instructions as submitted by the Developer.

(12) Approve and coordinate the relocation of occupants for purposes of scheduled repairs.

(13) Provide list of occupant names and phone numbers, by address, to Developer as soon as possible but no later than 30 days of beneficial occupancy date and revise monthly thereafter.

(14) Notify Developer of any maintenance or repair work required of which the Developer may be unaware.

(15) Schedule, arrange, and conduct performance evaluation meetings with the Developer, and any other parties deemed necessary by the Government.

(16) Inspect each phase, at the Government's discretion, of the services rendered under this annex during both the Developer's work performance and after completion of the tasks.

(17) Give the Developer written notice of either noncompliance or unsatisfactory work on the part of the Developer.

3. Government's Responsibilities which will be Performed by Occupant:

(a) Occupants will be responsible for the performance of those routine, housekeeping tasks which are normally performed by occupants in private housing of similar type and value. Assigned occupants shall be liable for loss or damage to the housing unit or equipment caused by the abuse or negligence of the assigned occupant, dependents, or guests. Upon vacating, occupants will turn over the quarters, equipment and appliances, and immediate environs in a clean and orderly condition. The following tasks are the responsibility of the occupant:

(1) Cleaning interior surfaces of windows and those exterior surfaces readily accessible from the ground or which may be done in a safe manner.

(2) Cleaning carports, garages, storage spaces, porches, steps, walks and driveways, including snow removal in those areas.

(3) Cleaning interior walls, woodwork and other surfaces.

(4) Cleaning, waxing and polishing floors.

(5) Cleaning light fixtures, venetian blinds, shades, and carpets.

(6) Cleaning stoves, refrigerators, ovens, exhaust fans, sinks, tubs, plumbing fixtures, and other household equipment.

(7) Furnishing and replacing blown electric light bulbs and fuses.

(8) Simple preventive maintenance such as cleaning or replacing furnished filters on furnaces and air conditioners, light oiling of motors and bearings.

(9) Caring for assigned grounds, which are not to exceed 50 feet from the unit in any direction, including cutting, trimming, and watering the lawn, shrubs and plantings.

(10) Maintaining good sanitation practices, to include the control of light to moderate infestations of cockroaches, ants, ticks, fleas, mice, and other pests inside the unit.

(11) Other small maintenance tasks such as policing grounds, insuring overall cleanliness, and routine adjustments not requiring the skills of an expert or artisan.

(12) The occupant is expected to conserve utilities by conserving water, power, heating fuels, and other utilities in family housing.

(b) The occupant shall abide by all printed instructions relating to occupancy of the unit.

(c) The occupant is responsible for promptly notifying the Developer of any emergency/service or other maintenance and repair work requiring accomplishment.

D. MAINTENANCE MANAGEMENT:

1. General: The Developer is responsible for managing the total work effort associated with the maintenance and other services required herein to assure fully adequate and timely completion of these services. Included in this function will be a full range of management duties including, but not limited to, work identification and reception, planning, scheduling, establishing and maintaining records and inventories, as well as quality control. The Developer is expected to assure an adequate staff of personnel, with the necessary management expertise, at the housing site continuously to assure the completion of the work in accordance with sound and efficient management practices.

2. Contractor Quality Control: The Developer shall establish and maintain a complete Quality Control Program that is acceptable to the Government to assure that the requirements of the annex are provided as specified.

(a) The Developer shall submit a copy of the Quality Control Program to the Government at the pre-performance conference. The program shall include the following:

(1) A quality control inspection system covering all services included in the annex. It must specify areas to be inspected on either a scheduled or unscheduled basis and how inspections are to be conducted.

(2) The name(s) of the individual(s) tasked to perform the quality control inspections, their qualifications, and the extent of their authority.

(3) A method for identifying deficiencies in the quality of services performed and taking corrective action before the level of performance becomes unsatisfactory.

(b) A file of all Quality Control Inspections, inspection results, and any corrective action required, shall be maintained by the Developer through the term of this lease agreement. This file shall be made available to the Government during regular hours.

3. Performance Evaluation Meetings: The Developer shall meet with the Government periodically as called for by the Government. A mutual effort will be made to resolve all problems identified. The written minutes of these meetings, prepared by the Government, shall be signed by the Developer and the Government. Should the Developer not concur with the minutes, the Developer will state, in writing, to the Government any areas of disagreement.

4. Emergency/Service Calls: Generally, items of work communicated to the reception desk by occupants or the Government will be referred to as emergency/service (E/S) calls. The work requirements resulting from E/S calls will be completed in accordance with the level and quality of maintenance standards established herein and within the specified time limits for each type of service call. The Developer shall maintain a log of incoming E/S calls, showing date and time received, unit address, classification of call and a description of the problem. In addition, the Developer shall prepare a work order for each E/S call. Work orders will be filed by the Developer in the appropriate facility history file upon work completion. All E/S logs and work orders shall be available for periodic review by the Government. All E/S call work orders must be numbered sequentially and include the following information:

(a) Work order number.

(b) Date/time call received. Include name and phone number of occupant.

(c) Unit identification and address.

(d) Description of problem.

(e) Description of work performed, including signature of craftsman.

(f) Date/time work commenced/completed.

(g) Occupant, or occupant representative's signature indicating work has been performed.

(h) Classification of E/S Calls: The Developer shall classify each E/S call upon receipt. The classifications are described in the following clauses:

(1) Emergency Calls: E/S calls will be classified as emergency calls when the work consists of correcting failures in services which constitute an immediate danger to occupants or threaten to damage property, e.g., overflowing drains, broken water pipes, broken electrical components which may cause fire or shock to persons, gas leaks, etc. Calls from occupants that have a medical requirement for maintaining stable temperature levels of heating and air conditioning shall be classified as an emergency call instead of an urgent call as would otherwise be the case.

(2) Urgent Calls: E/S calls will be classified as urgent calls when the work consists of heating, air conditioning, ranges (two or more burners or oven inoperable), refrigerators or water heaters and other failures in services which do not immediately endanger the occupants or threaten damage to property, but would soon inconvenience and affect the health or well being of the occupants. When repairs to ranges, refrigerators or water heaters require more than 4 hours, the appliance shall be removed from the housing unit for the necessary repair work. At the time the appliance is removed, it shall be replaced with a properly operating one.

(3) Routine Call: E/S calls will be classified as routine calls when the work does not qualify as an emergency or urgent call. Routine calls will include, but are not limited to, repair of windows, floors, counters and cabinets, freeing up binding doors, repair of bathroom tile, etc.

(i) Response Time: Response time is defined as the interval between receipt of the E/S call by the Developer and commencement of the work. Undue delay, beyond the response times stipulated below, is not acceptable and will represent a failure on the part of the Developer to fulfill the terms of this lease agreement.

(1) Emergency Calls: The Developer shall respond to E/S calls classified as emergency calls on a 24-hour basis immediately, but in no case more than 60 minutes after receipt of the call. Once begun, the work shall be prosecuted to completion.

(2) Urgent Calls: The Developer shall respond to E/S calls classified as urgent calls within 24 hours after receipt of the call. Once begun, the work shall be prosecuted to completion.

(3) Routine Calls: The Developer shall commence and complete E/S calls which are classifed as routine within 1 week after receipt of the call.

