# APPENDIX
# PART 2

| :ATEGORY | ITEM | COST SUBMITTAL | APPROVEI COST | APPROVED | DISAPPROVED | REMARKS |
|---|---|---|---|---|---|---|
| \PPLIANCES | REF GTS QPCC REF | $922.44 | | | X | Rare w/a item. Submit per scope & job size. |
| | DISPOSAL | $110.88 | $111.00 | X | | Calculation error on submitted template. Pleas adjust yours |
| | DWASH BLACK PANEL | $61.66 | $52.08 | X | | 2004 book asked for justification as to why the e task time increased. Please provide justificatior for increased amount. If none is provided the approved cost will remain @ 52.08. |
| | DWASH DOOR | $140.03 | $140.03 | X | | |
| | DWASH PARTS | $29.45 | $25.61 | X | | Est task time adjusted. It only takes 1-4 minute replace items not 12 minutes |
| | RANGE BROILER SET | $28.50 | $33.17 | X | | Calculation error on submitted template. Pleas adjust yours. |
| | RANGE DRIPS/RINGS | $32.95. | $32.95 | X | | |
| | RANGE HOOD LENS | $41.10 | $41.10 | X | | |
| | RANGE VENT HOOD | $146.33 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | RANGE VENT FACE PAINT | $27.10 | NA | | X | Rare w/a item. This repair is normally FWT |
| | RANGE | $527.53 | NA | | X | Rare w/a item. |
| | REF CTX21 CLASS CRISPER SHELF | $63.61 | $63.61 | X | | |
| | REF CTX21 DOOR BAR END CAP | $109.54 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | REF CTX21 DOOR BAR END CAP | $311.78 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | REF CTS QBPCC REF | $910.64 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | REF PARTS | $85.63 | $85.63 | X | | |
| | REF CTX21 DOOR BAR | $40.50 | $40.50 | X | | Need Invoice supporting cost of bar. |
| LDG EXTERIOR | DRYER VENT | $38.35 | $38.35 | X | | Need Invoice supporting cost of vent. |
| | EXT CEDAR PAINTED 2X6 OVERHEAD DOOR JAMB | $148.58 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | EXT CEDAR TRIM | $85.69 | $85.69 | X | | |
| | EXT CEDAR DECKING | $27.71 | $27.71 | X | | |
| | EXT DRIVEWAY | $108.76 | $89.61 | X | | 2004 book asked for justification as to why the e task time increased. Please provide justification for increased amount. If none is provided the approved cost will remain @ 89.61 |
| | EXT 2 DRIVEWAYS | $193.92 | $144.71 | X | | 2004 book asked for justification as to why the e task time increased. Please provide justification for increased amount. If none is provided the approved cost will remain @ 144.71 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | ... per scope & job size. Please use the groundskeeper rate when work is ...mplishe |
| | MOW YARD | $36.41 | NA | | X | your groundskeeper. |
| | EXT POST | $145.67 | $129.60 | X | | 1 Travel trip was deleted. No reason why NSA needs to trips two remove/install. |
| | EXT YARD ITEMS 1.5 HOURS | $140.01 | NA | | X | Submit per scope & job size. Please use the groundskeeper rate when work is accomplishe your groundskeeper. |
| | EXT REMOVE NAILS EXT | $48.32 | $32.97 | X | | According to template, work accomplished by grounds keeper. Labor rate is $18.79 and not 27.54. Please adjust your template. |
| | EXT SIDING | $362.30 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | EXT SNOW REMOVAL LARGE | $104.37 | $70.59 | X | | Template errors. Wrong craft allowance and la rate. Please adjust your template. |
| | EXT SNOW REMOVAL SMALL | $60.84 | $41.04 | X | | Template errors. Wrong craft allowance and la rate. Please adjust your template. |
| | EXT CEDAR STEP | $52.9[illegible] | $52.58 | X | | Template errors. Wrong craft allowance. Pleas adjust your template. |
| | EXT YARD ITEMS 1.5 HOURS | $122.1[illegible] | NA | | X | Submit per scope & job size. Please use the groundskeeper rate when work is accomplishe your groundskeeper. |
| | EXT STOVE VENT | $28.1[illegible] | $28.10 | X | | Need Invoice supporting cost of vent. |
| | EXT YARD REPAIR SMALL | $54.60 | $38.02 | X | | Template error. Wrong labor rate used. Please adjust your template. |
| LDG INTERIOR | INT DOOR.ST/HOWER. ROD | $28.95 | $21.33 | X | | Template error. Incorrect craft allow time. Plea adjust your template. |
| | INT BATH ACCESSORIES | $28.64 | $28.49 | X | | Calculation error on submitted template. Pleas adjust yours |
| | INT BATH ACCESSORIES 2 | $28.19 | $28.27 | X | | Template error. Incorrect labor rate. Please ad your template. |
| | INT EXCESS SPACKLE | $71.51 | NA | | X | Submit per scope & job size. |
| | INT 3R FULL PAINT | $1,[illegible]95.57 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | INT 3F FULL PAINT | $1,[illegible]20.01 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | INT 4BR FULL PAINT | $1,[illegible]19.98 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | INT 5BR FULL PAINT | $1,[illegible]87.91 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | INT BEDROOM PAINT 500 FT | $[illegible]40.98 | NA | | X | Submit per scope & job size. |
| | INT PAINT LARGE ROOM | $248.50 | NA | | X | Submit per scope & job size. |
| | INT PAINT MIN 150 SQ FT | $51.36 | NA | | X | Submit per scope & job size. |
| | INT HALF SHEET OF ROCK | $[illegible]04.22 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | INT SHELF/ROD/BRACKET | $34.97 | $34.97 | X | | |
| | INT SPACKLE NAIL HOLES | $76.35 | NA | | X | Submit per scope & job size. |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | If repair is in unfinished garage, te ate must |
| | INT WALL HOLE 1(3)-12" | $116.62 | $116.62 | X | adjusted. |
| | INT SM WALL REPAIR | $22.86 | $22.86 | X | |
| **:ABINETS & CT'S** | DRAWER FRONT | $70.19 | $70.19 | X | |
| | | | | | Template errors. Wrong job prep time on painte |
| | CABINET BASE | $71.52 | $67.65 | X | Please adjust your template. |
| | CABINET DOOR HANDLE | $49.35 | $49.35 | X | |
| | CABINET DOOR | $73.91 | $73.91 | X | |
| | CABINET DOOR HINGE | $29.58 | NA | | X Rare w/a item. Submit per scope & job size. |
| | RPLC 11 FT BAR 3BR-R | $497.37 | NA | | X Rare w/a item. Submit per scope & job size. |
| | RPLC 3-5 FT CT. TOP | $240.86 | NA | | X Rare w/a item. Submit per scope & job size. |
| | | | | | Rare w/a item. This repair is normally the result |
| | END CAPS | $55.06 | NA | | X FWT. |
| | RPLC PER FT KIT. CT. TOP | $1,038.24 | NA | | X Rare w/a item. Submit per scope & job size. |
| | | | | | Countertop repair currently on countertops are |
| | REPAIR COUNTERTOP | $32.98 | NA | | X failing and unsightly. |
| **:OORS** | BYPASS DOORS FLIP X2 | $65.15 | $65.15 | X | |
| | BYPASS DOOR FLIP X1 | $45.99 | $45.99 | X | |
| | BIFOLD OR BY-PASS | $87.32 | $87.32 | X | |
| | INT DOOR KNOBS | $52.93 | $52.93 | X | |
| | BIFOLD DOOR REPAIR | $41.67 | $41.67 | X | |
| | DOOR PARTS | $23.28 | $23.28 | X | |
| | DOORS ONLY | $158.73 | $158.73 | X | |
| | EXT DOOR BRICK MOLDING | $141.93 | $141.93 | X | |
| | EXT DOOR AND LATCH | $298.02 | $298.02 | X | |
| | EXT DOOR SURFACE REPAIR | $64.00 | NA | | X Rare w/a item. Submit per scope & job size. |
| | | | | | Template errors. Wrong craft allow. Please adj |
| | EXT DOOR, LATCH, 1/2 JAMB | $534.74 | $528.19 | X | your template. |
| | EXT DOOR JAMB ONE SIDE | $261.31 | $261.31 | X | |
| | INT DOOR JAMB 1/2 | $101.08 | $101.08 | X | |
| | INT DOOR JAMB | $187.13 | $187.13 | X | |
| | INT DOOR & JAMB | $361.35 | NA | | X Rare w/a item. Submit per scope & job size. |
| | INT JAMB STOP OR TRIM | $23.98 | $23.98 | X | Need invoice supporting increase in 7' jamb sto |
| | STAIR HANDRAIL | $131.05 | NA | | X Rare w/a item. Submit per scope & job size. |
| | INT STAIR CAP WOOD | $75.24 | NA | | X Rare w/a item. Submit per scope & job size. |
| | KEY | $15.87 | $15.87 | X | |
| | REKEY 3 DOORS NEW | $116.77 | $116.77 | X | |
| | REKEY 3DOORS NEW | $128.15 | NA | | X Rare w/a item. Submit per scope & job size. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | OLID CORE JAMB ONE SIDE | $237.56 | $237.5 | X | | Template errors. Wrong craft allow. Please adj your template. |
| | STORM DOOR PARTS | $36.13 | $36.25 | X | | |
| | WOOD REPAIR | $23.50 | $23.50 | X | | |
| :LECTRICAL | DIMMER SWITCH KNOB | $18.68 | $22.52 | X | | Template errors. Wrong job pre time. Please adjust your template. |
| | LIGHT BULB | $26.21 | NA | | X | Rare w/a item. Work is normally replaced by resident or during cleaning. |
| | NEW LIGHT FIXTURES | $76.11 | $75.61 | X | | Template errors. Wrong craft allowance. Gene maintenance is .15 not .16. Please adjust your template. Per a COD, NSAHC is responsible fo the extra cost for components considered upgrades as is the case with the $109.00 oak gr kitchen light fixture. The government will only reimburse NSAHC $50.00 when the replacemer due to resident abuse. |
| | LIGHT LENS OR GLOBE | $31.09 | $30.90 | X | | Template errors. Wrong craft allowance. Genei maintenance is .15 not .16. Please adjust your template. |
| | RECEP OUTLET SWITCH | $31.79 | $26.06 | X | | Template errors. Cost materials column is incorrect. Please adjust your template. |
| | GFCI RECEPTACLE | $47.69 | $47.69 | X | | |
| | SMOKE ALARM | $40.24 | $38.54 | X | | Template errors. Wrong craft allow time and co of smoke detector does not match the invoice. Please adjust your template and provide the government with the justification for the differen in the invoice and cost on the template for the smoke alarm. |
| | THERMOSTAT | $50.71 | $50.71 | X | | |
| LOORING | DUMP FEE 1/2 CARPET | $20.30 | NA | | X | Disapproved. This is not a w/a item. |
| | DUMP FEE | $43.47 | NA | | X | Disapproved. This is not a w/a item. |
| | CPT PER YD NO SEAL | $575.96 | NA | | | Separate materials from labor and resubmit as done in 2004 approved cost book. |
| | CPT FULL & SEAL PER YD | $823.28 | NA | | | Separate materials from labor and resubmit. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | CPT RPL 3F FULL SEAL 124YD | $2,553.84 | $2,386.37 | upon receipt of required invoices validating increases | | Please submit new invoice for metal reduce, T 111 metal, & pad showing increase costs. 2004 approved cost book will be used for time unless justification for labor increase is provided. |
| | CPT RPL 3R FULL SEAL 112YD | $2,282.57 | $2,139.66 | SEE ABOVE | | SEE ABOVE |
| | CPT RPL 4BR FULL SEAL 136YD | $2,775.08 | $2,630.71 | SEE ABOVE | | SEE ABOVE |
| | CPT RPL 5BR FULL SEAL 152YD | $3,100.55 | $2,935.35 | SEE ABOVE | | SEE ABOVE |
| | CPT RPL 3F UP 84YD | $1,211.24 | $1,121.11 | SEE ABOVE | | SEE ABOVE |
| | CPT RPL 3R UP 80YD | $1,152.36 | $1,066.52 | SEE ABOVE | | SEE ABOVE |
| | CPT REPAIR | $26.83 | $26.83 | X | | |
| | CPT STEP | $57.82 | $57.82 | X | | |
| | VINYL REPAIR | $33.76 | $37.59 | X | | Template errors. Wrong job prep. Please adju your template. |
| | VINYL 1YARD MAX | $113.39 | NA | | X | Has NSAHC ever done a repair that required 1y of vinyl. I would think that it would look unsightl Submit per job scope. |
| | VINYL RPL 3F DS 43YD | $900.13 | $841.06 | Will be given upon receipt of required invoices validating increases | | Please submit your calculation for the shipping the pad. I also need the new invoice for the increase in cost on the rubber base. 2004 approved cost book will be used for time unless justification for labor increase is provided. |
| | VINYL RPL 3R KIT 16YD | $343.40 | $342.38 | SEE ABOVE | | SEE ABOVE. Template errors. Please adjust y template. |
| | VINYL RPL 4-5 BR KIT 24YD | $496.82 | $479.35 | SEE ABOVE | | SEE ABOVE |
| | VINYL RPL MIN 6YD | $141.74 | $115.69 | SEE ABOVE | | SEE ABOVE. Please provide the type of sealer used and the specifics. |
| | VINYL RPL MIN 6YD | $185.16 | $159.10 | SEE ABOVE | | SEE ABOVE |
| **ARAGE** | WHITE BLANKET REPAIR | $22.92 | $22.92 | X | | |
| | HALF BLANKET | $63.23 | $63.23 | X | | |
| | BLANKET | $109.21 | $109.21 | X | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | GUTTER AND PARTS | $23.50 | $23.50 | X | | Top 6 items on template are rarely laced due t resident abuse. Those 6 items are disapproved. |
| | HEATER PIPE INSULATION | $34.57 | NA | | X | Rare w/a item. Submit per scope & job size. Template error. Total labor time incorrect in 2 lin items. Please adjust your template. |
| | PANEL & BRACE | $272.74 | $272.97 | X | | |
| | BRACE | $51.93 | $51.93 | X | | |
| | PANEL OTHER THAN BOTTOM | $260.57 | $260.57 | X | | |
| | REPAIR PANEL | $78.55 | $78.55 | X | | |
| | 2 PANELS & BRACE & HINGE | $616.87 | $616.87 | X | | |
| | REMOTE | $57.38 | $57.38 | X | | |
| | REMOVE SHELF IN GARAGE | $21.08 | $21.08 | X | | |
| | THERMOSTAT LOCK | $24.10 | $24.10 | X | | |
| | VERTICAL TRACK & PARTS | $71.19 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | WEATHER STRIP STOP | $39.87 | $39.87 | X | | |
| LUMBING | PLUB PARTS | $38.32 | $38.32 | X | | |
| | INT BATH ACCESSORIES | $28.16 | $28.00 | X | | Template error. Wrong craft allow time. Adjust your template. |
| | BATH SINK FAUCET REPLACED | $90.07 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | BATH SINK BLOCKED | $22.61 | NA | | X | This is normally a PM item and not reimbursable. |
| | BATH SINK REPLACED | $122.18 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | OUTSIDE HOSE BIB | $98.27 | NA | | X | Rare w/a item. Submit per scope & job size. |
| | PAINT HEATER CABINET | $27.62 | | | X | Rare w/a item. This repair is normally the result FWT. |
| | HEATER CAPS | $27.71 | $27.71 | X | | |
| | SPLICE KIT - PIVOT | $24.11 | $24.11 | X | | |
| | HEATER BACK PER FT 2'-7' | $147.01 | $145.88 | X | | Template errors. Wrong craft allowance. Gener maintenance is .15 not .16. Please adjust your template. |
| | HEATER BACK 8'-12' | $230.25 | $228.78 | X | | Template errors. Wrong craft allowance. Gener maintenance is .15 not .16. Please adjust your template. |
| | HEATER COVER PER FOOT | $95.73 | $95.73 | X | | |
| | HEATER FULL PER FT 2'-7' | $240.24 | | | | Why is the cost so high on materials? Frontier Plumbing sells the complete 4' heater for just $29.69 & the 8' heater for just $59.37. |
| | HEATER FULL PER FT 8-12' | $311.68 | | | | SEE ABOVE |
| | SHOWER STALL | $399.48 | NA | | X | Rare w/a tem. This repair is normally the result FWT. |
| | TOILET BOWL | $183.62 | $183.62 | X | | |

