# APPENDIX
# PART 3

1066 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1578
Email naah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

June 27, 2002

Connie Kiser
Acting 801 Project Manager
Public Works, Ft. Wainwright

RE: Change of Occupancy

Dear Ms. Kiser:

Multiple issues regarding the turnover of units to North Star warrant your attention.

1. Revision of Turnover Dates and Failure to Provide Timely Notifications

The Lease Agreement between North Star and the Government requires the Government to notify North Star in writing of the date, time, and address of each inspection, and directs the Government to "make every effort to provide this notice 21 days in advance of the projected change of occupancy." Lease Maintenance Annex § D.7.(b)(1). Thus, pursuant to the lease, when the Government notifies North Star of the dates of the pre-termination and termination inspections, it does so counting backwards from the projected turnover date. Exhibit 3 to the Lease is to be used by the Government for this purpose. If there is any change to that date, at the conclusion of the pre-termination inspection, the Government shall notify North Star of the firm date and time for the termination inspection and the date and time the unit will be turned over to North Star for change of occupancy. Again, Exhibit 3 is to be used by the Government for this purpose. Lease Maintenance Annex § D.7.(b)(2). At this point, when the scope of the work has been determined, the Developer then provides its turnover date to the Government. Lease Maintenance Annex, § D.7.(b)(2). Similarly, at the termination inspection, "[s]hould the date and time that the unit will be turned over the Developer change for any reason, the Government shall immediately notify the Developer in writing of the revised date and time." Lease Maintenance Annex § D.7.(b)(3). And, if the Government revises the turnover date at the termination inspection, the lease provides that North Star "will then immediately notify the Government, in writing, of the revised date and time that the unit will be turned over to the Government for assignment." Lease Maintenance Annex § D.7.(b)(3).

Contrary to the lease scheme, the Government is engaged in the practice of revising turnover dates at the termination inspection *and* demanding that change of occupancy maintenance be completed three days after the revised unit turnover date, which is unilaterally controlled by the Government. This practice makes it impossible for North Star to predict what maintenance it will need to

North Star Alaska
Housing Corporation

A
Fischer
Properties
Company

perform on any particular day, and impacts the entirety of North Star's scheduling efforts. The lease contemplates a scheme whereby the Government knows prior to scheduling the pre-termination and termination inspections the date the unit will be turned over, and attempts to provide North Star with 21 days (but at least between 10 to 14 days) notice of that date. To the extent the Government is unable to accurately predict turnover dates prior to scheduling inspections and at the pre-termination inspection, North Star is entitled under the lease to determine the date the unit will be turned over to the Government. Any other reading of the lease would completely deprive North Star of its ability to maintain work calendars and schedule maintenance based on a unit turnover date that it contracted to know two to three weeks in advance of such date. In addition, the Government is failing to use Exhibit 3 to provide timely written notification to North Star of the pre-termination and termination inspection dates, as it is required to do under the Lease.

2. Repair Work vs. Change of Occupancy Work

The Lease Agreement makes a clear distinction between change of occupancy downtime and repair and renovation downtime. Lease Maintenance Annex § D.5.(a) – (b). The period of time for the completion of repair work is the number of days necessary for the Developer to complete the work. North Star provides the Government with the estimated time required to accomplish repair work on units. Lease Maintenance Annex § C.1.(v). The Government may approve the time period necessary for repairs as determined by the Developer, but may not dictate the unit return date, or the number of days allowed for such repair work. Lease Maintenance Annex § C.1.(v). Moreover, the downtime period for repair work begins when the Government turns the unit over to North Star for this purpose and ends when the Government accepts the unit in writing subsequent to work completion. Lease Maintenance Annex § D.5.(b). Contrary to the lease scheme, starting in June, 2002, the Government has been using the "Maintenance Issue" form to dictate to North Star a specified number of repair days. This practice is unacceptable and must cease.

3. Government Obligations During Pre-Termination Inspections

The Lease requires that during the pre-termination inspection, the Government shall provide the occupant and North Star with a list of all occupant damage identified by the Government and occupant, and associated costs for which the occupant is liable. Lease Maintenance Annex § D.7.(b)(2). We are not consistently receiving this information. The pre-termination inspection form the Government recently began providing to North Star does not fulfill the requirements of the contract to provide a complete listing of all occupant damage to the property and installed equipment. Indeed, the Government is engaged in the practice of not informing North Star until unit turnover of additional occupant damages that should have been, but were not, identified upon pre-termination or termination inspections. (The lease requires that following the termination

inspection, the Government shall issue to North Star a work authorization for the repair of damages or accomplishment of cleaning which are the responsibility of the occupant but were not completed as of the termination inspection. Lease Maintenance Annex § D.7.(b)(3)). This practice further hinders North Star's ability to maintain work calendars and schedule maintenance based on information that it contracted to have advance notice of. Please ensure that henceforth, complete documentation of occupant damage to the property and installed equipment is provided to North Star in a timely manner.

4. Government Obligations in Issuing Work Authorizations

As mentioned above, the Lease provides that after the termination inspection, the Government must issue a work authorization fully compensating North Star for the repair of damages, or accomplishment of cleaning, which are the responsibility of the occupant but which were not completed at the time of the termination inspection. Lease Maintenance Annex § D.7.(b)(3). If the occupant fails to properly clean the unit or correct damages for which he is responsible <u>and</u> the Government agrees to pay for same by issuing a complete work authorization, then and only then can North Star perform such work. Lease Maintenance Annex § C.2.(c)(10) and § D.7.(c); Exhibit 4. At present, the Government is issuing incomplete work authorizations that omit pricing information or list pricing at zero. This practice by the Government is in breach of the lease, and does not obligate North Star to repair damages or accomplish cleaning which were the responsibility of the occupant but were not accomplished as of the termination inspection. A complete work authorization must be timely provided to North Star before it can perform such work on any unit, including unit 1008 Sims.