(j) Rework: The Developer shall correct, as required, those maintenance deficiencies with respect to E/S calls which are due to poor workmanship, unsatisfactory completion, failure during warranty period or neglect. E/S calls requiring rework shall have an "R" placed after the original work order number to identify it as rework. Rework will be effected within 3 working days from notification of Developer by Government or occupants of the requirement.

5. Downtime: Downtime is defined as the period during which a housing unit is vacant for reasons of change of occupancy, maintenance work, major repair or unhabitability, or restoration of units damaged by fires or acts of God. The Developer shall ensure that downtime while a unit has been turned over to him does not exceed the allowable time prescribed below. Downtime must be minimized in order to maximize occupancy of these units.

(a) Change of Occupancy Downtime: The total number of downtime days for units vacant for purposes of change of occupancy maintenance shall not exceed the number of move-outs (excluding move-outs for purposes of scheduled repairs or fires and acts of God) per month multiplied by 3 days. For example, if there are 10 move-outs in 1 month, the total allowable downtime for that month is 30 days. Additionally, if any 5-day work period, more than eight units are turned over to the Developer, two additional days will be allowed for each unit in excess of eight. For example, if there are 17 move-outs in a month, the total allowable downtime is 51 days. However, if 11 of these units were turned over to the Developer within a 5-day work period, an additional 6 days will be allowed for a total of 57 days in allowable downtime (representing the additional 2 days for each of the units in excess of eight turned over within a 5-day work period added to the 51 days allowed for 17 move-outs). Deductions for Developer's failure to stay within prescribed downtime will be in accordance with clause H.1.

(b) Scheduled Repair or Renovation Downtime: Downtime for reasons of scheduled repair or renovation will be completed on the basis of the actual number of days any specific unit has been turned over to the Developer for such work. The downtime period will begin with the date the Government turns the unit over, in writing, to the Developer for this purpose and will end when the Government accepts, in writing, the unit from the Developer subsequent to work completion. Deductions for Developer's failure to adhere to the scheduled downtime will be in accordance with clause H.1.

6. Fire Damage/Restorations: Normally, restoration due to fire damage or other causes will be accomplished while units are unoccupied. The Government will immediately notify the Developer, in writing, of all fire damages or other occurrences resulting in a need for restoration. Within 5 days of receipt of notification from the Government, the Developer will provide a firm written commitment as to the date and time the unit will be returned to the Government for assignment of an occupant. The format contained on the bottom half of Exhibit 3 may be used. The Developer will officially notify, in writing, the Government of work completion. The format contained in Exhibit 3 may be used for this notification. In cases where units are unoccupied, payments under terms of this lease will stop as of the date notification is made by the Government and resume on the date of the Government's acceptance of the restored unit.

7. Change of Occupancy:

(a) General: Work identified by the Developer or Government during the pre-termination and final termination inspections which is required to make a unit ready for the next occupant, shall be accomplished while the unit is vacant. This work includes any routine maintenance and repair, as well as interior painting. The extent of interior painting, partial or complete, required to be done during change of occupancy will be based on the criteria in clauses E.2.(a), E.2.(d). E.2.(g), and E.8 through E.8.(d) of this annex. The preponderance of changes of occupancy normally occurs during June, July, and August which would affect the Developer's workload. Based on historical data, it is estimated that 30% of the units may be vacated during a 12-month period. Variation from this percentage shall not be a basis for adjustment to this lease.

(b) Inspections: The Developer is responsible for conducting or participating in various types of inspections as described below. These inspections shall be conducted in accordance with the technical standards and guidance provided herein.

(1) Scheduling and Attendance: The Government will schedule a pre-termination and termination inspection after being advised by the occupant of an impending move. These inspections will be scheduled during normal working hours. The Government will, in writing, notify the Developer of the date, time, and address of each inspection. The Government will make every effort to provide this notice 21 days in advance of the projected change of occupancy. Because of short-time occupant orders or other extenuating circumstances, the Developer can expect an average of 10-14 days advance notice. The Developer, or his representative, is required to attend the pre-termination inspection. Developer representation at the termination inspection is at the Developer's discretion.

(2) Pre-Termination: During the pre-termination inspection, the Developer shall identify and prepare work orders covering all painting, maintenance, and repair work required of the Developer. The Government shall jointly identify, with the occupant, all damage to property and installed equipment which is over and above normal wear and tear and which is the occupant's responsibility to correct. The Government will provide the occupant with a list of this work and associated costs for which the occupant is liable, as contained on the approved list of repair costs, and provide a copy to the Developer. At the conclusion of this inspection, the Government shall notify, in writing, the Developer of the firm date and time for the final inspection and the date and time that the unit will be turned over to the Developer for accomplishment of change of occupancy work. The Developer, in turn, shall immediately provide the Government with a firm written commitment as to the date and time that the unit will be turned back over to the Government for assignment to the next occupant. Exhibit 3 will be used for this purpose. The Government and Developer shall jointly verify the serial numbers of all moveable equipment contained in the unit. The Developer shall notify the Government if an item of moveable equipment is to be replaced in the unit between the time of the pre-termination inspection and the time the unit will be turned back over to the Developer.

(3) Termination Inspection: The Government will conduct the termination inspection jointly with the occupant after the furnishings have been removed. Should the date and time that the unit will be turned over to the Developer change for any reason, the Government shall immediately notify the Developer in writing of the revised date and time. The Developer will then immediately notify the Government, in writing, of the revised date and time that the unit will be turned over to the Government for assignment. Subsequent to the termination inspection, the Government will issue to the Developer a work authorization for the repair of damages, or accomplishment of cleaning, which are the responsibility of the occupant but were not completed at the time of the termination inspection.

(c) Change of Occupancy Work: For all change of occupancy work, the standards of workmanship shall be in compliance with paragraphs E.1. through E.8.(e). In the event the occupant fails to properly clean the unit for any reason, or correct damages beyond normal wear and tear for which the occupant is responsible, it shall become the Developer's responsibility to satisfactorily clean and repair the unit for the next occupant in accordance with clauses C.1. and G.3. This work will be documented by the Government work authorization (Exhibit 4) and shall be accomplished during the period the Developer is completing other change of occupancy work. Developer charges for the performance of work identified on the work authorization shall be in accordance with the approved list of repair costs (see clauses C.1.(t) and H.2).

d. Completion of Work: Upon completion of all change of occupancy work, the Developer will notify the Government of work completion and unit availability (Exhibit 5). The Government will conduct an acceptance inspection in accordance with C.2.(a). Upon written notification of the Government's acceptance, the time period calculated for downtime purposes will be concluded.

(1) All change of occupancy work must be completed within three working days after the unit becomes available, which shall be determined from the date the unit is turned over to the Developer by the Government for change of occupancy work.

(2) The downtime period will be determined as follows: If the unit becomes available prior to 12:00 noon, the period will begin at 1:00 p.m. that day. If the unit becomes available at 12:00 noon or later, the maintenance period will begin at the start of the following work day.

8. Instruction for Occupants: The Developer will, with the approval of the Government, prepare for posting in all units, a set of printed instructions in English for the expected normal occupant care of the quarters and installed equipment and for operation of the heating system, electrical circuit breaker resets, operation of thermostat controls, and other maintenance and operation of functions and precautions. The procedure should be stated for reporting conditions that may require maintenance and for reporting emergency repair and servicing requirements. Also included and highlighted will be instructions as to how to report a fire, and actions to take in the event of a fire.