| | | | | | |
|---|---|---|---|---|---|
| | FULL TOILET | [illegible] | [illegible] | X | |
| | TOILET SEAT TIGHTEN | $21.08 | NA | | X This is normally a PM item and not reimbursable. |
| | TOILET SEAT | $37.35 | $37.35 | X | |
| | TOILET TANK | $108.89 | $108.89 | X | |
| | TUB & SURROUND | $965.17 | NA | | X Rare w/a item. Submit per scope & job size. |
| **WINDOWS** | BLIND CORD | $27.73 | NA | | Rare w/a item. This repair is normally the result of X FWT. Please submit recent voucher for cost of blinds. With Lowes and Home Depot, we can't get blinds at a lower cost. |
| | 54X57 BLIND | $212.43 | | | |
| | 118x33 BLIND | $176.23 | | | SEE ABOVE |
| | BLIND SMALL | $58.81 | | | SEE ABOVE |
| | BLIND MED | $62.17 | | | SEE ABOVE |
| | 3F LARGE BLIND SLAT | $63.08 | $58.09 | X | Template error. Wrong total labor time. Please adjust your template. How many slats does this repair include? |
| | BL1-SLATS | $40.98 | $35.98 | X | Template error. Wrong total labor time. Please adjust your template. |
| | WINDOW SASH | $60.71 | NA | | X Rare w/a item. Submit per scope & job size. |
| | CRANK HANDLES/WAND | $32.07 | $30.15 | X | Template error. Wrong craft time. Please adjust your template. |
| | WINDOW CRANK | $46.60 | $45.68 | X | Template error. Wrong craft time. Please adjust your template. |
| | FORMICA TRIM | $39.27 | $39.27 | X | |
| | FORMICA SILL | $125.11 | NA | | X Rare w/a item. Submit per scope & job size. |
| | GRID REPAIR | $23.76 | $23.76 | X | |
| | GRID ALL | $74.24 | $74.24 | X | |
| | SCREEN | $30.32 | $30.32 | X | |
| | SCREEN CORNERS | $29.61 | $29.61 | X | |
| | SCREEN&FRAME | $64.23 | $64.23 | X | |
| | TRAVERSE ROD | $50.96 | NA | X | Rare item. I have never w/a this item. |
| | 14x24 WINDOW | $126.68 | $126.68 | X | |
| | 14X32 WINDOW | $107.40 | $107.40 | X | |
| | 14X38 WINDOW | $117.13 | $117.13 | X | |
| | 14X44 WINDOW | $126.88 | $126.88 | X | |
| | 14X56 WINDOW | $146.11 | $146.11 | X | |
| | 20X24 WINDOW | $111.14 | $111.14 | X | |
| | 20X32 WINDOW | $129.61 | $129.61 | X | |
| | 20x38 WINDOW | $143.59 | $143.59 | X | |
| | 20X56 WINDOW | $185.01 | $185.01 | X | |

| | | | |
|---|---|---|---|
| 24X26 WINDOW | $127.78 | $127.78 | X |
| 4X38 WINDOW | $161.05 | $161.0 | X |
| 24X44 WINDOW | $177.69 | $177.69 | X |
| 24X56 WINDOW | $210.97 | $210.97 | X |

OTES: WHEN EVER A SUBCONTRACTOR IS USED, NSAHC MUST SUBMIT THEIR INVOICES.
THE ABOVE W/A'S INCLUDE TRAVEL TIME, HOWEVER, THE TRAVEL TIME SHOULD BE ADJUSTED WHEN THEY ARE COMBINED AS IN A COM. WHEN A UNIT IS ISSUED UNDER A COM, ACTUAL TRAVEL TIME TO ACCOMPLISH W/A ITEMS SHOULD BE CAPTURED AND REPORTED.

1066 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email naah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

September 4, 2002

Certified Mail / Return Receipt Requested

Mr. Harold D. Hopson
Contracting Officer
Department of the Army
U.S. Army Engineer District, Alaska
P.O. Box 898
Anchorage, Alaska 99506-00898

Dear Mr. Hopson:

The nineteen-and-a-half year lease agreement ("Lease") pertaining to the 400-unit Army housing complex on Fort Wainwright, Alaska known as Birchwood Homes was entered into by North Star Alaska Housing Corporation ("North Star") and the United States of America ("Government") by virtue of the authority of 10 U.S.C. § 2828, as amended by Section 801 of Public Law 98-115 ("Section 801"). Section 801 introduced privatization into the military housing market, and represents an effort by Congress to ensure that soldiers and their families receive quality, safe, affordable, and convenient housing options that had been lacking when military housing was exclusively Government-run. Successful implementation of Section 801 requires the Government to partner with private housing contractors in the provision of housing to servicemen and women and their families.

As set forth in the instant claim, the Government's continuous breaches of the Lease and its demonstrated bad faith in administering the Lease thwarts Congressional intent, impedes North Star's ability to maintain quality housing for military families, diminishes the value of the Birchwood Homes, and increases North Star's costs beyond that which was contemplated when the Lease was executed, resulting in a decrease in North Star's cash flow, uncertainty in its income, and a consequent increase in its capitalization rate. The government's actions have resulted in damages in the amount of $12,959,390 for which compensation is hereby requested. Considering your past correspondence, North Star considers that a Dispute under the Contract Disputes Act exists and a Decision is hereby requested within sixty (60) days from your receipt of this letter.

PLAINTIFF'S
EXHIBIT
231

North Star Alaska Housing Corporation

A Fischer Properties Company

THE CLAIM--

## I. The Government Neglects the Interconnected Duties to Supervise Occupants, Authorize North Star to Correct Occupant-Caused Damage, and Reimburse North Star for Such Correction

The Lease directs the Government to (1) ensure that Birchwood occupants comply with rules of maintenance and occupancy; (2) authorize North Star to replace and repair occupant-caused damage; and (3) reimburse North Star for the replacement and repair of such damage. The Government's failure to comply with these inter-connected contractual obligations have caused North Star's costs to increase and have caused substantial diminution in the value of North Star's asset.