5. Additional Government Obligations

Finally, the Government is required to provide North Star with a list of occupant names, phone numbers and addresses, to be revised on a monthly basis. Lease. Maintenance Annex § C.2.(c)(13). The Government has not been providing North Star with this list on a timely basis.

Sincerely,

Rhonda Sekyra, CPA
Finance / Operations

cc: Harold D. Hopson
cc: Rod Everett, COR

1060 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

August 19, 2002

Connie Kiser
801 Housing Manager, Birchwood
Public Works
Fort Wainwright

Subject: Your Letter of August 13, 2002 Regarding Units 914, 1021 and 1262

Dear Ms. Kiser:

The Government's practice of providing late notification to North Star of unit turnover dates, coupled with its practice of delaying until just before unit turnover to notify North Star of extra repair work for a unit, severely hinders North Star's ability to coordinate maintenance schedules for the 400 housing units at Birchwood and violates the terms of the Lease.

The Government is required to make every effort to notify North Star of the pre-termination and termination inspection dates 21 days in advance of the projected turnover date (although extenuating circumstances may result in average advance notice of 10 to 14 days). Lease Maintenance Annex § D.7.(b)(1). As we have reminded you in previous correspondence, at the conclusion of the pre-termination inspection, the Government is required to notify North Star, in writing, of the date and time the unit will be turned over to North Star for maintenance. Lease Maintenance Annex § D.7.(b)(2). Should the turnover date or time change for any reason, the Lease requires the Government to immediately notify North Star, in writing, of the revised date and time. Lease Maintenance Annex § D.7.(b)(3). At the pre-termination inspection, North Star is to receive a list of all damage to a unit beyond normal wear and tear that is the occupant's responsibility to correct. Lease Maintenance Annex § D.7.(b)(2). Then, after the termination inspection, North Star is to receive a Work Authorization from the Government for repairs and cleaning not completed by the occupant. Lease Maintenance Annex § D.7.(b)(3). It is clear from your letter of August 13, 2002 respecting Units 914, 1021, and 1262 that the Government is violating these contractual requirements.

For Unit 914, North Star and the Government completed the pre-termination inspection on July 18, 2002 and the termination inspection on August 6, 2002. However, the Government did not provide North Star with the Notification of Scheduled Change of Occupancy until August 13, 2002, which listed a turnover date of August 17, 2002 and, for the first time with respect to that unit, requested a full carpet replacement (repair work) that had not been noted

North Star Alaska
Housing Corporatio

A
Fischer
Properties
Company

at the pre-termination or termination inspections. Thus, contrary to the requirement that North Star receive notice of the unit turnover date and a list of damage in need of correction at the pre-termination inspection (July 18, 2002), the Government did not provide such notice until four days prior to the date of turnover.

These practices are unacceptable and do not provide North Star with adequate notice to schedule maintenance and repair work. Accordingly, please be advised that North Star is proceeding to schedule repair work for 914 and, pursuant to Section D.5(b) of the Lease Maintenance Annex, will notify the Government the date this unit will be returned to the Government. The Government also waited until three days before turnover of Unit 1262 to notify North Star of additional repair work (carpet replacement) to be performed. As with 914, North Star is scheduling repair work and will notify the Government the date the unit will be returned.

Finally, several incorrect statements in your August 13 letter require your attention. You state that our paperwork for Unit 914 omits certain repair work related to the porch, bath sink, and vinyl. In fact, the second item on our list of maintenance items is replacing cedar boards on the front porch, the third item is replacing the downstairs bath sink, and replacing the downstairs vinyl is listed at the top of the page (where vinyl replacement is always identified). You also state that our paperwork for Unit 1021 omits vinyl repair, when such repair is clearly noted at the top of our list of maintenance items for that unit. Additionally, the carpet in Unit 1262 (for which you have requested replacement) was replaced in September 2001, not September 1998 as you claim in the August 13 letter.

The Government's failure to follow the notification provisions of the Lease respecting unit turnover dates and maintenance requirements will be part of a claim that North Star plans to submit to a contracting officer in the near future.

Sincerely,

Eldon L Wartes

Eldon Wartes
Site Manager

cc: Harold Hopson
cc: Rod Everett

1060 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2800
Facsimile 206 • 328 • 4000
Email fischerpcoy@seanet.com

July 17, 2002

Connie Kiser, Birchwood Housing Manager
Acting 801 Project Manager
Public Works
Fort Wainwright

Dear Ms. Kiser:

Certain Government practices with respect to the calculation of downtime days for units warrant your attention. As we have addressed in previous correspondence, the Government continues to stockpile units and to unnecessarily delay providing North Star with turnover information for units. In addition, the Government appears to be engaged in the practice of delaying the acceptance inspection beyond the time allowed for in the lease, at which time it informs North Star of purported discrepancies in need of correction. The Government's apparent practice of delaying acceptance inspections, and then using acceptance inspections to fabricate discrepancies, unnecessarily delays the turnover of units to new occupants. Moreover, we believe that the Government is including the days the unit is down for correction of these late-identified "discrepancies" (for which, as discussed below, North Star is not responsible or which are not discrepancies at all) to inappropriately calculate downtime and deliberately increase the downtime days charged to North Star.