9. Forms/Documents: The following forms are to be used in conjunction with this lease agreement.

(a) Notification of Scheduled Change of Occupancy (Exhibit 3)

(b) Work Authorization (Exhibit 4)

(c) Notification of Work Completion (Exhibit 5)

E. STANDARDS FOR MAINTENANCE OF STRUCTURES: The Developer shall be responsible for maintaining all real property assets provided for in this lease agreement including dwelling units, garages, carports and other buildings to a standard that prevents deterioration beyond that which results from normal wear and tear, and corrects deficiencies in a timely manner to assure full life expectancy of the facilities and equipment. The level of maintenance shall assure all structures are free of missing components or defects which would affect the safety, pleasing appearance or habitability of the units or would prevent any electrical, mechanical, plumbing or structural system from functioning in accordance with the design intent. Corrected or repaired work shall be carried to completion, including touch-up painting and/or operational checks. The quality of the work and the repaired areas shall be fully compatible with adjacent surfaces or equipment. All replacements shall match existing dimensions, material, quality of work, finish, color and design. During and at completion of work, debris shall not be allowed to spread unnecessarily into adjacent areas nor to accumulate in the work areas themselves. All such debris, excess material, and parts shall be cleaned-up and removed at the completion of the job and/or at the end of each day work is in progress. Upon completion of work, any fingerprints, stains and other unsightly marks shall be removed. Wherever the term "pleasing appearance" is used in this or subsequent paragraphs, it shall be construed to mean an appearance similar to the original finished appearance with only minor, nonobjectionable deterioration resulting from normal use. The housing unit shall be evaluated against the maintenance standards contained herein to determine deficiencies requiring corrections.

1. Structural Exterior:

(a) Exterior Walls: An exterior wall is a wall that is exposed to the weather. All exterior walls shall be maintained in a structurally sound, weathertight condition and in a good state of repair. The wall shall be free of noticeable pitting and corrosion, vegetation and animal life, deterioration siding and trim, discoloration and graffiti or other defects which would render an unsightly appearance to the exterior walls.

(b) Roofing: All flooring, flashing and gravel stops shall be maintained in such a manner to preserve a weather tight seal and prevent corrosion and abnormal deterioration of individual components. Missing pieces shall be replaced to retain the original whole condition of the roof system.

(c) All Gutters, Downspouts and Splash Blocks: Shall be maintained to function as orginally designed to effectively channel runoff water away from the housing unit. Gutters and downspouts shall be maintained properly aligned and secured to the house with splash blocks correctly positioned to receive the impact of the drainage water. Gutters and downspouts shall be kept free of debris or any obstruction.

(d) Overhangs: Overhangs will be maintained in a good state of repair with fasciae and soffits properly secured. Bird screens and vents shall be maintained intact and free of corrosion.

(e) Windows, Doors, Screens, and Shutters: Windows, doors, screens and shutters will be maintained to operate smoothly and properly without binding, sticking or other defects which would prevent their functioning in accordance with the design intent. Exterior doors, windows, and shutters shall be maintained in a manner that preserves the weather tight seal with caulking, glazing and weatherstripping fully intact. New glass used for replacement shall be the same thickness, type and quality as the existing glass. Window screens and screen doors shall be maintained in good working order, free of torn fabric and frame defects to assure the screening function is effective. All hardware such as hinges, locks, strike plates, window operator mechanisms, door closers, springs, etc., shall be maintained free of corrosion or other defects that would prevent its operating as intended.

(f) Miscellaneous Roof Structures: Chimneys, vent stacks, roof ventilators or other items that pierce the roof shall be maintained to function as originally designed. All metal surfaces shall be maintained free of noticeable pitting and corrosion. Wind driven turbine ventilators shall be maintained free of corrosion or other defects that would prevent its operating as intended.

2. Structural Interior:

(a) Interior Walls: Interior wall systems shall be maintained in a good state of repair free of damage, deterioration, cracks or defective materials. The aesthetic appearance shall be free of noticeable discoloration or other defects which would render an unsightly appearance to the interior walls.

(b) Floors and Floor Coverings:

(1) Concrete Floors. Concrete floors shall be maintained useable, safe, and with a pleasing appearance, free of cracked, spalled or broken areas or cracks which adversely affect the structural integrity of the floor.

(2) Subflooring. Subflooring and structural members shall be maintained in a safe and useable manner. Deteriorated subflooring members shall be repaired or replaced to retain the original whole condition of the floor.

(3) Hardwood Flooring. All hardwood floors shall be maintained in an acceptable state of repair with a smooth, glossy finish free of damage, deterioration or buckling. All dust generated by floor finishing shall be removed from the quarters.

(4) Floor Coverings. All linoleum and/or resilient tile floor coverings shall be maintained free of cracks, chips, and torn or excessively worn material to provide floor coverings that are useable and have a pleasing appearance.

(5) Ceramic Tile. All ceramnic tile floors shall be maintained free of loose, damaged, broken, missing or cracked tiles and with joints properly sealed to provide the intended watertight surface.

(6) Carpeting. Carpeting shall be properly stretched to lay smooth and evenly. Any complete or partial replacement of carpeting shall be in kind.

(c) Stairways: Stairway metal/wood treads, risers, nosings, balustrades, handrails and/or structural members shall be maintained in a good state of repair to provide a safe and useable system.

(d) Ceilings: All ceilings and framing members shall be maintained properly secured and in a good state of repair. The ceiling shall be free of holes or cracks. Badly soiled, discolored, defaced or water damaged surfaces or other defects which would render an unsightly appearance to the ceiling are to be repaired to restore surfaces to a good condition.

(e) Venetian Blinds and Shades: All venetian blinds and shades shall be maintained to operate smoothly and properly, and kept free of damaged slats, deteriorated tapes, cords, hardware or rails or torn fabrics.

(f) Drapery Rods: Curtain rails, wire springs, and drapery rods will be replaced when no longer functional. Loosened rails, springs, and rods will be tightened.

(g) Interior Trim: All interior trim shall be preserved in a good state of repair, free of unsightly appearance. Surfaces shall be maintained smooth, free of chipped or peeling paint, exposed nails, wraps, cracks, rot or termite damage.

(h) Built-In Cabinetry: Cabinets, shelving, countertops and similar equipment shall be maintained in a fully useable condition with a pleasing appearance. Missing or inoperative hardware shall be replaced. The countertops shall be free of warped, marred, burned or damaged areas. Repaired/replaced cabinets shall be restored to original arrangement and/or finished to original condition.

(i) House Accessories: House accessories such as mail slots, doorstops, mechanical door bells, door knockers, paper holders, soap trays, tumbler holders, towel bars, shower curtain rods, toilet seats, medicine cabinets, venetian blind brackets, cutain rod boards, closet pully guides, house numbers, dryer vents, smoke detectors, etc., shall be maintained free of defects and in a satisfactorily functioning condition.

(j) Keys and Locks: Locks should be maintained so as to be free of all defects and to operate in a satisfactory manner. All new locks shall fit existing master key systems and keyed to fit the existing key it replaces. The Developer shall also replace broken mailbox locks.

3. Electrical: The Developer shall be responsible for all preventive maintenance of the electrical equipment and distribution system. The electrical equipment, distribution panel, connections, grounds, outlets, switches, wiring and lighting fixtures shall be maintained in a safe, operational, and useable condition. Cracked or broken receptacle and switch face plates shall be replaced with new plates of the same color. Light fixture lenses and globes shall be maintained with pleasing appearance. Receptacles and breakers with ground fault sensors shall be capable of properly detecting faults. Workmanship and materials shall conform to the National Fire Protection Association (NFPA) 70 Electrical Code.