### A. The Government Fails to Oversee and Control Occupant Conduct at Birchwood as Required by the Lease

The Government's obligation to oversee "the day-to-day administration of the housing site," includes the responsibility to "[e]stablish and disseminate to occupants rules and regulations governing occupancy of units" and to "[e]nsure occupant compliance with all rules and regulations." Lease Maintenance Annex § C.2.(c). The rules and regulations governing occupancy of Birchwood Homes are printed in the Fort Wainwright Resident's Handbook, and include the following:

- The yard cannot be utilized as a storage areas for items such as tires, wood, trash bags, furniture, boxes, cloth material, batteries, charcoal, etc.;
- No construction of trailers, ice houses, etc. in housing areas;
- Occupants must maintain homes in a manner similar to any proud homeowner in a well-maintained neighborhood;
- Occupants must keep their home and grounds in a clean, orderly, sanitary, and safe condition, and must ensure that their quarters, grounds, and equipment are not subject to abuse or neglect, and that the premises are not used for commercial, illegal or immoral purposes;
- In the case of damage beyond normal wear and tear, the resident will be held liable for payment or repair/restoration prior to clearance of quarters;
- Army quarters and related equipment, and furnishings which are damaged by pets allowed on premises by the resident will be repaired or replaced at the resident's expense. If pets are allowed in the quarters, carpets that cannot be thoroughly cleaned to remove pet odors will be replaced at the resident's expense;
- Residents are completely responsible for any damages done by pets inside or outside of their homes. Pet damage is never

considered "fair wear and tear". Occupants must exercise strict controls to ensure that pets do not soil or urinate on carpet;

- Residents can have no more than two pets per house, and all animals will be registered within five days of arriving at Fort Wainwright;
- Animals must be kept under control at all times, and residents who do not control their pets will be subject to revocation of their pet privileges;
- Pets will not be tethered to any parts of the buildings or landscaping, and will not be tied to trees;
- Family Housing areas are inspected periodically by Post Services with respect to grass cutting and edging; trimming along fences; pet feces removal; pet damage; pets tied to porches, trees, fences or utility outlets; storage of recreational vehicles; storage of tires or other appliances; privately owned vehicle repairs; policing of trash including all common areas; and dumpsters;
- Residents are responsible for maintaining their yards, which require more attention in the summertime;
- Residents should never leave a stove unattended and should keep all flammable items away from the stove;
- Residents should never smoke in bed and should not allow children access to matches, lighters, and the like;
- The Post Commander appoints area coordinators, who are responsible for ensuring that all residents comply with their responsibilities, including policing of lawns, ensuring that residents are aware of post regulations concerning control of animals, daily policing of animal feces, parking in family quarter areas, and maintaining quiet hours;
- If the resident willfully or negligently destroys, defaces, damages, impairs, or removes any part of the premises, repairs will be at the resident's expense;
- Residents will, at their own expense, keep and preserve in good condition lawns, shrubbery, and fences, and will repair and replace all broken or damaged glass, screens, flooring, wood, plaster, drywall, and locks occurring during their occupancy, normal wear and tear excepted.

Birchwood Homes are plagued by the Government's failure to enforce occupant compliance with rules and regulations for unit occupancy, maintenance of yards, and care of pets. For example, pets are permitted to run unleashed on the Premises, or are improperly tied to the Premises; pet feces are not picked up; occupants permit their pets to urinate on carpet; fires erupt from children gaining access to matches and lighters; yards remain unkempt, with pets digging holes, destroying the grass, and occupants leaving their yards cluttered with debris; some occupants have recreational vehicles permanently parked on their front lawns,

while others have vehicles permanently parked in visitor spots; and tires, furniture and other debris clutter porches, yards, and driveways at Birchwood. Some of these practices are highlighted in three letters from North Star to the Government, dated December 15, 2000 (Exhibit ("Ex.") A).

Despite these compound and obvious lapses in occupant compliance with community rules, the Government personnel tasked with enforcing community rules do not respond. Post Services and area coordinators neglect their duty to inspect the Premises and enforce occupant compliance with Birchwood rules and regulations. Moreover, the Government does not evict abusive tenants from North Star's property. In addition, the Government does not provide North Star with updated names and phone numbers of Birchwood occupants, which is also contractually required. Lease Maintenance Annex § C.(2)(c)(13). The Government's failure to monitor and enforce the conduct of Birchwood occupants, and its neglect of conditions at Birchwood in violation of the standards established by the Lease and Resident's Handbook have caused substantial diminution in the value of North Star's property, and have degraded the quality of life for Birchwood residents. Moreover, the correction of damages caused by the Government's neglect of its duty to enforce occupant conduct increases North Star's costs.

### B. The Government Fails to Issue Work Authorizations for Occupant-Caused Damage as Required by the Lease

The Lease provides that "[d]amages to a housing unit or to other improvements within the project which are beyond normal wear and tear and are caused by the Government or an occupant, his dependants, or invited guests, which are not corrected by the Government or occupant, shall be repaired by the Developer. The cost of such repairs shall be billed to the Government." Lease Maintenance Annex § C.1(s). The mechanism pursuant to which North Star secures payment for repairing occupant-caused damages is the Work Authorization, which is "[a]n official document issued by the Government for the accomplishment of work by the Developer and which is used to verify entitlement for reimbursement." Lease Maintenance Annex § B.(33). The Lease directs the Government to issue "a work authorization for the repair of damages, or accomplishment of cleaning, which are the responsibility of the occupant but were not completed at the time of the termination inspection.". Lease Maintenance Annex § D.7(3). It further directs that "[f]or those items of work, as identified elsewhere in this annex, for which the Developer is entitled to reimbursement in addition to the monthly lease and maintenance rent, the Government shall issue a work authorization." Lease Maintenance Annex § H.(2).

The Government has systematically refused to issue work authorizations to North Star to repair occupant-caused damages and maintain the Premises. Without a work authorization, North Star cannot expect reimbursement from the Government for work it performs, even if such work is necessitated by occupant-

caused damage. Indeed, in your March 26, 2000 Contracting Officer's Decision regarding replacement of carpet and vinyl at 815 Sibert, you stated that "[i]f North Star performs work without benefit of a work authorization, they [sic] do so at their sole expense." Moreover, the Work Authorization is North Star's only mechanism of reimbursement, as the Lease provides that "[u]nder no circumstances shall the Developer negotiate or settle reimbursement of costs for such [occupant-necessitated] repairs directly with the occupant, his dependents, or invited guests." Lease Maintenance Annex § C.1.(s). North Star relies solely on the Government's compliance with the Lease to be able to maintain the Premises and be reimbursed for occupant-caused damage.

The Government has taken the position that it is the sole arbiter, beholden to no standard, of when and whether to issue work authorizations to North Star to correct occupant damage. As set forth in the appended letters from North Star to the Government regarding 1108 New Guinea, dated July 24 and July 31, 2002 (Ex. B), the Government's position is untenable, as the Lease *requires* the Government to issue work authorizations for the repair of occupant-caused damage that have not been corrected by the occupant. Lease Maintenance Annex §§ D.7(b)(2), D.7(c). Moreover, the Government's position ignores the Standards for Maintenance, pursuant to which all units will be maintained "to a standard that prevents deterioration beyond that which results from normal wear and tear, and corrects deficiencies in a timely manner to assure full life expectancy of the facilities and equipment. The level of maintenance shall assure all structures are free of missing components or defects which would affect the safety, pleasing appearance or habitability of the units." Lease Maintenance Annex § E. Work authorizations are the contractual mechanism that North Star relies on to be able to maintain the units in accordance with the Standards for Maintenance and be assured of reimbursement.

The Government's practice of refusing to work authorize North Star to correct damages to units caused by occupants (while also failing to enforce tenant compliance with occupancy rules) violates the clear proscriptions of the Lease. The correction of occupant damages by North Star absent the benefit of a work authorization deprives North Star of the reimbursement to which it is entitled and increases North Star's costs, while the work foregone (because it has not been authorized) diminishes the value of North Star's property.

### C. The Government is Engaged in the Practice of Issuing Improper and Untimely Work Authorizations that Reduce or Eliminate the Amount Reimbursed to North Star

When the Government does issue work authorizations, such work authorizations are frequently deficient in one or all of the following ways: the reimbursement amount is left blank or listed as "zero"; reimbursement is not based on the List of Repair Costs; subcontractor invoices are required prior to reimbursement; reimbursement is withheld due to purported discrepancies

between subcontractor invoices and the billing template; work authorized replacement items are depreciated; work authorizations do not reflect the damage recorded on inspection forms; work authorizations are not based on maintenance identified at the pre-termination and termination inspections; and reimbursement for reasonable overhead is not included.

### 1. Cost Information is Eliminated

The work authorization "is used [by North Star] to verify entitlement to reimbursement." Lease Maintenance Annex § B.(33). Accordingly, the work authorization form appended as Exhibit 4 to the Lease provides a space for both a "description" and "cost" of work, and states that "[p]ayment will be based upon latest approved List of Repair Costs . . . ." Lease Ex. 4. The Government's actions in failing to list a cost for work authorized items, or listing such cost as "zero", violates the work authorization provisions of the Lease. The Government's conduct with respect to 1008 Sims exemplifies this practice (but is by no means the only example), as documented by letters from North Star to the Government dated June 28, July 3, and July 15, 2002 (Ex. C).

### 2. Reimbursement is not Based on the List of Repair Costs

The Government is issuing work authorizations that do not base reimbursement on the List of Repair Costs. Moreover, the Government has unilaterally removed items such as floor coverings from the List of Repair Costs. As set forth in the appended letters from North Star to the Government, dated June 28, 2002, July 25, 2002, August 7, 2002, and August 28, 2002 (Ex. D), the Government does not have this authority (the June 28 letter also shows the Government's listing zero as the reimbursement amount and requiring subcontractor invoices). Pursuant to the Lease, North Star "shall, with the approval of the Government, establish a list of cleaning and repair costs for dwelling unit components which will establish the normal maximum amounts to be charged in the event of damage to property and equipment installed within a living unit over and above normal wear and tear." Lease Maintenance Annex § C.1.(t).

### 3. The Government Demands Subcontractor Invoices as a Condition for Reimbursement

The Government attempts to justify its failure to list cost information on work authorization forms based on the List of Repair Costs by imposing an extra-contractual requirement on North Star: that it submit subcontractor invoices to the Government as a condition for reimbursement. As set forth in the August 7 and August 28 letters (Ex. D), nothing in the lease requires North Star to provide the Government with invoices from North Star's subcontractors – North Star simply bills the Government based on the List of Repair Costs, and provides invoices (based on such Costs) on a monthly basis, for reimbursement by the

Government. North Star's billing invoices (as opposed to subcontractor invoices) "shall be submitted monthly . . . for services performed for the Government. The original of each invoice shall have attached to it a copy of the work authorization document(s) and a summary of the charges for reimbursable work. Upon the Government's verification of work actually performed invoices will be processed for payment. Payment will be based on: (a) A monthly charge for the maintenance and operational services portion of the work; (b) Reimbursable work which is authorized by Government work authorizations and which is billed in accordance with the approved List of Repair Costs." Lease Maintenance Annex § H.(3).

#### 4. The Government Withholds Reimbursement Due to Purported Discrepancies Between Subcontractor Invoices and the Billing Template

As discussed above, the Government has conditioned reimbursement to North Star for correction of occupant-caused damages upon receipt of subcontractor invoices in violation of the Lease. In an effort to accommodate the Government, North Star provided several carpet installation invoices, despite having no contractual obligation to do so. The Government is now using the invoices to deny reimbursement to North Star, citing purported "serious discrepancies" between the billing templates used to invoice the Government (which was approved by the Government as part of the List of Repair Cost) and the invoices paid by North Star to its carpet installer.

As examples, as set forth in the July 25 and August 7 letters (Ex. D), North Star could not identify the Government's specific grievance, because the Government repeatedly refused North Star's request that it identify and provide the specific invoices in question. However, it appeared that the Government was quibbling with minor differences between the unit measurements listed on the billing template and the actual amount of carpet used by the installer – a difference that is to be expected, as carpet used for installation does not exactly match unit measurements. Moreover, the minor difference with respect to 1237 Munoz resulted in the Government being underbilled for 1.67 yards of carpet, the cost of which was borne by North Star. As set forth in the August 28 letter (Ex. D), none of the "discrepancies" that the Government finally identified were valid, as the invoices had been properly completed by the carpet installer. The Government's conduct of fabricating "discrepancies," in order to withhold reimbursement to North Star for work authorized carpet replacement necessitated by occupant damage and billed in accordance with the List of Repair Costs, violates the clear dictates of the Lease.