The Government's conduct with respect to Units 880 1237, 835, and 1205 illustrates the above-mentioned practice. The "discrepancies" noted for each of these units were either not discrepancies or not the responsibility of North Star (recall, however, that North Star addressed each "discrepancy" immediately as a courtesy to the Government). Moreover, even if these discrepancies had merit, the lease requires the Government to conduct an acceptance inspection on the same day that work is complete if notification of work completion is received before 12:00 noon, or before 12:00 noon of the next workday if such notification is received after 12:00 noon. Maintenance Annex Section C.2.(a). The Government is not adhering to this lease term.

North Star completed its work on Units 880 and 1237 on July 3, 2002, on which date it turned both units over to the Government. Over one week later, on July 11, 2002, the Government conducted an acceptance inspection and notified North Star of a purported discrepancy with the units: "mow/cut grass." This discrepancy is incorrect. The grass was mowed at the time the completed units were turned over to the Government on July 3rd, and was scheduled to be mowed again by North Star within a reasonable period of time (since these units would remain unoccupied, and North Star is responsible for grounds maintenance on quarters unoccupied for one week or more). Please also note that the Government is failing to provide North Star with housing

North Star
Alaska
Housing Corporation

A
Fischer
Properties
Company

assignment orders on a consistent or timely basis, such that North Star is not kept apprised of the date on which a unit becomes occupied and relieves North Star of responsibility for its grounds maintenance. In addition, for unit 1237, the Government alleged an additional discrepancy: "hand rail dirty." This is not North Star's responsibility, but rather is the responsibility of the Government cleaners.

North Star completed work on Unit 835 on July 8, 2002. Three days later, on July 11, 2002, the Government conducted an acceptance inspection and notified North Star of a purported discrepancy with the unit: "broken end cap on fridge door bar." This purported discrepancy is a self help repair, and is not the responsibility of North Star.

North Star completed work on Unit 1205 on July 5, 2002. Six days later, on July 11, 2002, the Government completed an acceptance inspection and notified North Star of a purported deficiency with the unit: "freezer rack broken loose from hinges." In fact, the freezer rack was not broken, but rather was missing four slip-on shelf brackets that are the Government's responsibility to work authorize.

We expect the Government to immediately discontinue its practices of delaying the acceptance inspection, holding North Star accountable for discrepancies that are not North Star's responsibility, and using such practices to increase downtime days charged to North Star.

Sincerely,

Eldon Wartes
Site Manager

FAIRBANKS, ALASKA 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

July 15, 2002

Connie Kiser, Birchwood Housing Manager
Acting 801 Project Manager
Public Works
Fort Wainwright

Dear Ms. Kiser:

With regard to the Notification of Scheduled Change of Occupancy forms for units 801, 1055, 1061 and 1042, North Star has provided the Government with the estimated time required to accomplish repair work on these units in accordance with the lease. You have noted on this form "All COM no extra days allowed." As previously stated in section 2 (titled Repair Work vs Change of Occupancy Work) of Ms. Sekyra's letter to you dated June 27, 2002 regarding change of occupancy, the Lease Agreement makes a clear distinction between change of occupancy downtime and repair and renovation downtime and the Government may not dictate the number of days allowed for repair work and renovation downtime.

Sincerely,

Eldon Wartes
Site Manager

North Star Alaska Housing Corporati

A Fischer Properties Company

[illegible]
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 6000
Email fischerprop@seanet.com

April 30, 2002

Mr. Rod Everett
Contracting Officer Representative
Department of the Army
U S Army Eng. Dist, AK.
Fairbanks Residential Office
P O Box 35066
Ft Wainwright, AK 99703Dear Mr. Everett:

This letter is written in response to yours dated April 17, 2002 received by us on April 22, 2002. We request the backup to your downtime calculation for the month of February and March so that we may see how those figures were calculated.

Please provide your calculations as soon as possible.

In the spirit of cooperation, we request that any rent abatement be deferred until you have documented your downtime calculations and we can confer with you on these calculations.

Sincerely,

Eldon Wartes
North Star Alaska Housing

North Star Alaska Housing Corporation
Fischer Properties Company

Fairbanks, Alaska 99703
Telephone 907·356·1616
Facsimile 907·356·1575
Email: [illegible]

1937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206·328·2000
Facsimile 206·328·1000
Email: [illegible]

5/24/02

Rod Everett
Contracting Officer Representative
Department of the Army
U S Army Eng. Dist, AK.
Fairbanks Residential Office
P O Box 35066
Ft Wainwright, AK 99703

**Re: Rent Reduction**

Dear Mr. Everett,

Reference is made to your letter of May 22, 2002 and the three pages of documents beginning with the memorandum for the Commander regarding rent deduction at Birchwood Estates also dated May 22, 2002, which included the actual deduction of rent for excess downtime in the amount of $2,308.25.

No justification has been provided for your calculation of excess downtime for the amount of 25 days. Despite that fact, the government has deducted rent. This action is particularly wrongful when considered with my letter of April 30, 2002 where North Star requested your downtime calculations for the months of February and March since North Star's records demonstrate significantly fewer downtime days than the government's stated figures. No response to my letter has been received and no back up for any downtime calculations has been provided by the government to North Star.