4. Plumbing:

(a) Plumbing Systems: All plumbing systems and fixtures of each housing unit and other housing real property facilities shall be maintained in a good and safe operating condition and free of leaks and drips. Domestic water lines shall be maintained from, and including, the service cut-off box. Workmanship amd materials shall conform to the American National Standards Institute A40.8-55 National Plumbing Code.

(b) Plumbing Fixtures: All sinks, tubs, toilets, basins, lavatories, showers, etc., shall be maintained to operate properly, drain freely and be free of chips, cracks or excessive discoloration. All replacement water closets shall be water-saver type that use approximately 3-1/2 gallons per flush. Shower heads shall be of a water-saver type.

5. Heating, Ventilation and Air Conditioning (HVAC): The work includes inspecting and maintaining heating, air conditioning and ventilating systems in good, safe, operating condition. All materials and equipment furnished shall be the same type, grade, quality and size as the original construction. The Developer shall furnish and maintain an adequate supply of air conditioning/heating spare parts to provide the level of maintenance specified in a timely manner.

(a) Investigation: Investigation of HVAC problems during service calls shall be thorough and shall include all related systems and equipment necessary to assure correction of the problem and continuing proper operation of the HVAC system.

(b) Replace Filters: All filters will be replaced at least twice each year, once prior to heating season (September) and once prior to air conditioning season (April) and additionally as recommended by the manufacturer. All filters will be of the size and type recommended by equipment manufacturers.

6. Periodic Preventive Maintenance: The Developer shall perform maintenance inspections, scheduled in accordance with manufacturer's recommendations. These systems shall be maintained by the Developer to standards that will insure the systems operate at their design capacity for their design life expectancy, free from defects that could affect their continued safe operation. Fans, coils and burners shall be clean and in proper adjustment. Controls and control devices shall be properly adjusted and in good operating condition. Insulation shall be in good condition free from cuts or tears. Ducts, dampers and diffusers shall be in good condition free from leaks and obstructions. Wiring shall be in good condition with no breaks in insulation and all connections tight. Motors shall draw the correct amperage. Piping shall be free from leaks and properly insulated to suit the usage. All safety devices shall be free from defects and in good operating condition. All metal housings shall be maintained free from corrosion and disfiguring damage. Heating and air conditioning systems shall provide room air temperature consistent with Government energy conservation guidelines. During preventive maintenance, batteries shall be replaced in smoke detectors when required.

7. Maintenance/Repair/Replacement of Appliances: The Developer shall be responsible for the maintenance, repair and/or replacement of moveable household equipment and appliances. Appliances/equipment shall be maintained in good operating condition with a pleasing appearance. Appliances/equipment that cannot be adjusted or repaired shall be replaced with new appliances/ equipment. Replacements shall match the unit they replace in type, size, capacity and quality. Components such as rubber gaskets, drip pans, broiler pans, burner bibs, trays or racks which cannot be cleaned or otherwise rid of discoloration, pitting, or other defects, shall be replaced.

8. Painting: Painting work shall include both the interior and exterior of the dwelling units. All painting, whether interior or exterior, partial or complete, will consist of all work necessary for a finished job including, but not limited to, windows, doors, frames, trim, molding, shutters, downspouts and appurtenances comprising an integral part of the housing unit or building.

(a) Painting General Requirements: Surfaces to be painted shall be thoroughly cleaned and, unless specified otherwise, shall be dry when paint is applied. Paint shall not be applied to surfaces upon which there is frost, ice or snow.

(b) Preparation of Surfaces: All dirt, dust, scale, loose particles, disintegrated paint, grease, oil, etc, and any other foreign objects shall be removed from all surfaces. Sanding, wire brushing and washing shall be employed as necessary, except that water shall not be used on unpainted wood. Previously painted surfaces not cleaned to bare base material shall not be primed. All new work and surfaces bared by cleaning shall be coated with primer paint prior to receiving finish painting.

(c) Workmanship: Paint, enamel and varnish finish shall be carefully applied with good clean brushes, approved rollers or by airless spraying. The work shall be conducted so as to avoid damage to other surfaces and public and private property in the area; all damage thereto shall be the Developer's responsibility. Finish coats shall be smooth and free from runs, sags or other surface preparation defects. Each coat of paint shall be of sufficient thickness to cover completely the previous coat or surfaces. Surfaces not to be painted shall be properly protected. Paint shall be promptly removed from surfaces not to be painted.

(d) Interior Painting: Complete interior painting will be accomplished as required in conjunction with the change of occupancy work. Complete interior painting will be accomplished at the first change of occupancy occurring subsequent to the 3rd, 6th, 9th, 12th, 15th, and 18th years of the lease agreement. Complete or partial interior painting during all other changes of occupancy, except where required in connection with maintenance and repair, will be at the discretion of the Developer. Paint utilized for interior painting will be a washable, top commercial grade. Semi-gloss paint will be used on all trim, woodwork, and interior walls and on ceilings of bathrooms and kitchens.

(e) Exterior Painting: Painting or stained exterior surfaces will be repainted or stained in the 5th, 10th, and 15th years subsequent to the beneficial occupancy date, or more often as required for preservation at the discretion of the Developer.

F. STANDARDS FOR MAINTENANCE OF OTHER REAL PROPERTY:

Real property other than structures shall be evaluated against the standards contained herein to determine deficiencies requiring correction.

1. Utilities: The provision of continued utility service is the responsibility of the Developer and/or local utility authority or municipality. Included in utility services are water, sewage, electricity, and gas. The Developer shall be responsible for notifying the utility companies, with concurrent notification of the Government's representative, of all water shortages, sewage line blockages, cloggings or breakage, electrical outages, and telephone line malfunctions occurring at the housing site. The Developer shall continuously monitor actions taken by the various utility companies to correct such problems, shall notify the Government's representative of progress made in this regard, and shall take whatever actions are necessary and within his power to facilitate prompt restoration of utility services. The Developer will ensure the provision of repairs to, and maintenance of, utility meters at the housing site. The Developer will also ensure that major overhaul, replacement of components, and maintenance and repair of utility systems resulting from normal wear and tear is accomplished as required to

ensure continuous utility service. The street lighting system will be controlled by automatic devices set to turn lights on one hour before sunset, and turn them off one-half hour after sunrise, or as required and operated by the Local Authority. The Developer is responsible for the maintenance and repair of the telephone system, to include all wiring and phone jacks/connectors, but not to include the telephones and cords, which are the responsiblity of the occupant.

2. Roads: "Roads" include all streets, curbing, sidewalks, access drives, parking areas, and appurtenant drainage contained within the housing site. Roads will be inspected at least every three months. All deteriorations, holes, spoiled areas, cracks, displaced curbs, etc., will be repaired in a permanent manner to preserve surface level and maintain a condition that is not detrimental to foot traffic and vehicle operation. Defects will not normally remain longer than 30 days after disclosure, depending on weather conditions. Roads will be kept free of sand, dust, mud, debris, and snow. Snow removal will be accomplished on sidewalks which are not otherwise the responsibility of occupants. All sidewalks and roads will be sanded when icy. The Developer shall not be responsible for any of the above items which would normally be the duty of the local county or state authorities. If any of the above conditions exist and are the responsibility of the local, county or state authorities to correct, the Developer is responsible for notifying the appropriate authorities of the existence of such conditions.