**5. Depreciation is Taken on All Work Authorized Replacement Items**

The Government is also using the work authorization form to improperly depreciate all work authorized replacement items (such as countertops, blinds, appliance parts, and flooring), in contrast to prior practice and despite the absence of a depreciation schedule from the Lease, which places financial responsibility for occupant-caused damages on the Government. Lease Maintenance Annex § C.1.(s). This conduct, which the Government is using to reduce or eliminate reimbursement to North Star, is exemplified in the appended July 18, 2002 and August 13, 2002 letters (Ex. E) from North Star to the Government. As noted, the Government's application of depreciation to reimbursable items is inconsistent, and varies across work authorizations. Moreover, the Government has not provided North Star with its basis for applying depreciation or its calculation of the rate of depreciation for items other than carpet, as requested on numerous occasions. (Finally, please note that 1/3 of the Birchwood units contain original washer-dryers, which are provided by and replaced by the Government).

**6. Work Authorizations for Units do not Match Inspection Forms**

Another problem with the Government's work authorization forms is that they do not accurately reflect the damage noted on inspection forms. As discussed in the appended August 8, 2002 letter from North Star to the Government (Ex. F), as well as the August 28 letter (Ex. D), the work authorizations for units 1004 and 748 each list a zero reimbursement amount for carpet identified as being replaced for fair and tear (frays, runs, bad seams, worn). However, the inspection forms for these units attribute carpet damage to pet urine stains. Additionally, as set forth in the August 28 letter (Ex. D), the Government has directed that kitchen vinyl be replaced in unit 745 despite the fact that the vinyl is not in a condition that warrants replacement and is not identified as such on the inspection forms for that unit. (A similar situation exists with respect to carpet replacement in unit 745). It is a violation of the Lease for the Government to issue work authorizations that do not reflect reimbursement to North Star for occupant-caused damages in need of correction.

**7. The Government is Using an Unauthorized Post-Cleaning Inspection to Determine Work to be Performed on Units**

As discussed in the August 28 letter (Ex. D), the Lease requires work authorizations to be based upon occupant-caused damages in need of correction "at the time of the termination inspection." Lease Maintenance Annex § D.7.(b)(3). Contrary to the Lease scheme, the Government has instituted a practice whereby the Housing Manager inspects the unit after the cleaning contractor cleans the unit, and bases the work authorization upon that

unauthorized post-cleaning inspection (or directs additional work after that post-cleaning inspection). Under the Lease, North Star is entitled to rely upon the list of maintenance items agreed upon by the Site Manager and Government Inspector at the pre-termination and termination inspections, and the Government's conduct in basing work authorizations on a "cleaning inspection" interferes with this process. Moreover, as the Government's conduct respecting 646 Wainwright (which sustained over $7,000 in occupant damage) illustrates, the Government is hindering North Star's scheduling efforts by delaying the provision of work authorizations for items in need of repair.

### 8. Overhead is Not Included in the Reimbursable Amounts

Finally, although Section C.1(t) of the Lease entitles North Star to reasonable overhead for manhour costs expended to repair damage to property above normal wear and tear, the Government is engaged in the practice of excluding overhead.

## II. The Government Treats Birchwood in a Discriminatory Manner as Compared to Other Housing Developments at Fort Wainwright

The Government Housing Office treats Birchwood Homes differently from other communities at Fort Wainwright. This practice has impeded the upkeep of the Premises at Birchwood and diminished the value of North Star's asset. Specific examples of this behavior, discussed below, include the Government's failure to provide the Self Help items necessary to assist Birchwood occupants in the maintenance of their homes, failure to regularly provide clean-up Battalion support to Birchwood as has done for other Fort Wainwright communities, placement of a disproportionate number of temporary occupants at Birchwood, and counseling military families at Fort Wainwright against living in Birchwood.

### A. The Government Excludes Birchwood Repair Items from the Self Help Center

The Housing Office specifically excludes hardware items needed to accomplish minor maintenance work in Birchwood Homes from its inventory of Self Help items. According to the Fort Wainwright Resident's Handbook, the Self Help Program is designed to facilitate the "maximum use of available resources to improve living conditions and general appearance of the facilities" by stocking items in a Self Help Center that occupants can obtain to conduct "required Self Help repairs": plunging plugged sinks or toilet bowls; resetting garbage disposal; replacing faucet washers; patching small holes in walls and ceilings; minor interior painting; repairing screens and frames; minor control of ants, roaches, and other household pests; tightening or replacing building hardware items; replacing light bulbs, globes, switch and outlet covers; cleaning

filters; and other similar work. The Government's exclusion of Birchwood repair items from the Fort Wainwright Self Help Center hampers occupants' ability to maintain the units in accordance with the rules and regulations for occupancy at Birchwood. Birchwood Residents are denied the convenience of the Self Help Program afforded to residents of other housing communities, and must obtain repair items at their own expense, from an alternate source. Moreover, the Government is engaged in the practice of passing minor maintenance charges on to Birchwood residents that it does not pass on to residents of other housing communities at Fort Wainwright. Accordingly, the Government's exclusion of Birchwood items from the Self Help Center and charging of Birchwood occupants for items not charged to residents of other communities makes Birchwood a less attractive housing option to Fort Wainwright residents and contributes to the diminution of value of North Star's asset.

### B. The Government Has Deprived Birchwood of the Clean-Up Services of the Support Battalion

The Government also accords disparate treatment to Birchwood by depriving it of the services of the Support Battalion, which is supposed to assist with occupant maintenance and property clean-up. In 2000, two Support Battalion members arrived at Birchwood with instructions not to enter the housing area, and in 2001, no Support Battalion members were sent to Birchwood at all. In contrast, other Fort Wainwright housing areas received support from their Support Battalion in 2000 and 2001, and had assistance in clean-up and maintenance efforts. In May 2002, for the first time in several years, the Support Battalion finally assisted with the clean-up effort at Birchwood. However, the years of neglect from the Support Battalion have compounded the poor appearance and property damage caused by the Government's failure to enforce occupant compliance with community rules and have substantially diminished North Star's asset.

### C. The Government Places a Disproportionate Number of Temporary Occupants at Birchwood

The Government is engaged in a course of conduct pursuant to which it places a disproportionately large number of temporary occupants in Birchwood Homes, to the financial detriment of North Star. In executing the Lease, the Government and North Star contemplated that an estimated 30% of the units may be vacated during a 12- month period. Lease Maintenance Annex § D.7.(a). Last year, 50% of the units at Birchwood underwent a change of occupancy. The Government is responsible for this disproportionate change of occupancy rate at Birchwood, through its targeted placement of families in need of temporary housing at Birchwood. Each occupancy change requires North Star to incur substantial costs and expend substantial resources to perform change of occupancy maintenance on units. Moreover, short-term occupants lack incentives to care for and maintain their temporary homes (particularly when the

Government fails ensure occupant compliance with occupancy standards, fails to charge occupants for damages they cause, and fails to evict abusive occupants), which diminishes the value of North Star's asset.

### D. The Government Counsels Prospective Residents Not to Live at Birchwood

Birchwood is also accorded disparate treatment by the Government housing counselors who have advised newly-arriving military families not to live in Birchwood due to alleged management problems. The Government's conduct in engineering a negative reputation for Birchwood among arriving military families interferes with North Star's ability to provide housing to military families, creates an atmosphere in which occupants lack incentives to care for Birchwood Homes, violates the U.S. Army Alaska's Family Housing Policy that "[a]ll government quarters are considered adequate housing and no distinction is made between the age, style, or location of housing units," and diminishes the value of North Star's asset.

## III. The Government's Conduct Respecting Change of Occupancy Inspections, Turnover, Maintenance, and Ordering Disputed Work Violates the Lease and Results in Inflated Calculations of Down Days

### A. The Government is Failing to Meet its Contractual Obligation to Timely Notify North Star of the Pre-Termination and Termination Inspection Dates

As set forth in the appended June 27, 2002 and August 19, 2002 letters from North Star to the Government (Ex. G), the Lease requires the Government to notify North Star in writing, in the form attached as Exhibit 3 to the Lease, of the date, time, and address of the pre-termination and termination inspections. The Lease directs the Government to "make every effort to provide this notice 21 days in advance of the projected change of occupancy." Lease Annex § D.7.(b)(1). The Government is failing to provide these notifications on a timely basis.

Moreover, the Lease requires the Government to notify North Star well in advance of the termination inspection the date the unit will turned over for change of occupancy maintenance ("turnover date"). Under the Lease scheme, the Government must attempt to provide North Star with 21 days notice, but at least between 10 to 14 days notice, of the turnover date. If the Government revises the turnover date at the termination inspection, it must do so in writing, at which time North Star notifies the Government in writing of the revised date the unit will be turned back to the Government for assignment. Lease Annex § D.7.(b)(3). However, the Government is engaged in the practice of revising turnover dates at the termination inspection *and* demanding that change of occupancy maintenance be completed three days after the revised turnover date. This practice is contrary

to the Lease, and makes it impossible for North Star to predict what maintenance it will need to perform on any particular day and maintain its schedules.

### B. The Government is Failing to Provide North Star With a List of Occupant Damage at the Pre-Termination Inspection

At the pre-termination inspection, the Government is required to provide the occupant and North Star with a list of all occupant damage identified by the Government and occupant, and associated costs, for which the occupant is liable. Lease Maintenance Annex § D.7.(b)(2). The Government is failing to provide North Star with this information on a regular basis, and is delaying until unit turnover (or just before) to notify North Star of additional occupant damages in need of repair that should have been identified during pre-termination or termination inspections. This practice further hinders North Star's ability to maintain its schedules, as discussed in the June 27 and August 19 letters (Ex. G).

### C. The Government is Rejecting Acceptable Quarters at the Acceptance Inspection

After North Star completes change of occupancy maintenance, the Government conducts an "acceptance inspection" to ensure that change of occupancy maintenance conforms to the Standards for Maintenance of Structures contained in the Lease. Lease Maintenance Annex § C.(2). Although the Government habitually violates its duty to enforce occupancy requirements and to authorize North Star to replace and repair significant occupant-caused damages, it uses the acceptance inspection as an opportunity to reject North Star's change of occupancy maintenance for minor, barely detectable minutiae. For example, the Government has refused to accept units because of minor paint spots on the interior of a kitchen cabinet, or an allegedly deficient amount of paint on a quarter inch portion of an interior wall when such "deficiency" was detectable only through the use of a black light. When the Government rejects quarters, North Star is forced to expend resources to correct the minutiae that the Government contends requires correction.

The Government appears to be using its baseless rejection of quarters as a mechanism to increase the downtime days charged to North Star. Indeed, it seems as though the Government is deliberately delaying the acceptance inspection beyond the time allowed for in the lease, at which time it informs North Star of purported "discrepancies" in need of correction. Then, it appears as though the Government is including the days the units are down for correction of these late-identified "discrepancies" (for which North Star is not responsible or which are not discrepancies at all) to inappropriately calculate downtime and increase the downtime days charged to North Star. The details of this practice are set forth in a July 17, 2002 letter from North Star to the Government, appended hereto (Ex. H).