In our letter of April 30, 2002 we requested that we be allowed to confer with you on downtime calculations, a request which was specifically ignored by your actions of May 22, 2002. Again, North Star's calculation of downtime days are significantly less than the government's. We can only conclude that the government's actions are made in bad faith with the specific intent of diminishing the value of the Birchwood property.

Sincerely,

Eldon Wartes
Site Manager
North Star Alaska Housing

North Star Alaska Housing Corporation

Historic Properties Company

1066 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email: fischerprop@seanet.com

May 30, 2002

Colonel Harold D. Hopson
U.S. Army Corps of Engineers
Alaska District
P.O. Box 6898
Elmendorf AFB, Alaska 99506-6898

Dear Mr. Hopson:

On April 24, 2002, the government provided North Star Alaska Housing (North Star) with a payment voucher deducting $2,847.47 from North Star's May 2002 rental payment for, according to the government, "excess downtime" for the months of February and March 2002. On May 23, 2002, the government provided North Star with a payment voucher deducting $2,308.25 from the June 2002 rent for alleged "excess downtime" for the month of April 2002.

North Star had requested that the government provide the backup for its calculations of downtime days since the North Star records reflect that the units were turned over well within the contractually allowed downtime. In addition, as you are aware, the government has recently changed its methods of calculating downtime which North Star asserts is directly contrary to the terms of the contract.

Accordingly, North Star, by letter dated April 30, 2002, requested that "any rent abatement be deferred until you have documented your downtime calculations and we can confer with you on these calculations." That request was ignored and, indeed, the government has not responded at all to North Star's requests.

The government's actions to deduct rent, therefore, calls into question the stipulated rental stream which has serious financial implications to North Star. The government's actions will directly impact the capitalization rate for the project which, in turn, seriously impacts the value of the North Star asset. Simply stated, the government has caused North Star damages in the millions of dollars as a result of its unsupported, and unexplained actions.

Sincerely yours,

Rhonda Sekyra, CPA
Finance / Operations

North Star Alaska Housing Corporation
A Fischer Properties Company

6060 7th Infantry Division Loc
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

August 1, 2002

Rodney G. Everett
Contracting Officer's Representative
Department of the Army
U.S. Army Engineer District, Alaska
Elmendorf AFB, Alaska 99506-6898

Dear Mr. Everett:

I am in receipt of your letter dated July 31, 2002 regarding alleged excess downtime for May and June of 2002 in which you state that $2,350.61 will be deducted from North Star's next rental payment. As North Star has informed the Government, North Star's records do not support the excess downtime calculated by the Government, and indeed show that units are turned over well within the contractually allowed downtime.

Although you have ignored such requests in the past (with respect to February, March, and April, 2002 downtime calculations), North Star expects that you will provide the back-up documentation for your downtime calculations for May and June, 2002, and will refund any abatement of rent until North Star has an opportunity to review such documentation and confer with the Government with respect thereto.

Unless North Star is able to reconcile its downtime calculations with yours, the Government's action in deducting rent will be part of the overall claim that North Star plans to submit to a contracting officer in the near future.

Sincerely yours,

Eldon Wartes
Site Manager

cc: Harold Hopson

North Star Alaska
Housing Corporation

A Fischer Properties Company

1055 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

August 16, 2002

Connie Kiser
801 Housing Manager, Birchwood
Public Works
Fort Wainwright

Subject: 1055 Downtime Days Calculation

Dear Ms. Kiser:

The Notification of Work Completion form for unit 1055, dated June 20, 2002, notes that the Government has assessed 34.5 downtime days for that unit. This calculation is clearly in error and appears to have been made in bad faith. Please immediately provide North Star with the back-up documentation you contend supports this calculation. Please also identify the contractual support for your inclusion of half-days in the downtime calculation for 1055.

Unit 1055 has been, and continues to be, the subject of multiple disputes between North Star and the Government. These disputes (which are discussed in detail in prior correspondence from North Star to the Government respecting the Government's administration of the Birchwood Lease) include the Government's issuing work authorizations that lack reimbursement amounts and conditioning reimbursement for occupant-damage upon receipt of subcontractor invoices; the Government's issuing work authorizations that do not accurately reflect the information noted on inspection forms; the Government's failure to distinguish between repair work and change of occupancy maintenance ("COM"); the authority of the Birchwood Housing Manager to order disputed work; and the use of the acceptance inspection to reject units for purported deficiencies that do not exist ("1055 Disputes").

The Government appears to have used the time associated with the 1055 Disputes – including the Government's own delay in responding to North Star's written requests for additional information respecting work to be performed – to improperly inflate the calculation of downtime for 1055 to 34.5 days. In fact, North Star's review of the timeline of events surrounding 1055 reveals that North Star spent a total of 1 day performing COM and 3 days performing repair work (i.e. major work such as carpet replacement) on that unit (as we informed you in previous correspondence, the Lease distinguishes between COM and repair work for purposes of calculating downtime). The timeline is as follows:

North Star Alaska Housing Corporatio

A Fischer Properties Company

- April 29, 2002 – The pre-inspection of Unit 1055 reveals urine odor and detection on the carpet.

- April 30, 2002 – Government notifies North Star that unit 1055 will be turned over for change of occupancy maintenance ("COM") on June 10, 2002. North Star tells the Government the unit will be turned back to the Government on June 12, 2002.

- May 29, 2002 – The Final Inspection of 1055 notes urine detection in the living room, downstairs hall, upper hall, steps, and bedroom.