3. Grounds Maintenance: The performance of grounds maintenance services in and around the common use housing areas is included by this annex. Grounds maintenance services include the care and maintenance of designated areas by mowing, trimming, weed and brush control, maintaining grasses and ground cover, seeding, fertilizing, irrigating, leaf collecting, shrubbery and hedge trimming and pruning, control of insects and plant diseases, care of flower beds and general policing. Occupant-assigned areas will be marked on the site plans and discussed at the pre-performance conference. Grounds maintenance services apply only to areas which are not identified on the site plan as occupant-assigned areas which are the reponsibility of occupants (With the exception of unoccupied quarters defined as quarters unoccupied for 1 week or more, which will be maintained by the Developer).

(a) Grass Mowing and Trimming: Grass shall not be allowed to surpass a 4" height between cutting and when cut, shall not be cut lower than 2". After cutting, grass shall have a uniform height throughout, free of grass clippings in windows or on walks, drives, concrete pads, outdoor athletic courts, baseball diamonds or on any adjacent paved or otherwise finished surface. Grass areas close or adjacent to buildings, hydrants, parking lots, manholes, fences, trees, hedges and shrubs are included in the mowing operations. Trimming within the improved areas shall be accomplished each time such an area is mowed. Trimming includes the cutting back of all grass until even with the edges of all curbs, sidewalks, driveways, walls, fences, guy wires, poles, tree trunks, foundations, garbage pads or any other objects. After trimming, no grass shall extend over any paved or similar surface and there shall be no evidence of clippings on any finished surface. Joints in all paved areas, including streets, shall be maintained free of vegetation.

(b) Hedges and Shrubs: Shrubs and hedges shall be trimmed and/or pruned prior to attaining a new growth of six or more inches. After trimming/pruning, shrubs shall not be left with square or flat tops but shall be pruned to control habit of growth. Wounds larger than 1-inch in diameter shall be covered with an approved wound dressing. All clippings shall be removed and disposed of at the end of pruning or trimming operations or at the end of each day.

(c) Weed and Brush Control:

(1) Weed Control: Measures will be undertaken by the Developer to control excessive growth of weeds or fungi in grounds. After weed control measures have been applied, no damage to surrounding areas or potential danger to human or animal life shall be evident.

(2) Brush Control: All undesirable trees or brushes with a ball diameter of 12" or less and within the area to be mowed, will be cut and cleared from the area. Trees, hedges, shrubs and/or bushes which have been planted as part of the landscape plan for aesthetic reasons or soil conservation measures, will be maintained and will be replaced by the Developer should they die.

(d) Trees: Trees will be trimmed as necessary to prevent obstruction of roads, sidewalks and parking areas. Trees will also be trimmed to prevent contact with structures and utility lines.

(e) Grasses and Ground Cover: The Developer shall provide routine fertilizing, seeding, liming and top dressing as necessary to maintain improved grass areas with a thick, uniform growth and uniform green color. Should bare spots become evident, treatment to abate the cause shall be undertaken and measures to start or substitute new growth be initiated. These measures will be continued until the new growth is thick and strong. Fertilizer suitable for this purpose shall also be applied at routine intervals to the base of trees and shrubs and covered with a mulch of suitable material.

(f) Irrigation: Grounds maintenance care includes the periodic watering of grass areas, shrubs, trees and other vegetation to maintain growth during hot, dry periods when the ground is excessively dry and prevention of dying vegetation is necessary, and when there are no restrictions imposed on use of water by local governmental authorities. Watering may also be required when assisting new growth or directly after fertilizing, liming, or seeding.

(g) Leaf Collection: Fallen leaves shall be removed from all grassed and paved areas and from shrubbery. Removal shall be done at intervals which do not allow accumulation of leaves to the extent that the grassed areas underneath could become smothered and/or damaged.

(h) Plant Disease and Insect Control: All infestations of diseases or insects in grassed areas, trees or shrubbery shall be treated by applying approved control measures. The control measures shall stop the infestation with a minimal amount of damage to the infected area. Application of control measures will not cause damage to surrounding areas or create any danger to

human or animal life. After the infestation is brought under control, steps will be taken to return any damaged vegetation to its condition prior to the infestation.

(i) Care of Flower Beds: Care of flower beds shall include the furnishing and planting of bulbs, plants, and seeds and the irrigation and cultivation necessary to promote growth and keep the beds free of weeds. Bulbs, plants and seeds shall be of the types and varieties which will provide foliage and/or continuation of bloom during the normal flowering season.

(j) Policing of Grounds: The Developer shall police improved and semi-improved areas for the removal of debris such as paper, tree limbs and branches, refuse, cans, bottles and other trash prior to each mowing, and monthly during the nongrowing season. Areas to be policed include grass, sidewalks, streets, parking lots, athletic fields, and all other areas within the housing complex, except areas for which occupant is responsible.

4. Drainage Systems: Drainage structures including swales, ditches, inlets, curb inlets, catch basins, manholes, junction boxes, grills, piping, culverts and headwalls shall be maintained free of debris, obstructions, brush and weeds to provide a system that functions as originally designed to effectively channel runoff water away from the housing area. Exposed areas shall be maintained free of missing or damaged grills, curb inlets or manhole covers, spalled broken or cracked concrete surfaces, cracks or holes in asphalt surfaces and erosion along swales and ditches.

5. Miscellaneous:

(a) Structures: All concrete surfaced areas such as patios, sidewalks, trash areas, garbage can pads, and any other areas not receiving vehicular traffic, shall be maintained structurally sound and safe, in a good state of repair at the original alignment and elevation free of damage, spalls and major cracks that impair the useability of the surfaced area. Fences and privacy walls (except those installed by occupants) shall be maintained structurally sound, free from gaps, breaks, tears, loose or broken components and in such condition that they function as intended.

(b) Master T.V. Antenna: The Developer shall be responsible for maintaining the master T.V. antenna system from antenna to wall outlet for each housing unit. All antennas, cables, cablings, fittings, terminal outlets, amplifiers and all other parts, components and equipment necessary to provide reception of very high frequency (VHF) and ultra high frequency (UHF) local broadcast shall be maintained to provide good reception of color or black and white transmission ghost-free.

(c) Playground and Tot Lot Equipment: The Developer is responsible for the maintenance, repair, and replacement of equipment located in playgrounds, tot lots, and recreational areas. Equipment shall be maintained to function as orginally designed.

G. STANDARDS FOR PROVISION OF OPERATIONAL SERVICES:

The operational services provided shall be evaluated against the standards contained herein to determine deficiencies requiring correction.

1. Refuse Collection: The Developer shall ensure that refuse is collected twice weekly with three days between collections unless it is controlled by the local municipality. Refuse refers to garbage and trash generated by the occupant and Government within the housing site and includes bulk items. The use of detachable, centrally located trash containers, centrally placed can collection buildings and/or other similar systems for central deposit and collection of refuse within the housing site is not allowed. The Developer shall notify the Government, at the time of the pre-performance conference, as to how refuse will be collected and what will be required of occupants with respect to the placement of their refuse.

2. Pest Control Services: The Developer shall provide the necessary pest control services to assure that structures are maintained essentially free of pests including cockroaches, flies, wasps, gnats, ticks, fleas, silverfish, centipedes, spiders and other crawling/flying pests, common rodent pests including rats and mice, and wood-destroying pests such as swarming termites, carpenter ants and carpenter bees. The housing units will be considered "essentially free" of pests when, for a period of 7 days, no visible evidence of pests has been observed. The Developer will comply with all Federal, State and local laws an regulations governing the sale and legal use of pesticides. An adequate insect and rodent control program will be established and maintained by the Developer. Immediate corrective steps will be taken upon discovery of insect infestation.