### D. The Government Fails to Distinguish Between Change of Occupancy Maintenance and Repair Work

The Government is also failing to distinguish between change of occupancy maintenance and repair work for purposes of calculating downtime days. The Lease contains different provisions with respect to calculating downtime for Change of Occupancy maintenance and calculating downtime for Scheduled Repair and Renovation. Scheduled Repair and Renovation Downtime "will be completed on the basis of the actual number of days any specific unit has been turned over to the Developer for such work." Lease Annex § D.5.(b). Under the Lease, the Developer provides the Government with a schedule of repairs and renovations. Lease Annex § C.1.(v). Change of Occupancy Downtime, in contrast, is calculated (with exceptions when eight or more units are released in a five-day work period) using the number of move-outs per months multiplied by three days. Moreover, Change of Occupancy maintenance is defined to include "*routine* maintenance and repair." Lease Annex § D.7.(a) (emphasis added). The Government is including all work performed on units – including the repair of occupant-caused damages such as carpet replacement – in its change of occupancy downtime calculations, and apparently using such calculations to deduct rent from North Star. This is in contrast to years of prior practice, and in violation of the Lease, which entrusts North Star with determining the amount of time needed to complete Repair work. This practice is addressed in North Star's June 27, 2002 letter (Ex. G), as well as a July 15, 2002 letter from North Star to the Government, appended hereto (Ex. I).

### E. The Government is Using Improper Downtime Calculations to Deduct Rent from North Star, and is Refusing to Provide North Star with Back-Up Documents Showing How it Arrived at its Downtime Figures

On April 17, 2002 and April 24, 2002, the Government stated that it would deduct $2,847.47 from North Star's rental payment for alleged excessive downtime in February and March, 2002. Because North Star's records do not support the Government's downtime calculations, in a letter dated April 30, 2002 (Ex. J), North Star requested backup to the Government's downtime calculations and requesting that any rent abatement be deferred until such time as the Government provided backup of its calculations and conferred with North Star. The Government ignored North Star's request, and failed to confer with North Star prior to deducting rent for alleged excess downtime in February and March, 2002.

On May 22, 2002, the Government deducted $2,308.25 from North Star's rent for alleged excessive downtime in April, 2002. In letters dated May 24, 2002 and May 30, 2002, appended hereto (Ex. K), North Star again contested the Government's downtime calculation and failure to provide backup documents or confer with North Star. In the May 30 letter, North Star's Treasurer, Rhonda

Sekyra, informed you that the Government's conduct with respect to rent deductions calls into question the stipulated revenue stream, which directly impacts the capitalization rate for the project and seriously devalues North Star's asset.

On July 31, 2002, the Government once again took action to deduct $2,350.61 in rent from North Star for alleged excessive downtime for May and June, 2002. In a letter from North Star to Government dated August 1, 2002 (Ex. L), North Star disputed the Government's calculations, and again requested back-up documentation and to confer with the Government prior to the deduction of rent.

The Government's downtime calculations appear to be in error. As set forth in III.A-III.D above, the Government is failing to timely notify North Star of inspection and turnover dates, failing to notify North Star of occupant damages at the pre-termination inspection, using the acceptance inspection to fabricate deficiencies, and failing to distinguish between change of occupancy maintenance and repair work. The Government appears to be using these practices to improperly increase downtime days assessed against North Star. Moreover, the Government is stockpiling units for same-day release to North Star, and deducting rent when change of occupancy maintenance on all simultaneously-released units is not complete in three days *total*, as opposed to three days *average*, as was the Government's interpretation at the lease's inception and for many years thereafter.

Additionally, as set forth in the appended August 16, 2002 letter and Notification of Work Completion regarding 1055 Simms ("Ex. M), the Government has used disputes between North Star and the Government to inflate the calculation of downtime days with respect to 1055 to 34.5 days. These disputes include the Government's issuing work authorizations that lack reimbursement amounts and conditioning reimbursement for occupant damage upon receipt of subcontractor invoices; the Government's issuing work authorizations that do not accurately reflect the information noted on inspection forms; the Government's failure to distinguish between repair work and change of occupancy maintenance; the authority of the Birchwood Housing Manager to order disputed work; and the use of the acceptance inspection to reject units for purported deficiencies that do not exist ("1055 Disputes"). As set forth in the July 2, 2002 and July 10, 2002 letters from North Star to the Government, appended hereto (Ex. N), North Star does not believe that the 801 Project Manager has the authority to order disputed work, and this dispute necessarily delayed North Star's ability to perform work on the unit. Moreover, as set forth above and in the June 28 (Ex. D) and August 16 (Ex. M) letters regarding 1055 Simms, the Government's conduct with respect to each of the 1055 Disputes further delayed North Star's ability to perform work on unit 1055 with the expectation of payment. Additionally, the Government appears to have used the time associated with the 1055 disputes – including the Government's own delay in responding to

North Star's written requests for additional information respecting work to be performed – to improperly inflate the calculation of downtime for unit 1055 to 34.5 days. In fact, as set forth in detail in the August 16 letter (Ex. M), our records indicate that North Star spent one day performing change of occupancy maintenance and three days performing repair work on unit 1055.

The Government's actions to deduct rent creates uncertainty in North Star's stipulated revenue stream, to the serious financial detriment of North Star. The Government's actions have caused an increase in the capitalization rate for the project, which devalues North Star's assets by millions of dollars.

## IV. The Government is Failing to Make Incentive Fee Awards to North Star

The Government has been fabricating excuses for its failure to make, or even consider making, incentive fee awards to North Star. In one instance, the Government failed to consider an incentive fee awards due to $135 of purported "overcharges." These "overcharges" resulted from portions of locksets that North Star's new manager mistakenly did not replace. However, these monies were refunded to the Government as soon as the new manager realized his error. The Government has also refused to consider an incentive fee based on alleged "missing documents" it purportedly became aware of during an extensive Government audit of the $135 lock set issue. The documents were not "missing" at all, and, as North Star explained in letters to the Government, dated March 15, 2002 and March 24, 2002 (Ex. O), were shown to the auditor who responded that he did not wish to see them. Nevertheless, the Government retained the reference to "missing documents" in letters to North Star dated April 12, 2002 and June 24, 2002. The Government is also tying change of occupancy maintenance issues to incentive fee elimination, to the monetary detriment of North Star. The Government's failure to consider an incentive fee award to North Star for the years 1999 to the present violates the terms of the Lease, which provides that "[t]he amount of the incentive fee shall be determined by an Incentive Fee Board" which "will evaluate the Developer's performance." Lease Art. VIII; Lease Maintenance Annex § H.(4).

## V. The Government's Position on Fencing at Birchwood Violates the Terms of the Lease

The Government's conduct with respect to fencing at Birchwood further contributes to the diminution in value of North Star's asset. The Lease gives North Star the right to reject (with reason) alterations, attachment of fixtures, and erection of additions, structures, or signs in or upon the Premises. Lease Art. VII. The Lease defines the "Premises" to include the land and the improvements constructed and provided thereon. Lease Art. I. In a letter from Rodney Everett to Eldon Wartes, dated May 21, 2002, the Government takes the position, contrary to years of prior practice, that North Star's approval of chain link fencing

is not required because "fencing is not attached to the structures in any way . . . [and] is not a change to improvements."

The Government's position is patently incorrect, as fencing is erected upon the Premises, and therefore requires North Star's approval. Indeed, materials respecting Birchwood Homes distributed to occupants in the 1998 Resident's Handbook states that "[a]ll fences need prior approval and final joint inspections from Housing and the North Star Manager." Moreover, North Star has opposed chain link fencing at Birchwood since the lease's inception.

North Star has always maintained the highest standards for its communities, and its requirement that any fencing at Birchwood be constructed of cedar furthers the enforcement of high standards. Indeed, a drive-through the housing communities on Fort Wainwright reveals a marked difference in the quality of appearance and maintenance between properties with chain link fences and properties with cedar fences, and the Government itself has paid for the erection of cedar fencing at its newest housing community on base, Chena Park. Moreover, chain link fencing is unsightly, and will not shield from view the unsightly clutter that the Government permits to accumulate in occupants' yards.

## VI. The Government Has Improperly Failed to Recognize the Authority of North Star's Officers

The Government has taken the position that North Star's Secretary and Treasurer, Rhonda Sekyra, lacks the authority to issue correspondence on behalf of North Star. The Government has continued to take this position despite the fact that on June 26, 2002, North Star's President, Richard W. Fischer, faxed you a corporate resolution designating Ms. Sekyra as an Officer of North Star (Ex. P). The Lease states that the Developer shall designate a site manager with full authority to act for the Developer pertaining all matters regarding work required at the housing site. Lease Annex § § B.28, C.1.(c)(1). Nothing in the Lease prevents others with authority to act for North Star – such as Ms. Sekyra – from authoring letters pertaining to the administration at the Housing site. North Star seeks a Contracting Officer's decision on this issue.

## VII. The Government is Administering the Lease in Bad Faith

The Government's actions in administering the Birchwood Lease, set forth above, have been undertaken in bad faith. Housing Office representatives have told North Star's site manager that the Government fails to issue work authorizations because it does not want to invest in Birchwood, whose lease expires in five years. The Government's writing of work authorizations that do not reflect occupant damage recorded on unit inspection forms appears to be an intentional bad faith attempt by the Government to shirk its financial obligation to pay for occupant-caused damages. The Government's failure to include cost information on work authorizations, unilateral removal of floor coverings from

the List of Repair Costs, failure to base work authorizations on the results of the pre-termination and termination inspections, requiring North Star to provide subcontractor invoices as a condition for reimbursement, depreciating work authorized items, and withholding reimbursement due to fabricated "discrepancies" between the List of Repair Costs and subcontractor invoices also appear to have been undertaken in bad faith. The Government's discriminatory treatment of Birchwood constitutes a bad faith violation of the Government's contractual obligation to oversee the day-to-day administration of the housing units and to enforce Army Family Housing rules and regulations. The Government's downtime calculations and abatement of rent also appear to have been made in bad faith, as well as the Government's failure to consider an incentive fee award to North Star from 1999 to the present. Also, the Government's repeated failure to provide documentation requested by North Star (i.e. support for downtime calculations) further evidences the Government's bad faith.

**DAMAGES**

Exhibit Q shows how three elements that cause damage to Birchwood Homes affect the value and operating expenses of the 400 unit development. These elements are directly caused by the Government's actions as outlined above. First, expenses are increased causing a decrease in the net operating income therefore lowering the value and causing a loss of net cash flow due to increased operating expenses. Second, the risk associated with the project is increased thereby causing the capitalization rate to increase and the value to decrease.

The Exhibit Q analysis is based on a comparison of the operating characteristics of North Star and Polar Star. Actual expenses data for the year 1966 through 2001 were brought together and analyzed. Polar Star was used as a control project. The deviation between the expenses of the two projects was calculated and summed to obtain the loss of net cash flow due to increased expenses. 1996 was used as a base year and the deviation from 1996 for the years 1997 through 2001 was determined. This amounted to $2,033.47 per unit for the five-year period. Since there are 400 units at Birchwood, the total loss in income is $813,390.

To determine the impact on value, the Birchwood was valued on a Before and After basis, following the Federal Takings Rule. The before value was calculated using expenses that should (rather than are) be occurring at Birchwood. The before expenses are based on the deviation in expenses when comparing North Star and Polar Star. It was also calculated using a capitalization rate that should be appropriate for North Star. This analysis resulted in a value of $64,632,000 (rounded).

Then, the value was calculated on an after basis. This analysis used expenses that are actual and a capitalization rate that would be appropriate for the project on an "as is" basis. This resulted in a value of $52,480,000 (rounded).