- June 5, 2002 – Government changes the turnover date to June 17, 2002, necessitating the rescheduling of carpet replacement by North Star.

- June 6, 2002 – North Star informs the Government that 1055 will be returned to the Government on June 19, 2002.

- June 17, 2002 – Government turns 1055 over to North Star for COM. The Government issues a work authorization form identifies only living room carpet replacement despite the fact that the inspection form notes pet stains on the upper hall, steps, and bedroom. The work authorization also requires an invoice from North Star as a condition for reimbursement – a change from prior practice. The Government also issues a Maintenance Issue form directing North Star to replace the vinyl in the upstairs hall bath. No problems with this vinyl existed which would necessitate replacement, nor were any such problems noted on the inspection form. North Star repairs the vinyl anyway.

- June 20, 2002 – North Star returns unit 1055 to the Government, with the living room carpet replaced, at 11:15 a.m. (Note that North Star performed 1 day of COM and one day of repair work).

- June 22, 2002 (Saturday) – North Star is sent a handwritten fax from the Government listing alleged deficiencies: (1) doorknobs have paint on them; (2) vinyl in bathroom needs replacement; and (3) the remote to the garage is missing. North Star is sent a second fax stating that carpet replacement is not complete, and the unit will be reissued for replacement at a later date.

- June 24, 2002 (Monday) – North Star receives the June 22 faxes and inspects the unit. North Star's inspection reveals no deficiencies – there is no paint on the doorknobs, the vinyl is not deficient, and the

remote is in a drawer (where the Government inspector typically places it after the final inspection).

- June 28, 2002 – North Star writes to the Government seeking answers to questions regarding reimbursement for work authorized repairs to 1055.

- July 1, 2002 – North Star receives a Deficiency Return Notification from the Government stating "the deficiencies had not been corrected so the unit is now officially being returned" and "insufficient carpet replacement which the unit will be re-issued for on July 8, 2002."

- July 2, 2002 – North Star requests that the Contracting Officer Representative ("COR") inspect the unit since North Star disputes the Deficiency Return Notification with respect to paint, vinyl, and the remote control. The COR does not find any deficiencies, but informs North Star it must replace it anyway if directed by the Birchwood Housing Manager. North Star sends a letter to the COR requesting his direction in writing. North Star also sends a letter to you stating that it returned the keys to the Government because no further work was required, and that it had requested direction from the COR to perform any further work. You responded to North Star by your letter of the same date, denouncing COR authority and stating that the unit is not in acceptable condition and downtime will continue while "deficiencies" remain. The Government issues another work authorization for the carpet replacement that was omitted from the initial June 17, 2002 work authorization.

- July 5, 2002 – North Star writes to the Government with questions and concerns regarding the July 2, 2002 work authorization form.

- July 8, 2002 – Unit 1055 is reissued to North Star, necessitating another carpet replacement rescheduling.

- July 9, 2002 – North Star returns to the unit to the Government after replacing the carpet on the stairs and in the bedroom and upstairs hall. (Note that North Star performed 2 days of repair work).

- July 10, 2002 – The Government accepts the unit, but continues to dispute the vinyl replacement issue. The Birchwood Housing Manager directs North Star to replace the vinyl. North Star writes to the Contracting Officer ("CO") regarding the contractual requirement that the COR order disputed work. This letter states that "as soon as we

have this direction and the dollar amount work authorized, we will give the Government a date as to which we will be returning to the unit and commence work directed."

- July 15, 2002 – North Star writes a letter to the Government regarding its failure to distinguish between COM and repair work.
- July 19, 2002 – North Star receives a response from the CO, dated July 3, 2002, regarding authority to order disputed work.
- July 22, 2002 – The Government provides North Star with a Notification of Work Completion for 1055, which notes a downtime calculation of 34.5 days.

The 34.5-day figure appears to include each day between June 17, 2002 and July 22, 2002, excepting one holiday. This calculation is obviously incorrect for this and other reasons as discussed above. Once again, please provide the back-up documentation you contend supports your downtime total for 1055. Finally, please be advised that the Government's past and present improper calculations of downtime days (and any associated rent abatement) will be the subject of a claim that North Star plans to submit to a CO in the near future.

Sincerely,

Eldon Wartes
Site Manager

cc: Harold Hopson
cc: Rod Everett

NOTIFICATION OF WORK COMPLETION

DATE: 6/20/02
TIME: 11:15

FROM: DEVELOPER / CONTRACTOR
TO: HOUSING DIVISION ATTN: Ms Kiser

SUBJECT: Notification of work completion and unit availability.

1) This certifies that all required work at 1055 has been completed and the unit is ready for occupancy.

2) Completed work includes reimbursement work identified on work authorization # ________

and dated ________

Signature: [signature]
NSAH rep.

Received by: Connie Kiser
Housing rep.

Date and Time: 22 July 02 (1300) (From CDC Tag)
(34.5 down days)
(Calculation of charges to follow)

1066 7th Infantry Division Loop
Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

7/02/02

Rod Everett
Contracting Officer Representative
Department of the Army
U S Army Eng. Dist, AK.
Fairbanks Residential Office
P O Box 35066
Ft Wainwright, AK 99703

Re: **1055 Sims**

Dear Mr. Everett,

As I mentioned to you this morning when we looked at unit 1055 Sims, I am waiting for direction from you as the designated Contracting Officer Representative with respect to issues pertaining to this unit.