3. Janitorial Services:

(a) General: The Developer is responsible for the performance of janitorial services in the housing site. In general, janitorial services are defined as the provision of all labor, material, supplies and supervision necessary to maintain areas and fixtures in and around real property buildings in a clean, sanitary and serviced condition.

(b) Work Location: Areas to receive janitorial service include all common use buildings and common use areas, such as the Government administrative space and common use areas of multi-unit buildings.

(c) Additional Locations: Complete janitorial services shall be provided to single housing units when ordered by the Government for abandonments and change of occupancy. The Developer will be reimbursed by the Government for these in accordance with the current List of Repair Costs.

(d) Services Provided and Frequencies: The services to be provided in and around the above areas shall include, as a minimum, but not to be limited to, the following normal frequencies of service as indicated below unless otherwise specified. These frequencies are for buildings identified in clause G.3.(b).

| | Service | Frequency |
|---|---|---|
| (1) | Vacuum carpets. | W |
| (2) | Dust mop and buff resilient tile floors. | W |
| (3) | Dust mop wood floors. | W |

| | | |
|---|---|---|
| (4) | Sweep and damp mop concrete terrazzo and quarry tile floors. | W |
| (5) | Damp mop, wax and buff resilient tile or wood floors. | M |
| (6) | Strip, rewax and buff resilient tile or wood floors. | M6 |
| (7) | Strip, seal, rewax and buff concrete, terrazzo and quarry tile floors. | M6 |
| (8) | Clean carpets. | A |
| (9) | Remove trash. | 2W |
| (10) | Sweep porches, platforms, building entrances, stairways and shops. | 2W |
| (11) | Clean and service restrooms. | 5W |
| (12) | Clean drinking fountains, dust windowsills, ledges, A/C grilles, baseboards, tops of partitions, ductwork, piping and heaters, damp wipe door hardware, switch plate and miscellaneous hardware. | W |
| (13) | Spot clean walls. | M |
| (14) | Clean entrance/exit doors and other glass doors. | W |
| (15) | Clean light fixtures. | M6 |
| (16) | Wash windows. | M6 |

(e) Key to Frequencies:

| Service | Frequency |
|---|---|
| (1) W Once a week | Services performed once during a calendar week, with a minimum of 6 days between services. |
| (2) 2W Two times a week | Services performed as scheduled on Mondays and Thursdays, or Thursdays and Fridays. |
| (3) 5W Five times a week | Services performed daily, Monday through Friday, once in every 24-hour period. |
| (4) W2 Once every other week | Services performed once during two calendar weeks, with a minimum of 13 days between services. |

| | | |
|---|---|---|
| (5) | M Once a month | Services performed once during each calendar month at intervals of 28 to 30 days. |
| (6) | M2 Once every two months | Services performed during the lease period at intervals of 55 to 65 days. It is to be considered that there are six 2-month periods within each year of this lease. |
| (7) | M3 Once every three months | Services performed during the lease period at intervals of 80 to 100 days. It is to be considered that there are four 3-month periods within each year of this lease. |
| (8) | M6 Once every six months | Services performed during the lease period at intervals of 160 to 200 days. It is to be considered that there are two 6-month periods within each year of this lease. |
| (9) | A Once a year | |

(f) Material, Equipment and Workmanship: All material, equipment and supplies furnished by the contractor shall be of high quality and the type used in commercial cleaning operations. The workmanship shall be of the highest quality in every detail. Work shall be thorough and neat in all respects. The word "clean" as herein means to remove all dust, dirt, stains, marks, smears, scuff marks or foreign matter which can be removed without resultant damage to the surface.

(g) Services Defined: The following definitions apply to the janitorial services as required by this specification:

(1) Sweeping, Dust Mopping: Floors shall be swept, and/or dust mopped so as to present a clean and orderly appearance, with no loose dirt or streaks in evidence, including corners and places inaccessible to the mop. It is intended that all dirt, dust and surface contamination, except embedded dirt and stains, shall be removed by the sweeping method. Care shall be taken to prevent marring of baseboards, furniture or equipment. The use of sweeping compound is permitted only on unwaxed surfaces.

(2) Vacuum Rugs: Woven fiber rugs and carpeting shall be vacuumed. After vacuuming, the carpeted floor shall be left free from all visible litter, lint and dirt without having damaged the nap. The entire carpeted floor shall be vacuumed including areas under furniture accessible to the vacuum cleaner.

(3) Clean Carpet or Rugs: Carpeting and/or rugs may be cleaned by the steam cleaning or shampooing method using current equipment, material and techniques. Cleaning of carpets and/or rugs shall be scheduled so that the cleaned items are thoroughly dry prior to regularly scheduled working hours.

After shampooing or steam cleaning, carpets and/or rugs shall be left free of streaks, stains and spots and should have a uniform bright color.

(4) Damp Mopping: Floor areas to be damp mopped shall consist of all areas accessible to the mop and include corners and the floor beneath items which can be easily moved, such as chairs and waste baskets. All mopped floors shall present a clean appearance free from streaks, smears, dirt residue and omissions, and shall not show any evidence of any standing water, or splashing of baseboards, furniture or other equipment.

(5) Buffing: After damp mopping and/or waxing, waxed floors shall be buffed to obtain maximum gloss and remove traffic marks, surface dirt and heavy soil to provide a uniform glossy appearance.

(6) Damp Mopping and Waxing: After the floor has been damp mopped and is dry, a light coat of nonflammable, nonslip, self-polishing floor wax suitable for use on the surface being maintained shall be applied. The rewaxed floor shall present a clean appearance free from scuffs, smears, dust marks, or wax build-up. Luster shall have uniform gloss, free from unequal wax distribution throughout the floor area. Damp mopping and waxing shall not be accomplished during the time in which stripping and waxing are accomplished. All furniture shall be moved before damp mopping and waxing.

(7) Stripping and Rewaxing: Stripping shall be accomplished to remove all wax from previously waxed floor surfaces and shall leave the floor clean, dry and uniformilly without gloss. Rewaxing of floors which have been stripped requires two coats of wax, which shall be buffed as described above. All furniture including coat racks, chairs, tables, desks and file cabinets shall be moved and the floor beneath them stripped and waxed with furniture, etc. being replaced to original location after completion of waxing and buffing.

(8) Dusting: The dusting operation includes, but is not limited to furniture, radiators, cabinets, partitions (except floor to ceiling), trim, ledges, wainscots, air-conditioners, lamp shades, file cabinets, partitions, window and door ledges, baseboards and miscellaneous installed equipment on walls. All dusted surfaces shall present a clean appearance, free of smears, streaks, abrasive marks and omissions.