Therefore, the total claim as a result of the government's actions and inactions is:

| | |
|---|---|
| Before Value | $ 64,632,000 |
| After Value | $ 52,486,000 |
| Difference (Damage) | $ 12,146,000 |
| Additional Expenses (1996 – 2001) | $ 813,390 |
| Total Damages | $ 12,959,390 |

**CONCLUSION**

As set forth above, multiple aspects of the Government's conduct with respect to Birchwood violates the 801 Lease with North Star. Moreover, the course of the Government's conduct in overseeing the Birchwood project speaks clearly of the Government's bad faith in administering its Section 801 Lease with North Star. Through the Government's conduct, what should be a relationship of teamwork and cooperation has been denigrated to a relationship of animus and frustration, to the detriment of North Star's asset and cash flow and, ultimately, to the quality of life of military families. We hope that this letter illuminates the true situation with which North Star is struggling, and look forward to receipt of your unbiased adjudication of its grievances in your capacity as a Contracting Officer. Again, your Final Decision is requested within sixty (60) days from the date received or North Star shall deem this claim denied.

I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

Sincerely,

Rhonda Sekyra
Secretary/Treasurer

cc: Connie Kiser

1966 7th Infantry Division L
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.co

12/15/00

Rod Everett
Department of the Army
U S Army Eng Dst, AK
Fairbanks Residential Office
P O Box 35066
Ft Wainwright, AK 99703
(907)753-2859
fax (907)753-1836

Re: **Rules Enforcement**

Dear Mr. Everett,

Dogs are being permitted to be chained to trees and boiler houses. Dogs are being let out to run without being on a chain or leash. Dogs are being walked and the feces left not being picked up. Cars are parked permanently in visitor parking. Snowmachines, trailers, lawn furniture, and junk is sitting in residence yards and porches. Trees are being cut down and damaged. These are just examples of the things I see every day when I drive around Birchwood. We see no evidence of the government enforcing it's rules, and would appreciate your assistance in solving the problem of the lack of rules enforcement in Birchwood. Please advise as soon as possible.

Sincerely,
Eldon Wartes

Site Manager
North Star Alaska Housing Corporation

North Star Alaska Housing Corporatio



PROPERTIES

[illegible] 7th Infantry Division L
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.co

12/15/00

Rod Everett
Department of the Army
U S Army Eng Dst, AK
Fairbanks Residential Office
P O Box 35066
Ft Wainwright, AK 99703
(907)753-2859
fax (907)753-1836

Re: **Vandalism and Deteriorating Government Standards**

Dear Mr. Everett,

As you are aware we had one of our employee's cars stolen from the North Star parking lot and totaled. We had a North Star company vehicle that was broken into, an attempt was made to steel it, and over a thousand dollars of vandalism damage done. Also a contractor who was working for us during the day had their van stolen during the middle of the day. It was obvious the military police did not want to know who did these acts because they did no investigating.

The continuing spiraling down of government standards of cleanliness and occupant upkeep and repair on their quarters and yards, and lack of enforcement of rules and laws is obvious. It is obvious that the government has changed their standards at Birchwood homes. This is having a detrimental effect on the quality of life of the occupants. It will also be the cause of future action against the government if Birchwood Homes has deteriorated because of a lack of reasonable care.

We rarely see the military police patrolling this area, Post Services is non-existent and little or no rules are enforced. It is North Star's responsibility to bring these issues to your attention, because of the government's apparent lack of desire to maintain control of its tenants at Birchwood.

Please advise us of your future course of action on these matters.

Sincerely,
Eldon Wartes

Site Manager
North Star Alaska Housing Corporation

North Star Alaska Housing Corporation



FISCHER PROPERTIES

[illegible] Division Ln
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsih@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2006
Facsimile 206 • 328 • 4006
Email fischerprop@seanet.com

12/15/00

Rod Everett
Department of the Army
U S Army Eng Dst, AK
Fairbanks Residential Office
P O Box 35066
Ft Wainwright, AK 99703
(907)753-2859
fax (907)753-1836

**Re: 1124 New Guinea cars parking in yard**

Dear Mr. Everett,

I have contacted Ms. Kiser on three separate occasions with regards to a tenant at 1124 New Guinea that is parking his two vehicles in his yard and accessing the area from the pedestrian path / service road. At this writing it has been over 2 weeks and both cars are still using the path to access parking in the yard every night. This practice must be immediately stopped. We will be blocking off this path area from vehicle traffic as soon as weather will allow us to do so.

Sincerely,
Eldon Wartes

Site Manager
North Star Alaska Housing Corporation

North Star Alaska Housing Corporation



FISCHER PROPERTIES

1060 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email asah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4009
Email fischerprop@seanet.com

July 24, 2002

Connie Kiser, Birchwood Housing Manager
Acting 801 Project Manager
Public Works
Fort Wainwright

Subject: 1108 New Guinea

Dear Ms. Kiser:

Blinds
The master bath blind in 1108 New Guinea needs to be replaced with the replacement cost charged to the Government due to occupant damage. Six blind slats were discolored with what appears to be dye and one slat is bent. This blind was removed by the tenant or Government and was left lying on the floor of the master bath of this unit.

The work authorization for this unit dated July 16, 2002 shows the words "Replace m-bath blind – labor only blind supplied, need new invoice" (item b) with a zero reimbursement amount. Our understanding is that you are asking us to re-install the damaged blind, which does not meet the maintenance standard for pleasing appearance.

Also, I previously supplied you with an invoice showing the labor amount and cost of a new blind for your use when completing the work authorization, so you already have an invoice.

Your instructions do not provide for the proper repair necessary with proper reimbursement or adhere to the lease maintenance standards with respect to maintaining a pleasing appearance.

Excess Spackle
The above mentioned work authorization for this unit also lists "Remove excess spackle – DISAPPROVED – wall prep will fix, not bad" (item d) with a zero reimbursement amount. I counted over 60 areas of excess spackle filling which were over an inch in diameter. This excess spackling does not constitute fair wear and tear and the proper repair work and preparation for painting is reimbursable by the Government.

Sincerely,

Eldon Wartes
Site Manager

Cc: Harold Hopson
Cc: Rod Everett

North Star Alaska Housing Corporation

A Fischer Properties Company

1060 7th Infantry Division Loc
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

July 31, 2002

Connie Kiser, Birchwood Housing Manager
Acting 801 Project Manager
Public Works
Fort Wainwright

Subject: 1108 New Guinea

Dear Ms. Kiser:

We disagree with your position, set forth in your memorandum dated July 30, 2002, that acceptability of occupant damage is entirely at the discretion of the Army. The contract directs the Government to identify, with the occupant, all damage to property and installed equipment that is over and above normal wear and tear and which is the occupant's responsibility to correct. Lease Maintenance Annex § D.7(b)(2). The blind in 1108 New Guinea had six slats that were discolored with what appeared to be dye, and a bent slat -- clearly a case of occupant damage beyond normal wear and tear. The walls contained excess spackle -- also occupant damage beyond normal wear and tear. The contract provides that when such damages are not corrected by the occupant, North Star is responsible for repairing the damages, and the Government is responsible for issuing a work authorization and reimbursing North Star for such repair. Lease Maintenance § D.7(c).

The Government's position ignores the Standards for Maintenance of Structures, pursuant to which the units will be maintained "to a standard that prevents deterioration beyond that which results from normal wear and tear, and corrects deficiencies in a timely manner to assure full life expectancy of the facilities and equipment. The level of maintenance shall assure all structures are free of missing components or defects which would affect the safety, pleasing appearance or habitability of the units." Lease Maintenance Annex § E. The Government is required to issue work authorizations for the correction of occupant-caused damages so that North Star may maintain the units in accordance with the Standards and be assured of reimbursement.

This matter will be addressed as part of the overall claim that North Star will be submitting to a contracting officer in the near future.

Sincerely,

Eldon Wartes
Site Manager

Cc: Harold Hopson
Cc: Rod Everett

North Star Alaska Housing Corporation

A Fischer Properties Company

[illegible]
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1578
Email [illegible]@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

June 28, 2002

Connie Kiser
Acting 801 Project Manager
Public Works, Ft. Wainwright

RE: Unit 1008

Dear Ms. Kiser:

We would like to reiterate the statement made in our letter to you dated June 27, 2002 that a complete work authorization form showing the cost of items listed must be provided by the Government before North Star can complete work on the above referenced unit. The work authorization North Star received from the Government dated June 21, 2002 for unit 1008 is incomplete as it shows a cost of zero for replacement of carpet/pad without appropriate explanation.

Even though not required to at this time, we have provided you with a receipt showing the cost of occupant damaged carpet replacement for this unit. You stated on the work authorization form that payment would be work authorized after receipt of invoice which you received June 27, 2002. If charges for work authorization items shall be in accordance with the list of repair costs (in accordance with the contract - Lease Maintenance Annex § D.7.(b)(3)(c)) as stated on item 2 on the work authorization form, then why does the Government show "payment to be w/a after receipt of invoice"? The contract does not authorize the Government to condition the listing and approval of work authorization costs based on North Star's provision of an invoice.

Please provide completed work authorization information to North Star as soon as possible in order to allow repair work to be scheduled and performed in a timely manner and so North Star can provide the Government with a revised return date.

Sincerely,

Eldon Wartes
Site Manager

cc: Harold D. Hopson – Eldon to fax
cc: Rod Everett, COR → Eldon - delivered

North Star Alaska
Housing Corporatio

A Fischer Properties Company

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email saab@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

7/03/02

Connie Kiser
Acting 801 Project Manager
Public Works, Ft. Wainwright

Subject: **1008 Work Authorization clarification**

Dear Ms. Kiser,

We are returning 1008 Sims to you. We have twice requested a proper Work Authorization from you on the carpet replacement. As of today we have not received a response. The maintenance work is complete.

Sincerely,

Eldon Wartes
Site Manager
North Star Alaska Housing Corporation

North Star Alaska Housing Corporation
A Fischer Properties Company

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

July 15, 2002

Connie Kiser
Acting 801 Project Manager
Public Works, Ft. Wainwright

RE: Unit 1008

Dear Ms. Kiser:

---

We received your letter dated July 10, 2002 regarding unit 1008. We understand that certain repairs are to be work authorized by the Government. As discussed in Ms. Sekyra's letter to you dated June 27, 2002 regarding change of occupancy, and again in my letter to you dated June 28, 2002, we expect the Government to provide North Star with cost information for each work authorized item listed. This does not require the Government to make payment in advance of work done, but to show what payment will be made by the Government for reimbursable work, and as stated in item 2 of the Work Authorization form, based upon the latest approved List of Repair Costs dated March 6, 2002.

You state that carpet replacement is no longer part of the approved repair cost listing, however, by virtue of being listed on the work authorization form, carpet should be included in the List of Repair Costs. As stated in item 2 of the Work Authorization form, payment of work authorized items are based upon the List of Repair Costs.

With respect to authority to perform disputed work, please refer to Ms. Sekyra's letter to Mr. Hopson dated July 10, 2002.

Regarding downtime for this unit, please again refer to Ms. Sekyra's above referenced letter to you addressing the distinction between downtime for change of occupancy work versus repair work.

Sincerely,

Eldon Wartes
Site Manager

North Star Alaska Housing Corporation

A Fischer Properties Company

1060 7th Infantry Division Lo
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

June 28, 2002

Connie Kiser
Acting 801 Project Manager
Public Works, Ft. Wainwright

RE: Unit 1055

Dear Ms. Kiser:

With regard to the work authorization form dated June 17, 2002 for the above referenced unit, what does "install pending invoice" in item a. mean? Also, why is there $0.00 on this line? What type of North Star labor are you referring to and how did you arrive at the $96.40?

If charges for work authorization items shall be in accordance with the list of repair costs (in accordance with the contract - Lease Maintenance Annex § D.7.(b)(3)(c)) as stated on item 2 on the work authorization form, then why does the Government show "install pending invoice"? The contract does not authorize the Government to condition the listing and approval of work authorization costs based on North Star's provision of an invoice.