I specifically require direction from you as to the upstairs hall bath vinyl replacement, the carpet and pad replacement on the steps, up hallway and bedroom 3, the paint on the doorknobs, and the garage door opener. We do not believe the vinyl needs replacement. The carpet replacement needs a dollar amount added. The doorknobs are fine, and the garage door opener is in its place.

If you direct North Star to do any of this work please advise us as to what dollar amount the Government is Work Authorizing for this work. As soon as we have this direction and the dollar amount Work Authorized we will give the Government a date as to when we will be returning the unit and commence work directed.

Sincerely,

Eldon Wartes
Site Manager
North Star Alaska Housing

North Star Alaska
Housing Corporation

A Fischer Properties

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1615
Facsimile 907 • 356 • 1571
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2001
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

March 15, 2002

Col. David B. Snodgrass
Director of Public Works
730 Quartermaster Road
APVR-RTW
Ft Richardson, AK 99505-5000
(907)384-3000
fax (907)428-1186

Re: Your letter dated 2/28/02

Dear Col. Snodgrass,

The in formation you received from your subordinates as set forth in your letter dated February 28, 2002 was significantly incorrect. May I extend to you North Star Housing's sincere hope that we may develop a meaningful and productive working relationship. We would very much like to change what is clearly an advisory relationship practiced by certain of your subordinates. Mr. Fischer and I are available to meet with you at any mutually agreeable time to discuss the contents of your letter of February 28th 2002 and any other maters of dispute between our two organizations.

Let me now turn to the statements in your letter. First, to put things in perspective, overcharges referenced in the first paragraph totaled $135.00. The government deducted $45.00 from our Work Authorized Billing in November 2000. The overcharge was a mistake and we have refunded the $90.00.

Despite our prompt response to this discovery, a formal audit was initiated which we understand has resulted in a "formal copy of the audit report."[1] Your second and third paragraph states as follows:

> I have now received the formal copy of the audit report, which recommends that NSAHC replace the work authorizations missing from the Birchwood facility history files. The auditors are unable to complete their task until this quality control problem has been corrected.
>
> This situation, as you are aware, precludes the government from considering any performance award for NSAHC for 2001 (or for any part of 2002 for which it remains unresolved).

1 Please provide me with a copy of this report.

North Star Alaska Housing Corporation

A Fischer Properties Company

The facts of the matter are that the unit files in my office contain the work orders with descriptions of work and the government work authorization number on that work order. Every few years those work orders are removed from the files and a spreadsheet documenting each work order is added in their place. The actual government supplied work authorizations files are boxed by unit month and year in our shop. During the audit I explained all this to the government auditor, including showing him the boxes containing the actual work authorization files. I specifically asked him if he wanted me to get the files down for him. His response was "no, not at this time" I will ask my boss if he wants me to go through those and if so, I will come back up here next week to examine those work authorizations. He did come back the following week but spent little time here at our offices and did not mention or ask for the work authorizations. We have heard nothing further until your letter.

You also refer to Mr. Everett's letter of January 17, 2002 as directing North Star to "return the missing documents". That is incorrect. Mr. Everett's letter only asked us to devise a system to refer to work authorizations which, as described above, we have in place.

Your letter uses the above described "Quality Control problems" as justification for not considering any performance award for 2001. You may not be aware that, even if true (which it is not), this justification is untimely. The lease is clear that the award is to be determined no later than March 1st, and this letter was received on March 6th 2002. Thus, the excuse for no performance award is not only unjustified on the facts but is not timely.

North Star again offers to meet with you at a mutually convenient time in an attempt to set the framework of discussions and procedures which hopefully will negate comments and misunderstandings such as those set forth in your letter dated February 28th 2002.

Sincerely,

Eldon Wertes
Site Manager
North Star Alaska Housing

Fairbanks, Alaska 99703
Telephone 907 • 356 • 1616
Facsimile 907 • 356 • 1575
Email nsah@polarnet.com

937 Harvard Avenue East
Seattle, Washington 98102
Telephone 206 • 328 • 2000
Facsimile 206 • 328 • 4000
Email fischerprop@seanet.com

May 24, 2002

Col. David B. Snodgrass
Director of Public Works
730 Quartermaster Road
APVR-RTW
Ft. Richardson, AK 99505-5000

Re: **Petersen's letter of 4/12/02**

Dear Col. Snodgrass:

This is in response to Mr. Peterson's letter to Mr. Fischer of April 12, 2002 received on or about April 23, 2002. a copy of which is attached.

First, your letter dated February 28, 2002 belatedly used "missing documents" as the reason for the government's failure to consider any performance awards for 2001 and, in part, 2002. My letter of March 15, 2002 corrected the misstatements of fact in your letter concerning "missing documents."

Simply stated, the documents were never missing. They were fully available to the auditors and, as I stated in my letter of March 15, 2002, the auditor stated that he did not want to see them. Further, as stated in my March 15, 2002 letter, we were simply requested to reorganize the existing documents, which has been done.

Despite these unrefuted facts, your Mr. Peterson again refers to "missing documents" and uses this as an excuse for the government's failure to complete its audit.

The government's action in this regards can only be perceived as being made in bad faith with the specific intent of diminishing the value of the Birchwood property.