(9) Cleaning and Servicing Restrooms and Showers:

a. Cleaning: All surfaces in restrooms and showers shall be kept free from dirt, soil, graffiti and stains.

b. Fixtures: Fixtures (wash basins, showers, urinals, toilets, deep sinks, dispensers, etc.) shall be left clean and bright; there shall be no dust, stains, rust, mildew or excess moisture.

c. Toilets: Cleaning of toilets shall include both exterior and interior of the bowl, all parts of the seat, exterior of the tank, flushometer valve, polished piping and hardware. Removal of stains on all surfaces is required. All surfaces shall be left free from streaks, stains, scale and omissions.

d. Urinals: Cleaning of urinals shall include the interior and exterior of the bowl, trap or screen, flushometer valve and piping and removal of all foreign matter from inside the bowl. All surfaces shall be left free from streaks, stains, scale and omissions.

e. Floors and Walls: Restroom floors shall be swept and wet mopped. Traps shall be maintained free from odor at all times. All washable walls in restrooms shall be washed. Washed surfaces shall present a clean appearance free from streaks, stains, dirt, soil, and water marks.

f. Miscellaneous: All mirrors, shelving, dispensers, chromium fixtures and piping shall be damp wiped and polished. All waste receptacles shall be emptied, cleaned and disinfected.

g. Servicing: Restrooms shall be inspected, resupplied and maintained for use. Paper towel waste receptacles shall be emptied. Holders and dispensers for paper towels, toilet paper, seat cover dispensers (where provided) and hand soap (liquid, powdered or cake) shall be filled, cleaned and kept in good working order.

h. Policing: Restrooms shall be kept orderly and functional. Trash shall be picked up and all rooms maintained in neat condition.

(i) Clean Drinking Fountains: Drinking fountain tops and plumbing hardware shall be washed. Drinking fountain cabinet shall be wiped. Surfaces shall present a clean dry appearance, free of soil, markings, streaks, water marks and omissions.

(j) Clean Glass: Both sides of glass panels, interior and exterior doors, windows, partitions, interior walls and transoms and telephone booths shall be cleaned. The cleaning solution used shall not stain, fade, or affect adjoining framing, paintwork or varnish. After final wiping, all glass shall present a clean finish free of dirt, lint, water marks, film or streaks.

(k) Remove Trash: Trash baskets, area trash containers located within the various buildings, together with ash trays and butt containers shall be emptied and the refuse deposited in approved containers located near the buildings. Plastic trash bags placed in walkways or corridors shall also be collected and disposed of properly. Office trash containers and ash trays within the buildings shall be maintained in a clean, sanitary condition. Trash can liners shall be removed and a new liner shall be provided and fitted in the trash container at each emptying.

(l) Clean Venetian Blinds: Cleaned venetian blinds shall be left free of stains, streaks and omissions. Special care should be taken to prevent damage to operating mechanisms during cleaning operations.

(m) Clean Light Fixture Covers: Ceiling light fixture covers shall be periodically washed externally and internally and left free of dirt, foreign particles, stains and smears.

(n) Spot Wash Walls: Spot washing of walls shall be accomplished to remove all spots, stains and marks which appear on wall doors, baseboards, partitions and stairs. Surfaces cleaned shall be left dry and free of dirt, streaks and omissions.

(o) Clean Vents: Clean venetilation ducts (inlet and outlet) both high and low locations. Air conditioning units and air conditioning louvers shall be cleaned. Cleaned ducts, louvers and air conditioning units shall be left free of dirt, foreign particles and dust and allow an unobstructed flow of air to reach and pass through the ducts.

(p) Clean Door Exteriors: Cleaning of door exteriors shall be accomplished in the same manner as described for "spot wash walls."

(q) Defective, Damaged or Inoperable Items:The contractor shall repair without delay, all damaged, clogged, leaking or inoperable fixtures, all damaged and/or inoperable dispensers, holders and containers, and any other defective, damaged or inoperable equipment or surfaces.

(r) Moveable Equipment: All exterior and interior surfaces, including burner elements, rubber gaskets, coils, drip pans, broiler pans, racks, trays and burner bibs shall be free of any food residue, grease, grime, dust, fingerprints, soil, and soap or cleaning residue. All equipment components will include all originally-outfitted items. If ranges or ovens are built-in components of the kitchen, the above standards apply.

(s) Other: All exhaust fans, range hoods, assemblies, lights, components, ducts, grease screens/filters and fan blades shall be free of any food residue, grease, grime, dust, fingerprints, soil, and soap or cleaning residue.

H. PAYMENTS AND DEDUCTIONS

1. Consequences of Lessor's Failure to Perform Required Services shall be as follows:

(a) Government's Options:

(1) Correction of Deficiencies: The Government will give the Developer written notice of deficiencies by copies of the Inspector's Daily Reports or otherwise, whenever services are either nonperformed or are performed unsatisfactorily. The parties hereto agree that due to the obligation of the Developer under clause D.2. to maintain an effective inspection system, Developer shall be conclusively presumed to have actual knowledge of work not performed, and that therefore such written notice shall not be prerequisite for withholding payment for nonperformed or unsatisfactorily performed services. Said deductions by the Government for monies otherwise due to the Developer shall represent liquidated damages which are agreed by virtue of the execution of this lease agreement and which are assessed by the Government for nonperformance or unsatisfactory performance. Therefore, in cases where work is not performed or is performed unsatisfactorily, the Government, in addition to other deductions may make the deductions which are identified in the following paragraphs:

a. will deduct from the Developer's monthly invoice an administrative fee of $10 for each item of work which is either not performed or is performed unsatisfactorily.

b. may give Developer an opportunity to redo the work within 24 hours of the Developer's being advised of the opportunity; or

c. may, at its option, have the work performed by Government forces or other means and deduct from the Developer's invoice in addition to other deductions that are stipulated, an amount equal to the cost of having such work performed plus 20 percent for administrative costs, except in the case of E/S calls, which are classified as emergency or urgent calls. This 20 percent is as liquidated damages to compensate the Government for administrative costs and other expenses incurred by the Government to obtain satisfactory completion of the services; or

d. may, at it option, deduct the cost of the nonperformed or unsatisfactory work which is not corrected by any other means, plus 20 percent for liquidated damages. The costs of such work will be based upon the latest published edition of Engineered Performance Standards (EPS) Manuals (Army TB 420-series), which will be utilized to estimate manhour requirements. The manhour requirements will be multiplied by the Department of Labor Service Contract Act Wage Determination rate plus materials at wholesale cost.

(2) Termination/Partial Termination: Upon repeated instances of nonperformance or unsatisfactory performance, the Government, at its option, may assume the responsibilities of the Developer and perform them by use of Government forces or other means and reduceing the rental payment due the Developer by an amount equal to the cost of having the work performed, plus 20 percent for liquidated damages.

(3) Termination of Lease Agreement for Default: Repeated instances of nonperformance or unsatisfactory performance on the part of the Developer will be grounds for termination of the lease agreement for default.

(b) Developer's Failure to Perform Emergency/Service Work: In the event the Developer fails to respond to an emergency/service call within the stipulated response time, the Government may elect, at its option, to contract or otherwise have the services performed in conformity with the contract requirements and charge the Developer for any cost occasioned to the Government that is directly related to the performance of such services, plus liquidated damages in the amount of 20 percent of the cost, except for E/S calls which are classified as emergency calls, the rate for which will be 30 percent, and those classified as urgent, the rate for which will be 25 percent.

(c) Developer's Failure to Complete Change of Occupancy Maintenance Work as Scheduled: In the event the Developer fails to complete change of occupancy maintenance work by the date identified by the Developer as when the unit would be returned to the Government (see Exhibit 3), the Government shall assess liquidated damages based on the most current average daily rate of BAQ plus VHA plus average daily lease cost per unit for each calendar day subsequent to that date.