Sincerely,

[signature]

Eldon Wartes
Site Manager

cc: Harold D. Hopson
cc: Rod Everett, COR

North Star Alaska
Housing Corporation

A
Fischer
Properties
Company

1060 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

July 25, 2002

Connie Kiser, Birchwood Housing Manager
Acting 801 Project Manager
Public Works
Fort Wainwright

Subject: Flooring Invoices

Dear Ms. Kiser:

In response to your July 19, 2002 letter regarding flooring invoices, I do not recall any instances in which we discussed "serious discrepancies" on invoices provided to the Government for flooring replacement or repair. I do, however, recall informing you that North Star has taken accurate measurements of each Birchwood unit, and has historically used these measurements, with the continuing approval of the Government. As you know full well, North Star uses reputable, professional installers who follow industry standards. Moreover, the measurements for carpet purchased for installation on a unit do not exactly match the unit measurements, as a carpet installer must make necessary cuts to fit the carpet to the unit. Contrary to the implication in your letter, there is nothing unusual or suspect about differences in unit measurements and yardage of carpet ordered to supply such unit.

We are disturbed by the implication in your letter that North Star's flooring invoices in any way give the "appearance of fraud." North Star is extremely conscientious about providing proper invoices to the Government of the amount of carpet purchased for installation in a unit. Moreover, although you ask us to provide explanations and certifications for flooring invoices, you fail to identify which invoices you refer to. We cannot attempt to address your concerns without more specific information. Please provide specific information immediately.

North Star can only surmise that the Government is speculating about "serious discrepancies" in order to avoid reimbursing North Star for work. The Government does not have the authority under the Lease to condition reimbursement on receipt of certifications of accuracy from North Star or its subcontractors. If you disagree, please provide your contractual or legal justification.

The Government's apparent attempt to circumvent its obligation to reimburse North Star for work on units will be a part of the overall claim that North Star will be submitting to a contracting officer in the near future.

Sincerely,

Eldon L Wartes

Eldon Wartes
Site Manager

cc: Harold Hopson
cc: Rod Everett

North Star Alaska Housing Corporation

A Fischer Properties Company

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

August 7, 2002

Connie Kiser,
801 Housing Manager, Birchwood
Public Works
Fort Wainwright

Subject: Flooring Invoices

Dear Ms. Kiser:

Your continued refusal to provide us with the specific flooring invoices about which you have questions makes it extremely difficult to address your concerns. Nevertheless, in an effort to understand your position, we retrieved the files for several units. Our findings with respect to 1237 Munoz, discussed below, are representative of our findings for the other units we reviewed. The flooring invoice for 1237 Munoz shows that you were billed for 50 yards of carpet pursuant to the measurement contained on the billing template approved by the Government, which is submitted with the List of Repair Costs book. You were billed in accordance with Section C.1.(t) of the Lease, which provides that North Star "shall, with the approval of the Government, establish a list of cleaning and repair costs for dwelling unit components which will establish the normal maximum amounts to be charged in the event of damage to property and equipment installed within a living unit over and above normal wear and tear." Lease Maintenance Annex § C.1.(t).

The Lease does not authorize your action of unilaterally removing floor coverings from the List of Repair Costs and requiring subcontractor invoices for every installation. However, because you conditioned payment to North Star on your receipt of subcontractor invoices, we provided you with subcontractor invoices despite having no contractual obligation to do so. With respect to 1237 Munoz, our subcontractor invoiced us for labor on 51.67 yards of carpet billed to North Star, not the Government. This 1.67-yard difference (between 50 yards on the billing template and 51.67 yards on the subcontractor invoice), if this is in fact your concern, is not at all suspect, let alone the "serious discrepancy" referenced in your letter of July 19, 2002. Rather, as stated in my letter of July 25, 2002, the measurements for carpet used for installation on a unit do not exactly match the unit measurements, as a carpet installer must make necessary cuts to fit the carpet to the unit. The billing template, which is submitted with the List of Repair Costs, reflects a consistent charge for this unit – 50 yards. In the case of 1237 Munoz, the Government received a benefit of 1.67 yards of carpet, the cost of which has, to date, been absorbed by North Star. There has always been and will continue to be small immaterial differences between the measurements for the cuts of carpet made by the subcontractor and the billing template, which is based on the unit measurements. Accordingly, we fail to understand your

North Star Alaska Housing Corporation

concerns, let alone the justification for your allegations of "fraud" or "serious discrepancies."

Please note that the Lease sets forth the process to be followed with respect to providing you with invoices: North Star's invoices "shall be submitted monthly . . . for services performed for the Government. The original of each invoice shall have attached to it a copy of the work authorization document(s) and a summary of the charges for reimbursable work. Upon the Government's verification of work actually performed invoices will be processed for payment. Payment will be based on: (a) A monthly charge for the maintenance and operational services portion of the work; (b) Reimbursable work which is authorized by Government work authorizations and which is billed in accordance with the approved List of Repair Costs." Lease Maintenance Annex § H.(3). Nothing in the lease requires North Star to provide the Government with invoices from North Star's subcontractors -- North Star simply bills the Government based on the List of Repair Costs, and provides invoices (based on such Costs) on a monthly basis, for reimbursement by the Government. Therefore, the Government is in breach of contract by withholding payment to North Star for work-authorized carpet replacement necessitated by occupant damage and billed in accordance with the List of Repair Costs.

We hereby reiterate our request that you identify your specific concerns (if not already addressed above) and provide us with the specific invoices about which you have questions, and advise you that the Government's bad faith withholding of reimbursement to North Star will be the subject of a claim that North Star plans to submit to the contracting officer in the near future.

Sincerely,

Eldon Wartes
Site Manager

cc: Harold Hopson
cc: Rod Everett

1060 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

August 28, 2002

Connie Kiser
801 Housing Manager, Birchwood
Public Works
Fort Wainwright

Subject: Your Letters of August 20, 2002

Dear Ms. Kiser:

North Star is in receipt of nine memoranda, signed by you, dated August 20, 2002. To the extent our response, set forth below, does not specifically address an area or areas covered in your memoranda, you should not interpret this to mean that we agree with the Government's position(s). Rather, North Star stands by each of the positions set forth in its previous correspondence that generated the responsive August 20 memoranda. New violations of the lease identified below will be part of a claim that North Star plans to submit to a contracting officer in the near future.

**1. COM Required at 745 Talbot**

Your statement that the kitchen vinyl in this unit requires replacement due to alleged cracking and non-pleasing appearance is inconsistent with the condition of this unit. North Star inspected the vinyl on August 22, 2002, and found no evidence of the cracking or non-pleasing appearance you allege. Moreover, the inspection form for unit 745, dated August 6, 2002 and reflecting the joint inspection of North Star's site manager and the Government housing inspector, does not identify kitchen vinyl as in need of replacement (although it does identify vinyl in the master bath, dining area, and entry as needing replacement). In light of our concerns about the Government's direction with respect to unit 745, we requested that the Contracting Officer Representative ("COR") inspect the unit. The COR found that a fifty-percent cost splitting is appropriate, but did not order such a cost splitting, presumably due to his self-professed lack of authority.

Your statement that all carpet in unit 745 requires replacement and that the carpet on the upper landing and bedroom number 3 requires sealing is also incorrect. The August 6, 2002 inspection form identifies only the downstairs and steps as requiring carpet replacement, and does not note urine detection or odor (which would necessitate sealing).

North Star Alaska
Housing Corporatio

A Fischer Properties Company

The Government's newly-instituted practice of directing additional work after the pre-termination and termination inspections interferes with North Star's reasonable reliance upon the maintenance items generated at the pre-termination and termination inspections in violation of the Lease Scheme. Pursuant to the Lease, between-occupancy work on units is identified at the pre-termination and termination inspections, and work authorizations are based on work in need of completion "at the time of the termination inspection." Lease Maintenance Annex § D.7.(b)(3).

Finally, you note that as of August 20, 2002, you had not received a work authorization request from North Star. Please recall that the Government's final inspection of this unit took place on Saturday, August 10, 2002, after which the Government turned the unit over to the cleaners. The Government did not provide North Star with keys to access the unit until August 21, 2002, at which point North Star was able to conduct its final inspection and complete is work authorization request.

**2. NSAHC Memo Dated 8 Aug 2002 (Carpet Replacement)**

As we informed you in our August 8, 2002 letter, the inspection forms for units 748 and 1004 (which document the joint observations of North Star's site manager and Government inspector) attribute carpet conditions to pet damage and odor, and the carpet in those units would not require replacement but for the pet damage. As you state in paragraph 7 of this letter, that the Government expended resources to clean the carpet indicates that following the pre-termination and termination inspections, the carpet in units 748 and 1004 was not slated for replacement. Once again, the Government is violating the Lease and basing work authorizations on extra-contractual inspections it conducts after outside contractors clean the units. Your failure to note this pet damage on the work authorization form appears to be an attempt on your part to escape your responsibility to pay for the portion of the carpet damage attributable to occupant damage beyond normal wear and tear. Additionally, that you did not detect pet odor at your post-cleaning "inspection" of unit 748 is neither surprising nor relevant, as cleaning agents tend to temporarily mask the odor of pet urine. Finally, as you are no doubt aware, the United States Court of Federal Claims has ruled that the Lease does not on its face incorporate a depreciation schedule for carpet.

**3. 1055 Downtime**

As set forth in our August 16, 2002 letter, we dispute your positions respecting the calculation of downtime for unit 1055. Also, we renew our

request that you immediately provide the documentation that you contend supports a 34.5-day downtime calculation for this unit.

**4. 646 Wainwright Road**

The Government's conduct with respect to 646 Wainwright Road provides yet another example of the Government using an unauthorized post-cleaning inspection to direct additional work of North Star. The Lease states that following the termination inspection, the Government will issue a work authorization "for the repair of damage, or accomplishment of cleaning, which are the responsibility of the occupant but were not completed at the time of the termination inspection." Lease Maintenance Annex § D.7.(b)(3). Accordingly, the work authorization must reflect the determination of North Star and the Government as it exists at the time of the termination inspection. Moreover, there is no conceivable justification for the Government's failure to issue a work authorization because a report of survey is pending, or because the unit is awaiting cleaning.

Finally, the implication that North Star has resisted scheduling work at 646 due to uncertainty about what work the Government will work authorize is misleading and incorrect. On June 28, 2002, the Government notified North Star that it expected the unit to be turned over for maintenance on July 26, 2002. On June 19, 2002, the Government informed North Star that the unit would not issue on July 26 due to a pending report of survey, but did not provide another turnover date. Then, on August 13, 2002 (over one month after the July 22, 2002 final inspection), North Star was told that the unit would be turned over for maintenance on August 23, 2002. Then, on August 21, 2002, the Government notified North Star that the turnover date had been changed again to August 29, 2002. North Star's inability schedule the extensive repairs required at unit 646 is directly attributable to the Government's conduct. As we have stated in previous correspondence, the lack of consistent and reliable turnover information from the Government interferes with North Star's ability to schedule work at the 400 housing units at Birchwood and violates the provisions of the Lease (Lease Maintenance Annex § D.7.(b)(1)) that afford North Star two to three weeks prior notice of the change of occupancy date.

**5. Depreciation**

Two points about depreciation warrant mention here. First, in its order denying the Government's motion for summary judgment, the United States Court of Federal Claims rejected the argument that the Lease on its face incorporates a depreciation schedule for carpet. Second, in recent

correspondence, North Star has asked the Government to provide the depreciation schedule it uses for non-carpet items such as countertops, blinds, appliance parts, and flooring. You have continually failed to respond to this request, which we hereby renew.

**6. Invoices**

While we appreciate your finally identifying the specific invoices that concern you, the statement that North Star has been unwilling to review its files and respond to your purported concerns is without basis. Rather, our August 6, 2002 letter regarding flooring invoices sets forth our detailed review of the flooring invoice for 1237 Munoz that we undertook in an effort to understand your concerns.