Sincerely,

Eldon Wartes
Site Manager
North Star Alaska Housing

North Star Alaska Housing Corporation

A Fischer Properties Company

# North Star Alaska Housing Corporation

1056 7th Infantry Division Loop
Fort Wainwright, Alaska 99703
Telephone (907)356-1616
Fax (907)356-1575

## Memorandum

**Date:** June 26, 2002

**To:** Harold Hopson (fax 907-753-1836)

**From:** Richard W. Fischer

**RE:** **North Star Alaska Housing Officers** **2 pages total**

---

The following individuals are corporate officers of North Star Alaska Housing Corporation:

| | |
|---|---|
| President | Richard W. Fischer |
| Vice President | Dennis Wertz |
| Secretary/Treasurer | Rhonda R. Sekyra (please see attached corporate resolution) |

Mr. Eldon Wartes is the designated Site Manager for North Star Alaska Housing Corporation.

Richard W. Fischer, President

cc: Rodney Everett
cc: Connie Kiser

# NORTH STAR ALASKA HOUSING CORPORATION

## CONSENT IN LIEU OF ANNUAL MEETING OF DIRECTORS

The undersigned, being all the directors of North Star Alaska Housing Corporation, an Alaska corporation, hereby consent to the adoption of the following resolutions:

RESOLVED, that the following person is elected to serve as a officer of the corporation for a term expiring on death, resignation or removal from office, or the election of a successor: Treasurer, Rhonda Sekyra.

DATED at Seattle, Washington on December 17, 1996

Richard W. Fischer

:24 pm

Birchwood Manor/North Star
Value Analysis

| | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | Total | Average | Units | Average/ Unit |
|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | |
| North Star | 1,707.96 | (6.62) | (13.72) | (13.69) | 2.90 | (1.50) | | $ (6.52) | | |
| Polar Star | 1,100.38 | 12.79 | 11.68 | 19.52 | 31.33 | 23.17 | | $ 19.70 | | |
| Difference | | | | | | | Difference | $ 26.22 | | |
| **Total Expenses** | | | | | | | | | | |
| North Star | $ 518,082 | $ 519,769 | $ 641,250 | $ 554,119 | $ 725,742 | $ 1,242,053 | | | | |
| Polar Star | $ 503,982 | $ 509,428 | $ 501,207 | $ 502,638 | $ 509,360 | $ 714,498 | | | | |
| Deviation from Base Year | Base Year | | | | | | | | | |
| North Star | $ 518,082 | $ 1,688 | $ 123,169 | $ 36,038 | $ 207,661 | $ 723,972 | $1,092,528 | $ 218,505 | 400 | $ 546.26 |
| Polar Star | $ 503,982 | $ 5,446 | $ (2,775) | $ (1,346) | $ 5,378 | $ 210,516 | $ 217,219 | $ 43,444 | 300 | $ 144.81 |
| Deviation Difference | | | | | | | $ 875,307 | | | $ 401.45 |
| Deviation difference times # of North Star units | | | | | | | | $ 175,061 | | $ 160,580 |
| **Unit Expenses** | | | | | | | | | | |
| North Star | $ 1,295 | $ 1,299 | $ 1,603 | $ 1,385 | $ 1,814 | $ 3,105 | | | | |
| Polar Star | $ 1,680 | $ 1,698 | $ 1,671 | $ 1,675 | $ 1,698 | $ 2,382 | | | | |
| Deviation from Base Year | Base Year | | | | | | | | | |
| North Star | $ 1,295 | $ 4 | $ 308 | $ 90 | $ 519 | $ 1,810 | $ 2,731 | $ 546 | | |
| Polar Star | $ 1,680 | $ 18 | $ (9) | $ (4) | $ 18 | $ 702 | $ 724 | $ 145 | | |
| Difference | | $ (14) | $ 317 | $ 95 | $ 501 | $ 1,108 | $ 2,007 | $ 401 | | |
| difference times # of North Star units | | | | | | | | $ 160,580 | | |

| Capitalization Rate | Rate | Ak. Adjust | Total |
|---|---|---|---|
| Institutional | 10.00% | 1.00% | 11.00% |
| Non-Institutional | 12.00% | 1.00% | 13.00% |

**VALUES**

Before/After Based on Expense& Cap Rate Differences

| | | Before Value | After Value | Difference |
|---|---|---|---|---|
| [1] | Effective Gross Income | $ 8,191,043 | $ 8,065,171 | |
| [2] | Operating Expenses | $ 1,081,473 | $ 1,242,053 | |
| | Net Operating Income | $ 7,109,570 | $ 6,823,118 | |
| | Rate | 11.00% | 13.00% | |
| | Value | $ 64,632,452 | $ 52,485,521 | |
| | Rounded | $ 64,632,000 | $ 52,486,000 | |
| | Difference | | | $ 12,146,000 |

[1] Re: revenue Anal. NSAH for before, Revenue difference (see below) for after.
[2] Before are actuals less deviation difference * 400 units,
After are actuals for 2001 from above

**Income and Expense Difference**

| | | |
|---|---|---|
| Five year expense deviation/unit | $ 2,007.25 | |
| Five year revenue deviation/unit | $ 26.22 | |
| Total expense difference | $ 2,033.47 | |
| Number of units | 400 | |
| Total expense difference | | $ 813,390 |

**Revenue Difference**

| | | |
|---|---|---|
| North Star Revenue/unit/month | $ 1,706.47 | [2001] |
| Valance in Revenue/Unit/Month | 26.22 | |