(d) Developer's Failure to Meet Allowable Change of Occupancy Downtime: If the downtime in any one month for units vacant for purposes of change of occupancy work exceeds the allowable downtime for that month (established in accordance with clause D.5.(a)), the Government shall assess liquidated damages based on the most current average daily rate of BAQ plus VHA plus average daily lease cost for each calendar day in excess of the allowable downtime.

(e) Developer's Failure to Complete Scheduled Repairs: If the Developer fails to complete scheduled repairs in units that were made vacant for that purpose within the time period approved by the Government, the Government will deduct shelter and maintenance rentals prorated on a daily basis beginning with the first late day plus, liquidated damages based on the most current average daily rate of BAQ and VHA for each calendar day in excess of the approved time period.

(2.) Work Authorizations: For those items of work, as identified elsewhere in this annex, for which the Developer is entitled to reimbursement in addition to the monthly lease and maintenance rents, the Government shall issue a work authorization, in writing, authorizing the accomplishment of such work. The work authorization will include the unit address, identification of work to be accomplished, and date when unit will be turned over to the Developer. Developer charges for this work will be based upon the approved list of repair costs.

(3.) Invoicing Instructions: Developer's invoices shall be submitted monthly in an original and three copies for services performed to the Government. The original of each invoice shall have attached to it a copy of the work authorization document(s) and a summary of the charges for reimbursable work. Upon the Government's verification of work actually performed invoices will be processed for payment. Payment will be based on:

(a) A monthly charge for the maintenance and operational service portion of the work.

(b) Reimbursable work which is authorized by Government work authorizations and which is billed in accordance with the approved List of Repair Costs.

(4.) Incentive Fee Board: An incentive fee, for exceptional performance of standards contained in this annex, not to exceed 5 percent of the "Maintenance Rental", will be determined on an annual basis by a board composed of three (Army) Officers or civilian personnel who will evaluate the Developer's performance over the preceding twelve-month period. The board will make a determination within 60 days after the end of the period to grant all, some, or none of the incentive award fee. The 5 percent incentive fee shall not be applied to work ordered by the Government for damages or caused by occupants as contained in C.1.(t).

EXHIBIT 1

FAMILY HOUSING RATES

*Rent Plus Housing Rate

| | |
|---|---|
| 0-3 - 0-10 | $925 |
| W3 - W4 | $925 |
| W1 - W2 | $650 |
| 01 - 02 | $650 |
| E8 - E9 | $850 |
| E4 - E7 | $717 |
| E3 | $645 |
| E2 | $625 |
| E1 | $475 |

Housing allowances are subject to legislation. Congress may institute additional allowances or may elminate current allowances during the term of this lease agreement. In addition, rates are subject to periodic change. To ensure continued full utilization of the units, the Government reserves the right to redesignate the grade occupancy of the units on an annual basis.

*NOTE: These figures include rent plus.

EXHIBIT 2
SAMPLE LIST OF REPAIR COSTS

Date: ______________
Time: ______________

From: (Developer)
To: (Government)

Subj: List of Repair Costs

In accordance with clause C.1.(t), the following items/costs are submitted for approval:

| Item No. | Description | Cost |
|---|---|---|
| 1. | Patch hole in drywall (2" in diameter or less) | $<br>$ |
| 2. | Patch hole in drywall (over 2" in diameter/length) | $ |
| 3. | Patch hole in screen window/door | $ |
| 4. | Replace screen in window | $ |
| 5. | Replace screen in door | $ |
| 6. | Clean refrigerator | $ |
| 7. | Clean range | $ |
| 8. | Clean bathroom | $ |
| 9. | Clean entire unit | $ |
| 10. | Strip floors, etc. | $ |

Signature: ______________________
(Developer Rep)

Approved: ______________________
(Signature of Government Rep and date

EXHIBIT 3
NOTIFICATION OF SCHEDULED CHANGE OF OCCUPANCY

Date: ____________________

From: (Government)
To: (Developer)

Subj: Notification of Scheduled Pre-Termination Inspection, Termination Inspection, and Unit Availability

An intent to vacate notice was filed by ___(occupant name)___ of (address) on ___(date)___. A pre-termination inspection is scheduled to be held at ___(date/time)___. A final inspection is scheduled for (date/time) and the unit is expected to be turned over to you for change of occupancy work/painting as of ___(date/time)___.

Signature: ____________________
(Government Rep)

Received by: ____________________
(Developer Rep)

Date & Time: ____________________

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Date: ____________________

From: (Developer)
To: (Government)

Subj: Notice of Unit Availability for Assignment

The housing unit at ___(address)___ will be officially returned to the Government on ___(date)___ at ___(time)___, with all required work in this unit completed.

Signature: ____________________
(Developer Rep)

Remarks: ____________________

Received by: ____________________
(Government Rep)

Date & Time: ____________________

EXHIBIT 4
WORK AUTHORIZATION

Date: ____________
Time: ____________

From: (Government)
To: (Developer)

Subj: Work Authorization # ____________

You are hereby authorized to perform the reimbursable work listed below at ___ (address)____.

Description | Cost
--- | ---

2. Payment will be based upon latest approved List of Repair Costs dated ________.

Signature: ____________
(Government Rep)

Received by: ____________
(Developer Rep)

Date & Time: ____________

# EXHIBIT 5
## NOTIFICATION OF WORK COMPLETION

Date: ______________
Time: ______________

From: (Developer)
To: (Government)

Subj: Notification of Work Completion/Unit Availability

1. This certifies that all required work at ___(address)___ has been completed and the unit is ready for occupancy.

2. Completed work includes reimbursable work identified on work authorization # ____________ of (date).

Signature: ______________________
(Developer Rep)

Received by: ______________________
(Government Rep)

Date & Time: ______________________

EXHIBIT 6

ENERGY CONSUMPTION ANALYSIS

EXAMPLE CALCULATION:

UNIT TYPE 3 Bedroom
GROSS FLOOR AREA 1200 x 1.20 = 1440 sf
NUMBER STORIES/UNIT 2 Story Duplex

GLASS AREA/UNIT = 150 sf x 0.65 ("U") = 97 BTU
EXTERIOR WALL AREA/UNIT 1300 - 150 = 1150 sf x 0.08 ("U") = 92 BTU
ROOF AREA/UNIT 1300 divided by 2 = 650 sf x 0.05 ("U") = 32 BTU

TOTAL EFFECTIVE BTUs 221 BTU

BTU x HRS/DAY x NO. UNITS / UNIT AREA = BTU/SF/DD-ANNUALLY

221 BTU x 24 HR x 1 UNIT / 1440 SF = 3.68

(Note - See Section LLL, 3.n.1. Energy consumption analysis. 3.68 BTU/SF/DD-Annually would score 55 points.)

PROPOSER'S CALCULATION:

UNIT TYPE ____________
GROSS FLOOR AREA ____________
NUMBER STORIES/UNIT ____________

GLASS AREA/UNIT ____________ = ____ sf x ______ ("U") = ____ BTU
EXTERIOR WALL AREA/UNIT ____________ = ____ sf x ______ ("U") = ____ BTU
ROOF AREA/UNIT ____________ = ____ sf x ______ ("U") = ____ BTU

TOTAL EFFECTIVE BTUs

BTU x HRS/DAY x NO. UNITS / UNIT AREA = BTU/SF/DD-ANNUALLY

BTU x HRS/DAY x 1 UNIT / SF = ____________

For multiple unit types, complete above analysis for each type and provide median or weighted average figure.