Please be advised that none of the "discrepancies" that you identify is valid. Invoices 201429 (unit 904), 201426 (unit 1137), and 201433 (unit 1117) are correct, and reflect hallway carpet yardage that includes measurements for steps. Invoice 201422 (unit 969) is also correct, and reflects downstairs carpet cut to include carpet used on the steps. The other invoices you identify have also been properly completed by our installer.

Finally, as we have stated in previous correspondence, the Lease does not entitle you to invoices prior to issuing work authorizations (which must be based on the List of Repair Costs), and the aforementioned invoices were provided only as a courtesy to the Government.

**7. Work Authorization Billing**

Attached7 to this letter is a spreadsheet listing "Approved Work Authorizations" that identifies reimbursement amounts as including 20%. Our calculations indicate that these figures include only 10%, presumably because the Government is continuing it practice of failing to provide overhead on work authorization billings. Please provide a written explanation for the figures listed on the "Approved Work Authorizations" column of the spreadsheet.

**8. Notification of Possible Occupant Damage Repairs at 915**

Once again, the Government is attempting to base work that needs to be performed on unit 915 on an unauthorized cleaning inspection, as opposed to on the pre-termination and termination inspections, as required by the Lease. Moreover, the repair items identified as among those that "may be work

authorized" – replacement of doors, replacement/repair of a front entry screen, and taping of the garage door blanket – will not be impacted by cleaning.

**9. Notification of Possible Occupant Damage Repairs at 1040**

This notice also represents the Government's violation of the Lease requirement that work authorized items be based upon the condition of the unit at the pre-termination and termination inspections. The Government's newly-instituted practice of basing its determination of work authorized items on a post-cleaning inspection delays notice to North Star of work needed on units, and violates the Lease scheme. Moreover, the need for the burn mark on the living room carpet to be repaired will clearly not disappear once the unit has been cleared and cleaned.

Sincerely,

Eldon Wartes
Site Manager

cc: Harold Hopson
cc: Rod Everett

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

July 18, 2002.

Connie Kiser, Birchwood Housing Manager
Acting 801 Project Manager
Public Works
Fort Wainwright

Dear Ms. Kiser:

As discussed below, the Government is continuing its practice of improperly writing work authorization forms by listing reimbursable amounts as zero. Moreover, the Government has instituted a new practice of taking depreciation on certain items damaged by occupants to reduce or eliminate reimbursement to North Star. This practice must cease. There is no depreciation schedule in the lease, and occupant-caused damages are the Government's financial responsibility. Maintenance Annex § C.1.(s). Some examples of this conduct are set forth below.

Countertops
The countertop at 722 Hurdis was damaged by occupant-caused burns. The Government issued a work authorization for this unit, dated July 10, 2002, that lists the replacement of the countertop (item a) as a reimbursable item. However, the reimbursable dollar amount listed by the Government reflects 75% depreciation taken by the Government. The lease requires the Government to reimburse North Star for the full cost of this item. Moreover, the Government's attempt to depreciate the reimbursement cost of replacing this item represents a complete change in the Government's prior practice of fully reimbursing North Star for replacing countertops damaged by occupants.

The Government engaged in a similar practice with respect to replacement of an occupant-damaged countertop at 883 Muese. There, the kitchen countertop was being replaced solely because of occupant damage. However, the work authorization, dated June 6, 2002, lists a reimbursement cost for countertop replacement (item d) that reflects only 25% of the replacement cost. The Government states on the work authorization that "other is FWT [fair wear and tear]." The only factor necessitating replacement of this countertop is occupant damage, and accordingly the Government is contractually obligated to pay the entire replacement cost. Please provide us with the depreciation schedule you are using to calculate the reimbursable amount due to North Star.

Blinds
The blind brackets at 1061 7th Infantry require replacement because they were broken by the occupant. However, the work authorization, dated July 9, 2002, lists the replacement cost for blind brackets (item l) as zero due to fair wear

North Star Alaska Housing Corporation

A Fischer Properties Company

and tear. In addition the words "original 15+ yrs old" appear in parentheses. It is unclear whether the Government is listing a zero reimbursement amount due to the condition (fair wear and tear) or age (15 years old) of the item. Whatever the reasoning, the Government is contractually obligated to reimburse North Star for the replacement cost of the blind brackets, which were damaged by occupant conduct and are being replaced solely as a result thereof. The work authorization for 1061 7th Infantry also lists bent slats (item k) with a zero reimbursement amount. The Government's attempt to depreciate the reimbursement cost of replacing blinds and blind parts represents a change in the Government's prior practice of fully reimbursing North Star for replacing such items damaged by occupants.

Similarly, the June 25, 2002 work authorization for 880 Sansapon lists occupant-damaged blinds (item d) with a zero reimbursement cost due to fair wear and tear. The Government has engaged in the same practice with respect to a June 21, 2002 work authorization for repairs to a cut blind cord (item f) in 1008 Sims. Again, the Government is financially responsible for these replacement costs, and its apparent attempt to depreciate the cost of repairing and replacing these blinds and blind parts is contrary to the lease and years of prior practice.

<u>Appliance Parts</u>

A June 29, 2002 work authorization for 1205 Manchu lists a zero reimbursement amount for the occupant-necessitated replacement of a refrigerator fruit crisper cover (item a) that had been broken in half. The work authorization states that this item is "disapproved, 15 yrs old, no useful life left." The lease does not authorize the Government to depreciate the cost of replacing the fruit crisper cover. Moreover, the Government's action constitutes a deviation from its prior practice of paying the replacement cost of refrigerator crisper parts without imposing a depreciation schedule.

Similarly, the Government lists a zero reimbursement amount for replacement of a cracked vegetable crisper cover (item h) on a June 21, 2002 work authorization for 1008 Sims. Again, the Government appears to be depreciating the cost of replacing an occupant-damaged appliance part contrary to the lease and years of prior practice.

In addition, a June 6, 2002 work authorization for 883 Muese lists a zero reimbursement amount for installation of a new range panel (item b) necessitated by occupant damage to the old range panel. The Government lists fair wear and tear as the reason for the zero reimbursement amount. Also, the June 21, 2001 work authorization for 1008 Sims lists a zero reimbursement amount for repainting the black strip on the range hood (item g), which was damaged by the occupant's use of an inappropriate cleaning product. Again, the lease requires the Government to bear the cost of occupant-caused damage, and does not authorize application of a depreciation

schedule. Moreover, the Government's prior practice has been to reimburse North Star for the cost of installing and repainting these items.

Flooring

A July 9, 2002 work authorization for 801 Sibert takes depreciation on the replacement of the carpet and pad (item a). However, contrary to the Government's prior practice, the Government calculates the depreciation amount based on a half-year convention, as opposed to the full-year convention which apparently was previously used by the Government. (As you are aware, North Star has consistently objected to the Government's depreciation of carpet, and such dispute is the subject of litigation between the parties). This is yet another example of the Government's inconsistent conduct with respect to calculating depreciation.

The July 10, 2002 work authorization for 722 Hurdis lists carpet replacement (item e) and states that the Government will approve installation labor pending receipt of an invoice (and lists no reimbursable amount for installation labor). This work authorization is improper. Please direct your attention to our June 27, 2002 letter regarding change of occupancy, in which we explain the necessity of the Government providing reimbursement figures for work authorized items. Please also direct your attention to item 2 on this work authorization, which states that payment will be based upon the latest approved List of Repair Costs dated March 6, 2002.

Similarly, the June 6, 2002 work authorization for 883 Muese lists the replacement of carpet, pad and seal (item b) as work authorized items. However, the work authorization appears to be stating, in effect, that the amount of reimbursement beyond the cost of the seal will be considered pending receipt of an invoice for North Star. We cannot discern from this work authorization whether carpet and pad replacement are reimbursable, and whether or depreciation has or will be applied. A similar deficiency exists with respect to the carpet replacement listed on the June 28, 2002 work authorization for 1205 Manchu.

Finally, we do not understand the rationale behind several work authorizations which authorize replacement of undamaged flooring, in good condition, that are not in need of replacement: the July 10, 2002 work authorization for 1266 Sykes listing replacement of all carpet and stating that 100% depreciation has been taken (item b); the July 15, 2002 work authorization for 1092 Robertson listing vinyl replacement (item e) with a zero reimbursement amount; and the July 15, 2002 work authorization for 620 Wainwright listing replacement of all carpet and pad (item c) when only the downstairs, stairs and upstairs hall warranted replacement. It would appear that you are applying 100% depreciation to items based solely on the fact that they are original. Please explain your rationale for these work authorizations.

Conclusion

The Government is engaged in behavior entirely inconsistent with its prior conduct of reimbursing North Star the full amount of replacing and/or repairing the occupant-damaged items set forth above. We wish to reiterate our position that the Government's practice of depreciating the reimbursement amounts for occupant damages deprives North Star of the economic value necessary for replacement of items, otherwise in good condition, which warrant replacement solely due to the conduct of occupants. We believe the above practices exhibit the Government's bad faith and will be part of any future claim we submit to a Contracting Officer.

Sincerely,

Eldon Wartes
Site Manager

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

August 13, 2002

Connie Kiser
801 Housing Manager, Birchwood
Public Works
Fort Wainwright

Subject: Depreciation Calculations

Dear Ms. Kiser:

As stated in our letter to you dated July 18, 2002, the lease (Section c.1.(s) of the Maintenance Annex) requires the Government to bear the cost of occupant damage, and does not permit the Government to take depreciation on items damaged by occupants to reduce or eliminate reimbursement to North Star. Nevertheless, the Government continues to apply depreciation percentages to reimbursement amounts due to North Star. Moreover, the Government does not indicate the basis for depreciation or it's calculation of the rate of depreciation. Further, application of depreciation to reimbursable items is inconsistent and varies across work authorizations. Please refer to our July 18, 2002 letter for some examples of these inconsistencies.

Please immediately provide North Star with the documentation you contend authorizes the Government to apply depreciation to the reimbursement amounts due to North Star for occupant damaged items. Please also immediately provide the depreciation schedules for each item, as well as the supporting calculations used by the Government to determine the amount of depreciation to be applied to each item.

Sincerely,

Eldon Wartes
Site Manager

cc: Harold Hopson
cc: Rod Everett

North Star Alaska Housing Corporation

Fischer Properties

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2009
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

August 8, 2002

Connie Kiser
801 Housing Manager, Birchwood
Public Works
Fort Wainwright

Subject: Work Authorizations - Flooring

Dear Ms. Kiser:

Once again, the Government has been improperly writing work authorizations.

The August 6, 2002 work authorizations for units 1004 and 748 each list zero reimbursement amounts for replacement of all carpet and pad (item a), and state "FWT (frays, runs, bad seams, worn)." These descriptions do not match the respective inspection forms for the units, on which carpet damage is attributed to pet urine stains.

It appears that the Government is intentionally omitting pet damage from the work authorization forms in an attempt to circumvent its financial responsibility for occupant damage. This practice improperly, and in bad faith, places the full burden of replacement on North Star. But for the pet damage, carpet replacement in these units would not be warranted.

As we have reminded you numerous times in previous correspondence, the Lease provides that when occupant damages are not corrected by the occupant, North Star is responsible for repairing the damages, and the Government is responsible for issuing a work authorization and reimbursing North Star for such repair. Please note Lease Maintenance § D.7(c). The Government's failure to adhere to the terms of the Lease, and its bad faith omission of pet damage from the work authorization forms, will be the subject of a claim that North Star plans to submit to the contracting officer in the near future.

Sincerely,

Eldon Wartes
Site Manager

cc: Harold Hopson
cc: Rod Everett

North Star Alaska Housing Corporation

A Fischer Properties Company