Capitalization Rate
Band of Investment

| | | Ratio | Rate | Wt. Rate |
|---|---|---|---|---|
| Institutional | Equity | 30% | 15.00% | 4.50% |
| | Debt | 70% | 9.00% | 6.30% |
| | Total | | | 10.80% |
| Non-Inst. | Equity | 50% | 20.00% | 10.00% |
| | Debt | 50% | 10.00% | 5.00% |
| | Total | | | 15.00% |
| Difference | | | | 4.20% |

Korpacz

| | |
|---|---|
| Difference | 1.03% |

Scott + Dupree (Tentative) 2.00%

Forbes/Lehman

| | |
|---|---|
| High Risk (Unrated) | 11.25% |
| Low Risk (=/> BBB) | 8.22% |
| Difference | 3.03% |

Moody/Treasury

| | |
|---|---|
| Moody (Baa) | 7.76% |
| 10 Year Treasury | 4.51% |
| Difference | 3.25% |

Q And isn't that sentence consistent to what you just told the Court, that it was your understanding that the units would be turned over to North Star as they became available from the tenants, and then cleaned by the government? Isn't that consistent with your previous testimony?

A Yes, sir.

Q Okay. And you see no reason, do you, sir, for the government to hold onto units as opposed to releasing them to North Star for change of occupancy as they are released by the previous tenant? You don't see any reason for the government to hold them, do you?

A I don't know what the reasons are. I understand that there have been some reasons for the government to delay issuance, or delay the pre-termination inspection or delay issuance of units after the occupants have moved out.

Q Okay, sir.

A But I don't know the specific reasons.

Q So you don't know any specific reasons?

A No, sir.

Q And you know, did you not, when you were the contracting officer that if the downtime was exceeded, that rent abatement damages could be assessed? Isn't

that true?

A Yes, sir.

Q Okay. And you knew they could add up to significant dollars, correct?

A Yes, sir.

Q And you knew as an individual who has been involved in real estate since 1985, that the way to value a commercial property is to look at a stream of income for that property and the expenses for that property; isn't that true?

A I'm not an appraiser, but I do realize that there is three approaches to most commercial appraisal and residential appraisal, commercial appraisal, I think.

Q Commercial. I mean, you realize that the way to appraise commercial property is to analyze a stream of income and the expenses for that property; isn't that true?

A That is one way; yes, sir.

Q Okay, and you knew this in 2002, correct?

A Yes, sir.

Q Now, sir, I would like you to keep the lease in front of you, if you would, and if you would look at Plaintiff's Exhibit 93. It's in the same book.

A Um-hmm.

Do you see that, sir?

A Yes.

Q Now, you never made an investigation or you didn't make an investigation at this time into the calculation of North Star's damages, did you?

A No.

Q And can you tell us what capitalization rate is, sir?

A I can tell you what I -- I think it has to do with the profit versus expense.

Q Did you direct anybody to do an investigation at this time into North Star's damages?

A No, sir.

Q Now, in February of 2002, the government began deducting monies from North Star's rent, did they not?

A Yes, sir.

Q And what for?

A For excessive downtime.

Q And you're a contracting officer. That must have been done under your direction, correct?

A Yes, sir. Not direction, but at least permission. I don't know what's the -- unless it was over $10,000.

Q But you're the man responsible?

A Right.

Q And you knew that was serious, did you not, sir, to offset an income flow on an investment property?

A Yes, sir. The whole lease is serious.

Q Pardon?

A The whole lease is serious.

Q Absolutely, and no argument there at all. But in terms of the action, when you're offsetting an income stream on an investment property, you knew as a man that's been in real estate since 1985 that was a very serious move, didn't you?

A Yes, sir.

Q And what investigation did you make personally as the contracting officer on this lease to determine whether or not the government's actions were correct or not correct?

A I talked to my contracting officer's representative, and asked him to check the calculations to make sure that these calculations are accurate.

Q But you never looked at them yourself, did you?

A No, sir.

Q And in February of 2002, this was the first

that North Star said they hadn't been receiving the backup? Is that the first time you were aware?

A I don't recall. I think it may have been.

Q Okay. Let me refer you to Exhibit K, sir. Exhibit K contains two letters. One is a letter from Mr. Everett to Mr. Wartes, and then there is a letter, a second letter, which is a letter to you dated May 30, 2002.

Do you see that?

A Yes.

Q And you received that letter, sir?

A Yes, I did.

Q And the second paragraph -- I'm sorry, the first paragraph talks about rent being deducted, correct?

A Yes, sir.

Q And the last paragraph of the letter talks about the seriousness of deducting rent because of the issue with respect to the rental stream which has serious financial implications to North Star.

Do you see that, sir?

A Yes, sir.

Q Okay. It talks about the actions will directly impact the capitalization rate for the project, which, in turn, serious impacts the value of

the North Star assets.

Do you see that?

A Yes, sir.

Q So you were put on specific notice that these actions were having serious financial impacts on North Star Alaska Housing at at least May 30, 2002, correct?

A Yes, sir.

Q And what did you do? As a contracting officer whose job is to be fair and equitable, what did you do when you received this letter on May 30, 2002?

A I don't recall specifically when I received this letter, but I do recall on several different occasions talking to my contracting officer to assure that they were not taking down days for any time between -- that the government was late in their inspection, the final inspection, and to also make sure that North Star was being given an opportunity to view the calculations.

Q And if they weren't being given an opportunity to review the calculations, you can't provide this Court with any good faith reason why they wouldn't be, can you?

A No, sir. As a matter of fact, I thought